UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| JOSHUA BLANCETT,<br>PLAINTIFF, | §<br>§<br>§ | |
| VS. | §<br>§<br>§ | CASE NO. 6:16-CV-00024 |
| | § | JURY DEMANDED |
| CARGILL MEAT SOLUTIONS, CORP.<br>DEFENDANT, | §<br>§ | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE THE
TESTIMONY OF DR. CATHERINE ADAMS HUTT, PHD, RD, CFS**

**TO THE HONORABLE DISTRICT COURT JUDGE:**

JOSHUA BLANCETT ("Plaintiff") asks the Court to deny CARGILL MEAT SOLUTIONS, CORP.'s ("Defendant") Motion to Exclude the Testimony of Dr. Catherine Adams Hutt, Ph.D, RD, CFS, Plaintiff's expert witness, and shows the Court the following:

## I.  FACTUAL BACKGROUND

1.  This case revolves around several chubs of ground turkey meat that were placed into commerce by Defendant and sold to the public near the Waco, Texas area. Plaintiff purchased and consumed several chubs of ground turkey, and subsequently, became ill. Plaintiff experienced severe abdominal and intestinal pain, anal bleeding and other symptoms that Plaintiff attributes to bones and ossified, connective tissue that were present in the ground turkey sold by Defendant. Plaintiff retained Dr. Hutt to test, examine and render opinions regarding four turkey bones that Plaintiff found in a Honeysuckle White Ground Turkey chub, and the contents of two unopened Honeysuckle White Ground Turkey chubs that were purchased by Plaintiff at the same time.

## II.  SUMMARY OF ARGUMENT

2.  In Defendant's motion, Defendant champions the erroneous position that Dr. Hutt's

testimony should be struck because her opinions allegedly lack factual support, are speculative, and are not reliable or relevant.

3.    This Court should not strike Dr. Hutt's testimony because Plaintiff contends that a full gatekeeper proceeding is not required, since this is an "ordinary" case in which the reliability of Dr. Catherine Adams Hutt's methods can be properly taken for granted. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-52 (1999).    Plaintiff further contends that Dr. Hutt's reliability has not been "called sufficiently into question" by Defendant to necessitate or require a full gatekeeper proceeding. *Id.*

4.    Furthermore, Plaintiff objects to Defendant's motion because all of the issues raised in the motion are directed towards the weight and credibility of Dr. Hutt's testimony, rather than the admissibility of her opinions.

5.    Additionally, Plaintiff contends that Dr. Hutt's testimony is reliable because Dr. Hutt's testimony is based upon sufficient facts or data; (2) is the product of reliable principles and methods; and (3) Dr. Hutt applied the principles and methods reliably to the facts of this case. FED. R. EVID 702; *Smith v. Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir.2007).

6.    Moreover, Dr. Hutt's testimony is admissible because the testimony will "assist the trier of fact to understand the evidence or to determine a fact issue.    FED. R. EVID. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).

### III. BURDEN OF PROOF

7.    The responding party has the burden of establishing the admissibility of the expert's testimony under FRE 702 by a preponderance of the evidence.    *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir.2002).    The responding party does not, however, have the burden of proving that the expert's opinions are correct.    *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir.1999); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155-56 (3rd Cir.2000)(evidentiary requirement

for reliability is lower than standard for proving case). The gatekeeper analysis should be focused on principles and methodology, not on the conclusions the experts generate. *See Guy v. Crown Equip. Corp.,* 394 F.3d 320, 325 (5th Cir.2004). Concomitantly, the responding party does not have to show that it will win its case on the merits; rather, it must only show that the requirements of the Federal Rules of Evidence have been met. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3rd Cir.1994).

8.      Under FED. R. EVID. 702, the Court's role as a gatekeeper is not intended to replace the adversary system, but rather, the Court should permit vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof that are traditional and appropriate means for attacking admissible evidence. *See Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 250 (5th Cir.2002).

## IV. ARGUMENT AND AUTHORITIES

### A. THIS COURT SHOULD PERMIT DR. HUTT TO TESTIFY BECAUSE DR. HUTT IS QUALIFIED BY KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION.

9.      A court should allow the testimony of an expert witness who is well qualified by knowledge, skill, experience, training, or education to render an opinion based on scientific, technical, or other specialized knowledge. FED. R. EVID. 702(a); *see Pipitone,* 288 F.3d at 244. As long as a reasonable indication of qualifications is offered, qualifications become an issue for the trier of fact, not the court. *See Rushing v. Kansas City S. Ry.,* 185 F. 3d 496, 507 (5th Cir.1999).

10.     Based on Dr. Hutt's knowledge, skill, experience, training and education, Dr. Hutt is clearly qualified to testify about the turkey bones, fragments and ossified connective tissue that were found in the ground turkey chubs sold to the public by Defendant and purchased by Plaintiff.  (Ex. P-1, Hutt C.V., pgs. 1-7)(Ex. P-8,Hutt Depo. 9:8-16:25; 17:14-18:16; 52:6-52:24; 107:19-108:12)

**B. THIS COURT SHOULD PERMIT DR. HUTT TO TESTIFY IN THIS MATTER BECAUSE DR. HUTT'S TESTIMONY IS RELIABLE.**

11.    A court should allow the testimony of an expert if is it reliable.    *Khumco Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592-93 (1993).    For the expert's testimony to be reliable, the following requirements must be met: (1) the testimony must be based on sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must reliably apply the principles and methods to the facts of the case.    FED. R. EVID. 702; *see Smith v. Goodyear Tire & Rubber Co.,* 495 F.3d 224, 227 (5th Cir.2007).

**1.    DR. HUTT'S TESTIMONY IS BASED UPON SUFFICIENT FACTS OR DATA.**

12.    "Sufficient facts and data" may include inadmissible evidence, hypothetical facts, and other experts' opinions.    *Rudd v. General Motors Corp.,* 127 F. Supp.2d 1330, 1343 (M.D.Ala.2001).    When reviewing the sufficiency of the underlying facts, the court must determine whether the expert considered enough facts to support the opinion.    *See Pipitone,* 288 F.3d at 249.    Even if experts reach different conclusions based on competing versions of the facts, the court should not exclude an expert's opinion simply because the court believes another version of the facts or considers the evidence doubtful or tenuous.    *Pipitone,* 288 F.3d at 249. The factual basis of an expert's opinion generally relates to the weight a jury should give that opinion and the expert's credibility, not to the testimony's admissibility.    *Primrose Oper. Co. v. National Am. Ins.,* 383 F.3d 546, 562 (5th Cir.2004)(questions about basis and sources of expert's opinion generally affect the weight to be assigned to that opinion rather than its admissibility and should be left for the jury's consideration).

13.    Dr. Hutt's opinions can be summarized as follows: (1) The bones in the Honeysuckle White Ground Turkey Product and ingested foreign material is from turkey and not a different species; (2) hardened/ossified connective tissues were found in the two unopened Honeysuckle

White Ground Turkey chubs purchased at the time the products were ingested, and (3) the size of the bone fragments and hardened/ossified connective tissue are consistent with the apparent grind size of the Honeysuckle White Ground Turkey that could have been processed together by Cargill Meat Solutions. (Ex. P-2, Hutt Report, pgs. 1-22)(Hutt Depo, pgs. 18:21-19:14; 54:20-54:25; 108:13-113:1)

14.     In determining that the bone in the Honeysuckle White Ground Turkey product and ingested material is from turkey and not a different species, Dr. Hutt received a total of four bone fragments, two unopened and commercially packaged chubs of Honeysuckle White Ground Turkey and several photographs that were obtained by Plaintiff of the turkey bones and ossified connective tissue that were present in the partially consumed turkey chub ingested by Plaintiff. (Photos from Dr. Hutt Depo. labeled Ex. P. 4-7, 9-10; Ex. P. 11-12).

15.     Dr. Hutt sent four bone fragments that originated from an opened and partially consumed turkey chub, and two commercially packaged and unopened ground turkey chubs to Certified Labs of the Midwest in Bolinbrook, Illinois ("Certified Labs").    (Hutt Report, p.2)(Hutt Depo. 19:15-21:3) (Ex. P.13-18).   Prior to Dr. Hutt sending the samples to Certified Labs, Dr. Hutt reviewed a Report of Microscopic Examination that was performed by Alteca Laboratories ("Alteca Labs") at the request of both Defendant's representative and Plaintiff.    (Ex. P.3, Alteca Lab. Report) (Hutt Depo., 21:4-21-20).    Alteca Labs performed a qualitative analysis of the bone fragments that included: stereomicroscopy, PLM (polarized light microscopy), FITR (Fourier transform infra-red) analysis and RSID (rapid stain identification) reader and cook/bake test.   *Id.*   Alteca Labs concluded that the turkey meat on the bone fragments were a quality match to the Honeysuckle White Ground Turkey that was contained in the *Ziplock* bag that was sent to Alteca Labs by the parties. (Hutt Depo, 22:3-23:1).

Even thought Alteca Labs was able to determine that the meat on the bone fragments was

a quality match to the Honeysuckle White Ground Turkey meat, Alteca Labs did not speciate the meat to determine that the meat was, in fact, turkey. (Ex. P.3, Alteca Lab. Report). Consequently, Dr. Hutt sent the samples to Certified Labs who ran a battery of tests on the bone fragments and two unopened packages of ground turkey.  (Ex. P-13-18).  Neil Rogman, Molecular Supervisor for Certified Laboratories concluded that the ground turkey samples contained "Turkey DNA." (P.19, Certified Laboratories, Inc. Report, pgs. 1-20).

Dr. Hutt further testified, that hardened and ossified connective tissues were found by Certified Labs when they tactilely examined the two unopened Honeysuckle White Ground Turkey chubs purchased by Plaintiff. (Hutt Report)  Although Certified Labs did not find any bone fragments in the unopened turkey chubs, Certified Labs did reveal that the unopened turkey chubs contained five hardened and partially ossified connective tissue elements.  (Hutt Report, p. 7-21)(Certified Lab Report pgs. 7-20)

Based upon the series of tests which included tactile examinations of both the turkey bones and turkey meat contained in the unopened turkey chubs, magnifications of the bone and ossified connective tissue, along with DNA tests performed and confirmed by Certified Labs, Dr. Hutt opined that the dangerous defective bones and ossified connective tissue should never have been sold to the public by Defendant because the defective material, once consumed, may cause damage to the mouth, throat, stomach lining and other parts of the body. (Hutt Depo, pgs. 27:10-31:10; 36:1-48:22-51:3; 61:7-63:7)

Lastly, Dr. Hutt opined that the size of the bone fragments and hardened/ossified connective tissue are consistent with the apparent grind size of the Honeysuckle White Ground Turkey that could have been processed together by Cargill Meat Solutions.  In this regard, Dr. Hutt did disagree with Alteca Labs opinion that the raw bone fragments were too large in size to have been processed with the ground turkey.  (Hutt Depo., 23:19-24:9; 28:18-29:23;

33:18-33:25)   Clearly, the bone fragments were processed and packaged with the Honeysuckle White Ground Turkey because the meat from both labs matched the meat inside the chubs.

With respect to the grind size of the ossified material found in the two unopened chubs, Dr. Hutt indicated that Certified Labs examined the ossified connective tissue and concluded that the ossified connective tissue was consistent with the grind size of the Honeysuckle White Ground Turkey and could have been processed by Defendant.   (Hutt Depo., p. 27:10-27:23; 36:20-37:6; 37:17-46:46:21; 74-20-75:20; 87:2-88:18)(Hutt Report).    Accordingly, consultation with other experts can be a reliable and appropriate methodology under *Daubert*. *See Baldwin Graphic Systems, Inc. v. Sibert Inc.,* No. 03 C7713(N.D.Ill.2005).

**2.   DR. CATHERINE ADAMS HUTT'S TESTIMONY IS THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS**

Experts may rely on a variety of sources of information and may use a similarly wide choice of methodologies in developing an expert opinion.   *See Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1020-21 (7th Cir.2000).    For an expert's testimony to be admissible, the expert is not required that show that he performed the most elaborate tests or studies imaginable.    *Oddi v. Ford Motor Co.,* 234 F3d 136, 160 (3d Cir.2000).    An expert may rely upon reports of others to formulate his opinions, and such reliance is often an indicia of reliability.   *See Johnson v. Samsung Electronics America Incorporated,* 1377 F.R.D. 161, 165-66 (E.D.La. 2011).

In rendering her opinions, Dr. Hutt sent the turkey bones and unopened turkey chubs to Certified Labs where they performed visual, physical, microscopic, amplification, and PCR analysis to characterize the DNA of the meat found on the turkey bones and chubs. (Hutt Depo., 81:18-82:7)   The battery of tests performed by Certified Labs actually proved the species that the meat originated from was turkey, and not some other species. (Hutt Depo., 25:12-26:7)   The tests performed by Certified Labs also revealed that the unopened turkey chubs contained numerous ossified fragments that are dangerous defects and should not have been placed into

commerce and sold to the public for consumption.    (Hutt Depo., 26:8-27:1; 27:25-31:10)    Dr. Hutt bases her opinion that turkey bones and ossified materials are unsafe due to their potential to cause harm to consumers.    (Hutt Depo., 54:1-54:9; 79:4-79:9)

Dr. Hutt's testimony is the product of reliable principles and methods because she is able to detail and describe the process employed by Certified Labs upon which she bases her opinions.    (Hutt Depo., 32:4-51:3)    Dr. Hutt's opinions are based on the investigative procedure utilized by Certified Labs-a lab she trusted, her passed experience in working with these types of cases in both the private and public sector, and the impact foreign and defective products have on consumers.    (Hutt Depo. 55:22-56:11; 74:12-74:19; 84:19-85:15)    Prior to rendering her opinions, Dr. Hutt maintained the fragments and materials in a frozen state when she sent the fragments and materials to Certified Laboratories where the material could be tested under a controlled environment by trained technicians.    (Hutt Depo., 80:4-80:23; 90:10-92:7) Although Dr. Hutt is not required to perform the most elaborate testing on the material, the tests performed on the specimens analyzed by Certified Labs were unique in evaluating the products. (Hutt Depo., 97:19-98:4; 80:4-80:11)

In Defendant's motion, Defendant argues that Dr. Hutt did not photograph the turkey product, did not study the turkey product, did not perform a tactile investigation of the turkey product, and did not do any independent analysis of the turkey product in arriving at her conclusion.    Defendant's arguments about the basis and sources of Dr. Hutt's opinions generally affect the weight assigned to those opinions and are more proper for jury consideration than the remedy Defendant seeks in excluding Dr. Hutt's testimony. *Primrose Oper. Co. v. National Am. Ins.*, 383 F.3d 546, 562 (5th Cir.2004).    Consequently, the ultimate credibility determination and the testimony's accorded weight are for the jury to decide. *See Cruz-Vasquez v. Mennonite Gen. Hosp., Inc.* 613 F.3d 54, 59-60 (1st Cir.2000).

Defendant further argues that Dr. Hutt did not see the video taken by Plaintiff of Defendant's processing plant. However, Dr. Hutt testified that the video would not have changed her testimony. (Hutt Depo. 57:11-59:10). Defendant's argument that Dr. Hutt could have done a better job is irrelevant. *Oddi* at 156. Additionally, Defendant's argument lacks merit because experts routinely rely upon other experts hired by the party they represent for expertise outside of their field. *See Apple Inc., v. Motorola, Inc.,* 757 F.3d 1286, 1321 (Fed. Cir.2014). Both Certified Labs and Alteca Labs opined that the turkey bone fragments and ossified connective tissue were of turkey origin and were contained in Defendant's plastic packaging. "An expert may base an opinion on facts and data in the case that the expert has been made aware of and personally observed." FED. R. EVID. 703.

### 3. DR. HUTT HAS APPLIED THE PRINCIPLES AND METHODS RELIABLY TO THE FACTS OF THE CASE.

Dr. Hutt has not unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *See Bocanegra v. Vicmar Servs., Inc.,* 320 F.3d 581, 586-87 (5th Cir.2003). Experts may use their past experience and professional judgment to make critical judgments on the basis of such information outside of the court. *Factory* at 523-24. Dr. Hutt tested the two unopened turkey chubs with the bone fragments because the turkey meat, bones and ossified connective tissue that Plaintiff bases his complaint on, were purchased by the Plaintiff at the same store and the same time, and all of the Honeysuckle White Ground Turkey originated from Defendant's processing plant. (Hutt Depo., 91:7-92:7)

Defendant argues that Dr. Hutt does not have actual knowledge whether turkey bones or ossified connective tissue were actually ingested by Mr. Blancett; however, Dr. Hutt was provided with a copy of Mr. Blancett's complaint and photographs of Mr. Blancett laid up in a hospital bed after he consumed two Honeysuckle White Ground Turkey meat chubs. (Hutt Depo, 68:1-69:18; 72:20-73:10)(Ex. P-20) "An expert testimony, in order to be admissible

under Rule 705, need not detail all the facts and data underlying that opinion.   *B.F. Goodrich v. Betoski*, 99 F.3d 505, 525 (2d Cir.1996).   Moreover, an expert may base their opinions on otherwise-inadmissible information, such as hearsay because, to provide otherwise would entail "the expenditure of substantial time in producing and examining various authenticating witnesses." *Factory Mut. Ins. v. Alon USA L.P.*, 705 F.3d 518-24 (5th Cir.2013).

Dr. Hutt has accounted for obvious alternative explanations.   *See Pipitone v. Biometrix, Inc.*, 288 F.3d 239, 248-49 (5th Cir.2002).   In her sworn deposition, Dr. Hutt has ruled out the possibility that meat, bone fragments and ossified connective tissue contained in the Honeysuckle White Ground Turkey originated from anywhere else, other than Defendant's processing plant in Springdale, Arkansas.   (Hutt's Depo., 106:24-107:16).   Based on the foregoing, Dr. Hutt has been as careful, and has used the same intellectual rigor, as she would in her professional work.   *Kumkho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

**C.   DR. HUTT SHOULD BE PERMITTED TO TESTIFY BECAUSE HER TESTIMONY IS RELEVANT.**

A Court should allow the opinion testimony of an expert if it is relevant.   FED. R. EVID. 401, 402, 702; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir.1999). Relevancy requires the proponent to demonstrate that the expert's reasoning or methodology can be properly applied to the facts in issue.   *Johnson v. Arkema, Inc.* 685 F.3d 661, 668 (5th Cir.1999).   This Court should allow the testimony of Dr. Hutt because the evidence supporting Dr. Hutt's opinions are sufficient to allow a reasonable juror to conclude that the proposition is more likely to be true than false.   *See Glaser v. Thompson Med. Co.*,32 F.3d 969, 972 (6th Cir.1994).

## VI. PRAYER

WHEREFORE, Plaintiff prays that this Court deny Defendant's Motion to Exclude the Expert Testimony of Dr. Hutt.

Respectfully submitted,

**LAW OFFICE OF DAVID SANCHEZ, P.C.**

/s/ James D. Trujillo
JAMES D. TRUJILLO
State Bar No. 24056453
james@972lawfirm.com
1349 Empire Central, Ste. 700
Dallas, TX 75247
(972) 529-3476 Phone / Fax
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

Counsel for Plaintiff hereby certifies that a true and correct copy of the foregoing instrument was served upon all counsel of record, in accordance with the Federal Rules of Civil Procedure on this 16th day of December, 2016.

/s/ James D. Trujillo
JAMES D. TRUJILLO

# Exhibit "P-1"

# CATHERINE ADAMS HUTT, Ph.D., R.D., C.F.S.



**Address:**    4568 Elm Bottom Circle
Aubrey, TX 76227
&
124 South Fairfax
Alexandria, VA 22314

**Telephone:**    630-605-3022

**E-mail:**    cadams@rdrsol.com

**PROFESSIONAL SUMMARY:**
With experience in the public and private sectors, Dr. Adams Hutt provides advice and
guidance on a wide range of topics. Catherine has senior experience in regulatory
compliance, health and wellness, business strategy, food safety, quality systems
management, supply chain, product development, and software solutions for
management of quality and product development processes.

Dr. Adams Hutt is a recognized expert and leader in the areas of food safety, nutrition,
and regulatory matters and routinely supports clients as expert witness. She is also an
accomplished leader for the creation and execution of strategic change designed for
business results. She successfully works at the interface of disciplines for solutions;
including nutrition, food safety, innovation, regulatory, quality, and food science. She
excels at strategic analysis and problem solving and builds coalitions designed for
results. Dr. Adams Hutt has senior executive experience with the manufacturing and
food service industries, trade associations and regulatory agencies in the Federal
Government. Her business experience includes the creation, design and launch of
innovative applications of global Quality and food safety management systems,
supporting Quality and Product Development as cornerstones for successful business
growth. She designed and executed nutrition strategy for a global business leading
reformulation and product innovation designed to promote health. Catherine
recommends and leads implementation of business strategies and new products
designed for success using health and wellness as a business platform. She drove the
creation and implementation of novel internet-based information management systems
for product lifecycle management, aligning Research & Development, Nutrition,
Marketing, Quality, Procurement and Operations. She also designed and drove
implementation of supplier food safety and Quality management programs with proven
results for enhanced effectiveness and efficiency, with integration of sustainable
agriculture practices.

EXHIBIT
1
Hutt 12-7-16

Dr. Adams Hutt has senior leadership experience in multiple Fortune 200 businesses and has been Chief Executive Officer for a bakery manufacturing business, leading a safety, production, and quality turnaround.   She also has extensive experience with Federal and state regulatory policies delivering regulatory compliance and food safety. Her experience includes organizing and managing Quality teams with more than 35 professionals in the manufacturing and food service industries and has led the vision for Quality, Food Safety and Nutrition strategies for a multinational business with sales in excess of $60B.  As Assistant Administrator of USDA's Food Safety and Inspection Service, she was the third highest ranking leader in the agency of over 7500 professionals.

Catherine is recognized by leadership teams and by her peers as a strategic visionary with strong business orientation and acumen, an innovative thinker, a decisive leader, and a demanding professional with extraordinary integrity and strong people skills.  She is trained as a corporate media spokesperson and has exceptional communication and presentation skills.

**EDUCATION:**
PhD, Food Science, University of Illinois, Champaign-Urbana (1986)
MS, Food Science & Human Nutrition, Michigan State University, East Lansing (1981)
BS, Food Science, Pennsylvania State University, University Park (1979)
ISO 9000 Lead Assessor Program, Chipping Campden, UK (1992)
Carnegie Mellon University Senior Executive Management Program, Pittsburgh, PA (1990)
FDA Better Process Control School, University Park (1978)
Harvard Business School Agribusiness Seminar (2009)

**HONORS and CERTIFICATIONS:**
Graduation from Pennsylvania State University with Highest Distinction (First in Class) (1979)
US Federal Government, Senior Executive Service (1990)
Distinguished Alumnus, Pennsylvania State University College of Agriculture (1995)
Fellow, Pennsylvania State University (2008)
Fellow, Institute of Food Technologists (2009)
Member, Cosmos Club (inducted 2011)
Member, Phi Tau Sigma Honorary Society
Registered Dietitian
Certified Food Scientist

**WORK EXPERIENCE:**

***President and CEO, RdR Solutions Consulting, LLC***
***(June 2008 – Present)***
- Consulting organization with focus on for food safety, health and wellness, regulatory compliance, labeling, food safety policy, and quality systems management.
- Supports businesses with strategic guidance and problem-solving for food safety, regulatory compliance, and wellness platforms.
- Supports businesses to prevent and manage food regulatory and food safety crisis situations; provides expert witness in litigation cases.

- Directs new product development based on consumer trends and policy landscapes for health and wellness, and food safety.
- Supports regulatory compliance and brand development for functional foods, dietary supplements, and medical foods.
- List of Expert Witness cases available upon request.

### Chief Regulatory and Science Officer, SloanTrends
### (August, 2011 – Present)

- Interprets scientific literature and data in order to identify emerging consumer market opportunities in the food and beverage business.
- Creates sustainable business opportunities and customer-centric solutions for food and beverage, dietary supplement, pharmaceutical, foodservice, ingredient, and commodity board marketers.
- Provides trend interpretation, forecasts and actionable market recommendations; strategic counsel on media, regulatory, safety, quality system, and scientific issues.
- Develops cutting-edge product concepts with on-target marketing messages and regulatory claim positioning to protect and drive business.

### Chief Executive Officer, Landes Foods (designed to be short-term consultancy role)
### (June 2015 – September 2015)

- Led a $26M bakery manufacturing business, based in Dallas, Texas.
- Designed a turn-around for the privately-held company; building systems to drive improvements in safety, productivity, efficiencies, and quality performance.
- Drove Global Food Safety Initiative (GFSI) quality systems implementation.
- Changed the existing culture to one that is a safety, quality and recognition culture.
- Delivered programs that reduced employee turnover and accelerate quality improvements.
- Delivered programs that enhanced worker safety programs and processes.
- Drove new business opportunities that will substantially expand revenue, and profitability; rationalizing the supply and customer base in order to improve margin and profit.

### Senior Advisor, Leavitt Partners
### (May 2010 – December 2013)

- Provided consulting on food safety, quality systems, and health policy issues.

### McDonald's Corporation
### Corporate Vice President, Worldwide Quality, Food Safety and Nutrition
### Chief Quality Officer, WW Supply Chain
### (January 2004 – June 2008)

- Developed and implemented a nutrition strategy to support the global business.
- Worked closely with Worldwide Marketing, Worldwide Communications and WW Menu Management (Research and Development) to implement and promote improved nutrition guidelines.
- Served as a corporate media spokesperson on scientific issues including food safety, Quality and nutrition.
- Developed and implemented an appropriate approach for engagement with key influence agents, including health professionals and consumer activists.

- Led relationships with key food industry trade and professional associations.
- Developed food safety systems to optimally support appropriate food safety standards and practices worldwide for suppliers and restaurants.
- Led the development of a global supplier Quality management system and distributor Quality management system, including HACCP and statistical process control.
- Led the development of criteria for classifying suppliers according to risk and assigning appropriate risk-based audit standards.
- Led engagement for current and emerging food safety issues.
- Developed proactive strategies to protect the Brand.
- Sponsored the McDonald's Food Safety Advisory Council.
- Supported the Legal Team proactively and in litigation.
- Led the corporate worldwide quality team.
- Developed systems to optimally support quality standards and policies worldwide.
- Improved quality practices system-wide in order to deliver world-class products to consumers.
- Drove worldwide development and implementation of Quality management tools.
- Initiated and led the development and implementation of a state-of-the-art internet-based information system for managing products, suppliers and menu worldwide.
- Shared responsibility to support social responsibility policies for the global business, including animal welfare and environmental practices.
- Led the reorganization of our European Supply Chain team, including Quality, Food Safety and Procurement.

### *Coors Brewing Company, Vice President Quality & Environmental Health & Safety (January 2003 – December 2003)*
- Led the development and implementation of enterprise-wide world-class Quality systems.
- Developed and delivered the strategy to build a Corporate Quality department with oversight responsibility for Quality and food safety for the global Coors' operations.
- Led the development of global web-based knowledge management systems.
- Led corporate compliance for environmental, health and worker safety programs.
- Led the development of rigorous corporate food security programs.
- Drove the delivery of a strong safety culture for all global sites.
- Led the Corporate team to define and deliver highly drinkable beers.
- Led the integration of social responsibility into the Quality agenda for the Company.

### *Heinz North America & Frozen Foods, Quality Lead (September 1999 – December 2003)*
- Led the development and implementation of world-class Quality systems, including food security planning and execution.
- Managed food safety control programs, including crisis response planning and product disposition.
- Developed a business model for product and vendor approval supporting e-commerce.

**YUM! Brands (formerly Tricon Global Restaurants, Inc.) (included over 30,000 Pizza Hut, KFC & Taco Bell domestic & international restaurants), Head Food Safety and Restaurant Quality (September 1997 – August 1999)**
- Developed YUM! Brands as a leader in food safety for the global food industry.
- Developed and implemented YUM! Brands food safety crisis management program and led all food safety-related crisis responses.
- Led a Field food safety and restaurant quality team, supporting regulatory compliance and improved product quality.
- Developed and implemented food safety training and restaurant audit programs.
- Developed, installed and maintained a QA Hotline for YUM! Brands restaurants for domestic and international operations.
- Developed and maintained a centralized nutrition database and responded to customer inquiries/medical food sensitivities.

**Campbell Soup Company, Director Worldwide Quality Systems (June 1993 – September 1997)**
- Developed the concept and implementation strategy for a customized Quality and Food Safety management system based on ISO 9001 and HACCP for all Campbell businesses and plants worldwide (over 100 locations globally).
- Engineered an ISO 9001-based management system's novel application in R&D, Marketing, Sales and Engineering.
- Led a three-year strategic initiative for nutrition and health.
- Optimized the use of consumer complaints for improving product Quality.

**Grocery Manufacturers of America, Director Scientific Affairs (October 1991 – June 1993)**
- Represented the food manufacturing industry to Government agencies, including US Department of Agriculture, Food & Drug Administration, Centers for Disease Control and Environmental Protection Agency. Organized and sponsored the first ISO 9000 conference to be convened in the US for the food industry.
- Provided technical and administrative support for a lobbying committee addressing microbiological and chemical food safety.
- Served as an invited Expert Consultant to the EU Food-Linked Agribusiness Research Group on HACCP and predictive microbiology.

**US Department of Agriculture – Food Safety and Inspection Service, Assistant Administrator (April 1990 – October 1991) and Special Assistant to the Administrator (December 1987 – April 1990)**
- Initiated and led the development of HACCP as a regulatory tool for Federal and State regulatory programs.
- Served as a primary spokesperson for the Federal meat and poultry regulatory agency in national and international forums.
- Served as the scientific technical expert for the Agency and the Secretary of Agriculture on food safety and toxicology issues.
- Chaired national and international committees, including the Federal Advisory Committee on Microbiological Safety of Foods & the Codex Alimentarius Commission Committee on Food Hygiene (including the Codex HACCP Subcommittee which defined the current HACCP system and gained international consensus).

- Prepared and tabled the international proposal to the Agricultural Negotiations of the GATT Uruguay Round on Sanitary and Phytosanitary Regulations.
- Participated as an expert member of two World Health Organization consultative groups on (a) HACCP and (b) *Listeria monocytogenes*.
- Member of the US Department of Agriculture Cooperative Project for Technical Assistance to the Former Soviet Union.

*US Department of Agriculture – Extension Service, National Program Leader – Food Safety (May 1987 – December 1987)*

**MAJOR PROFESSIONAL ACTIVITIES:**

- Faculty Member, 4th Annual Global Food Law and Policy Summer Academy, Italy
- Member, Cosmos Club, Washington, DC
- Owner, Rialto Racing Stables – a Thoroughbred racing and breeding business
- Owner, Rancho di Rialto – a working horse and cattle ranch in Aubrey, Texas
- Member, Advisory Board, Greenonyx, LLC
- Member, Advisory Board, Stonestop (a medical food)
- Senior Advisor, PureTech Ventures
- Delegate, Conference for Food Protection (CFP), Council III (2012 & 2014)
- Former Member, American Heart Association Better Diet Business Committee
- Past-Chair, Institute of Food Technologists (IFT) Food Laws and Regulations Division
- Former Board of Directors Member, IFT (elected position)
- Former Board Member, Ready By 21 (Youth Development Non-profit Organization)
- Candidate, IFT President (2011 & 2012)
- Former Chair, IFT Food Executive Leadership Forum and Senior Food Official Engagement Committee
- Grant Reviewer, US Department of Agriculture National Institute for Food and Agriculture (2011)
- Charter Member, Armsby Honorary Society, Pennsylvania State University.
- Member IFT (since 1978) and Former Chair Continuing Education Committee and Long-Range Planning Committee
- Former Member, Pennsylvania State University Advisory Committee to the College of Agriculture; Former Member Volunteer Fund Raising Committee
- Former Member: Pennsylvania 4-H Horse Program Endowment Committee
- Former Advisory Board Member, AgriCapital Investments
- Former Editorial Board Member and current reviewer, *International Journal of Food Control*.
- Former Co-Chair, NFPA-SAFE Supplier Audit Council
- Former Chair, Council III (Science & Technology), 2002 Conference for Food Protection; Delegate on Council III, 2012
- Former US Delegate, FAO-WHO Codex Alimentarius Commission Food Hygiene Committee.
- Former Co-Chair, HACCP Working Group, Codex Alimentarius Commission, Food Hygiene Committee
- Former Member, US Delegation, FAO-WHO Codex Alimentarius Commission Committee on Import/Export Inspection & Certification.
- Former Co-Chair, YouthPlaces Quality Program Committee, City of Pittsburgh

## Prior Legal Case Experience (past five years)

1. Shawn Love vs. Ruby Tuesday, Inc., Circuit Court for Baltimore City, Court File No. 24-C-14-002417 OT (Law Firm: KalbaughPfund & Messersmith)
   - Food safety event, provided expert report for the defense.  Plaintiff withdrew the case.

2. Barbara J Frazier vs. Ruby Tuesday, Inc., Prince George's County District Court, MD, Case No. 0502000098952013  (Law Firm: KalbaughPfund & Messersmith)
   – Personal injury, safety; provided expert opinion for the defense.  Plaintiff withdrew the case.

3. Eldredge D Williams vs. Westfam Restaurants et al., Civil action No. CV-2010-73; HC&D File No. 200-02038
   – Food safety event; provided expert report and affidavit on behalf of the defense (Burger King restaurant); the case settled before going to trial.

4. Zentis Food Solutions North America LLC vs. Continental Food Sales and A&P Fruit Growers Ltd.; US District Court, Northern District of Indiana, South Bend Division. Case No. 3:11-CV-00425 – CAN (Law Firm: Kightlinger Grey)
   - Food contamination event; reviewed physical plant and processing operations and provided expert opinion for the defense (blueberry processors); the case settled.

5. Clemmy's LLC vs. Nestle USA, Inc & Nestle USA, Inc vs. Clemmy's LLC; Superior Court of the State of California, County of Los Angeles, Central District, Case No. BC500811 (Law Firm: Girardi Keese)
   - Regulatory labeling compliance and standard of identity issue along with unfair trade allegations; provided expert summary of opinion and deposition regarding labeling rules, including naming and flavor identification; and standard of identity on behalf of Clemmy's.  Case settled without compensation to either side.

6. Insurance settlement for Garden Fresh Foods (Law Firm: Wade Clark Mulcahy)
   - Industry best practice and due diligence investigation related to Class I recall

7. Leslie Reilly vs Chipotle Mexican Grill, Inc, U.S. District Court Southern District of Florida, Case No. 1:15-cv-23425 COOKE/ TORRES (Law Firm: Harke, Clasby and Bushman, LLP)
   - Class action for meat and poultry menu items sold as "non-GMO".

# Exhibit "P-2"



RdR
*Solutions Consulting*

Catherine Adams Hutt, PhD, RD, CFS
4568 Elm Bottom Circle
Aubrey, TX 76227

November 2, 2016

**Summary of My Expert Opinion - Catherine Adams Hutt, PhD, RD, CFS**

The following is the expert report of Catherine Adams Hutt, PhD, RD, CFS in the evaluation of bone fragments and ground turkey meat in the case of Mr. Joshua Blancett vs Cargill Meat Solutions Corp, Civil Action No. 6:16-CV-00024-RP-JCM.

I am a consultant in food safety, food regulation, quality management, and health and wellness topics; serving as Principal of RdR Solutions Consulting, LLC and Chief Science and Regulatory Officer for Sloan Trends, a consumer trends firm. I reside at 4568 Elm Bottom Circle in Aubrey, Texas 76227.

**Education and Experience**

I am a trained food and regulatory scientist. I hold a Bachelor's of Science degree in Food Science from Pennsylvania State University, Masters of Science in Food Science and Human Nutrition from Michigan State University, and a Doctoral Degree in Food Science from the University of Illinois. I am a Registered Dietitian and Certified Food Scientist, and Fellow of Pennsylvania State University and the Institute of Food Technologists (IFT).

My work experience includes the public and private sectors: leading food safety and quality for McDonald's Corporation (Chief Quality and Food Safety Officer, Worldwide), H.J. Heinz (Director, North America Quality), YUM! Brands (Director, Worldwide Restaurant Food Safety and Supplier Quality), and Coors Brewing Company (Chief Quality Officer). I was a senior regulatory official in the US Department of Agriculture (USDA) Food Safety and Inspection Service (FSIS) (Assistant Administrator, Federal regulatory agency for meat and poultry) and member of the Government's elite Senior Executive Service. As a consultant, I work routinely with the regulations of the US Food and Drug Administration (FDA) and USDA-FSIS for clients in the food and dietary supplement industries.



**EXHIBIT**
2
Hhutt 12-7-16

**Summary of Opinion**

It is my professional opinion that turkey bone fragments and hardened/ossified turkey connective tissue were ingested by Mr. Joshua Blancett from Honeysuckle White Ground Turkey product. Four bone fragments with connective tissue attached were provided to me, which I understand were from a food product made with Honeysuckle White Ground Turkey. There are hardened and ossified connective tissue material in the two unopened chubs of Honeysuckle White Ground Turkey, which I understand were purchased at the same time as the ground turkey that was consumed. These bone fragments and hardened/ossified materials are considered foreign material and are defects, and should not have been in the ground turkey product presented for sale to the public. Such materials are considered defects because they have the potential to cause damage to the mouth and intestines, if consumed.

This opinion is based on the facts that (1) the bone in the Honeysuckle White Ground Turkey product and ingested as foreign material are turkey and not a different species, (2) hardened/ossified connective tissue were found in the two unopened Honeysuckle White Ground Turkey chubs purchased at the same time as the product ingested, and (3) the size of the bone fragments and hardened/ossified connective tissue are consistent with the apparent grind size of the Honeysuckle White Ground Turkey and could have been processed together by Cargill Meat Solutions.

**(1) The Bone in the Honeysuckle White Ground Turkey Product and Ingested Foreign Material is from Turkey and Not a Different Species**

Examination of three bone fragments, a bone fragment that was ingested, and two commercially packaged chubs of Honeysuckle White Ground Turkey was conducted by Certified Labs of the Midwest, in Bolingbrook, Illinois. Visual and microscopic examinations, in conjunction with real-time PCR for Turkey DNA, were conducted. Based on the observations and examinations including Real-Time PCR identification, the laboratory concluded that the bone fragments and foreign matter labeled as ingested contained Turkey DNA (See Figures 1 – 3). The ground turkey samples from the previously unopened Honeysuckle White Ground Turkey chubs also showed the presence of turkey DNA, as expected.

The following evidence were packaged and sent by myself to Certified Labs of the Midwest via overnight Fed Ex shipment. They were received in a frozen state in the same packaging containers as they were sent.

| Supplied Sample Description | CMW Lab # | Container |
|---|---|---|
| Bone Frag #1 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag |
| Bone Frag #2 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag |
| Bone Frag #3 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag (completely consumed during testing) |
| Injested | BG26747 | Inside a Zip-Lock Plastic Bag |
| Ground Turkey | BG26747 | Inside Consumer Packaging within a Zip-Lock Plastic Bag |
| Ground Turkey | BG26747 | |

The visual, physical, and microscopic examinations play a basic role in identifying foreign matter. However, the final confirmation of foreign materials was obtained via real-time PCR identification and comparison with reference materials. Microscopic techniques were used to examine the features. Real-Time PCR was selected to confirm the characteristics of foreign materials.

The real-time PCR assay used for the analysis was originally developed for the detection of turkey (*Meleagris gallopavo*) DNA in meat mixture at a relative amount of 0.1% in both processed and unprocessed samples. The real-time PCR assay contained an internal amplification control and an internal detection assay for animal DNA. The positive result of the internal detection assay for animal DNA and the positive result for turkey DNA showed that the extraction and analysis method were sufficient to detect turkey DNA from bone and marrow. The assay is specific to turkey DNA and has been validated to show no cross-reactivity for beef, pork, chicken, partridge, ostrich, Guinea-fowl, goose, pheasant, Muscovy duck, Peking duck, goat, horse, red deer, roe deer, and sheep. Positive and negative controls were also performed with the analysis and gave expected results.



**Figure 1. A.** The sample, Bone Frag #1 BG26747 was received in a zip lock plastic bag inside a Whirl-Pak. It consisted of a bone fragment and associated connective tissue (10X Magnification).



**Figure 1. B.** The sample, Bone Frag #2 BG26747 was received in a zip lock plastic bag inside a Whirl-Pak. It consisted of a bone fragment and associated connective tissue (10X Magnification).



Figure 2. A. Injested (10X Magnification).



**Figure 3. A.** Bone Frag #1.  **B.** Bone Frag #2. **C.** Injested **D.** Ground Turkey

*(2) Hardened/ossified Connective Tissue Were Found in the Two Unopened Ground Turkey Chubs*

The contents of the two Honeysuckle White Ground Turkey packages were also physically examined for the presence of fragments.  The physical inspection did not reveal bone fragments; however, five hardened connective tissue elements that appeared to have been partially ossified were found (See Figures 4-9).

Although no bone fragments or other foreign material were found in the unopened chubs of Honeysuckle White Ground Turkey, the hardened connective tissue is a foreign material and could pose a potential health hazard.  This material can be abrasive to the mucosal lining of the gut and cause damage to the intestinal tract.



**Figure 4.** Contents of two ground turkey packages received in consumer packaging. They were physically examined for bone fragments.



**Figure 5. A.** Hard fragment GT-1 isolated from ground turkey in consumer packaging. It consisted of a tough connective tissue fragment (1X Magnification).



**Figure 5.B.** Hard fragment GT-1 isolated from ground turkey in consumer packaging. It consisted of a tough connective tissue fragment (10X Magnification).



**Figure 6.A.** Hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (1X Magnification).



**Figure 6. B.** Left side of hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 6. C.** Right side of hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).

**Figure 7. A.** Hard fragment GT-3 isolated from ground turkey in consumer packaging. It consisted of a hard connective tissue fragment (1X Magnification).





**Figure 7. B.** Hard fragment GT-3 isolated from ground turkey in consumer packaging. It consisted of a hard connective tissue fragment (10X Magnification



**Figure 8. A.** Fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (1X Magnification).



**Figure 8. B.** Left side of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 8. C.** Center of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 8. D.** Right side of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue. This picture shows the junction between the harder left side and softer tissue on the right side (10X Magnification).



**Figure 9. A.** Hard fragment GT-5 isolated from ground turkey in consumer packaging. It consisted of slightly hardened connective tissue (1X Magnification).



Figure 9. B. Hard fragment GT-5 isolated from ground turkey in consumer packaging. It consisted of slightly hardened connective tissue (10X Magnification).

### (3) Size of Bone Fragments and Hardened/ossified Connective Tissue Are Consistent with the Apparent Grind Size of the Honeysuckle White Ground Turkey and Could Have Been Processed Together by Cargill

Although the actual grind diameter during processing is unknown to me now; the size of bone fragments, including the one ingested, and the hardened/ossified connective tissue is consistent with the apparent grind size of the Honeysuckle White Ground Turkey. The sliced bone fragments could have been created during processing by Cargill. The origin of the bone fragments could be the turkey raw material, processed by Cargill and packaged as Honeysuckle White Ground Turkey.

### Data and Information Considered

I have been provided with documents including Plaintiff's Rule 26 Initial Disclosures, Plaintiff's Rule 26(e) First Supplemental Disclosures, Cargill Meat Solutions Corp's Responses to Plaintiff's

First Request for Production of Documents, Cargill Meat Solutions Corp's Response to Plaintiff's First Set of Admissions, Plaintiff's Responses to Defendant's Request for Production, Alteca's Report of Microscopic Examination (dated March 12, 2015), Plaintiff's Answers to Defendant's First Set of Interrogatories, Graphic Design Layout and Graphics Specifications for Honeysuckle White All Natural Ground Turkey, and Commercial General Liability Declarations for Cargill, Inc.

I was provided with evidence and product, including four bone fragments with one fragment marked "Ingested" and two unopened Honeysuckle White Ground Turkey chubs, received from Mr. James Trujillo by personal courier. I released the evidence and product to Certified Lab of the Midwest, in Bolingbrook, Illinois, for technical analyses.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on November 2, 2016.

Signed,

Catherine Adams Hutt, PhD, RD, CFS

# Exhibit "P-3"



731 McCall Road
Manhattan, KS 66502
TEL: (785) 537-9773
FAX: (785) 537-1800
E-Mail: info@alteca.com
www.alteca.com

Sedgwick CMS
Attn: Petra Peterson
PO Box 14155
Lexington, KY 40512

March 12, 2015

## REPORT OF MICROSCOPIC EXAMINATION

**Claim #301428834010-1**                    **Lab Number: 15062-2-1**

Sedgwick CMS requested qualitative analysis for bone fragments that were allegedly
found in a chub of ground turkey. The sample was thoroughly examined via stereo
microscopy, PLM (polarized light microscopy), FTIR (Fourier transform infra-red)
analysis, RSID (rapid stain identification) reader, and cook/bake test.

ALTECA, Ltd. received the sample cold and in good condition. The entire sample is
examined at 7X to 200X magnification, with the Meiji RZ and Olympus microscopes.
There are three bone fragments that measure 16.36mm x 44.57mm, 6.67mm x 41.67mm,
and 7.30mm x 25.12mm. The meat, which was sent in with the fragments measures
34.56mm x 64.02mm. The bone fragments and meat were sent in a gallon size Ziploc
bag with an excessive amount of saliva present. Stereo microscopy shows the bone
fragments have been sliced and have meat still attached. FTIR analysis gives a quality
match to Honey Suckle White turkey for the meat in the Ziploc bag and on the bone
fragment. The RSID reader is positive for saliva. The cook/bake test shows the turkey
in the bag and on the bone fragments is raw.

I concluded from the above observations and tests, with a reasonable degree of scientific
certainty, that the bone fragments have been sliced. The physical and residual evidence
shows the raw bone fragments are too large in size and have been sliced, indicating
these bone fragments were not processed with the ground turkey. The source of the
raw bone fragments could not be conclusively determined based on the background
information.

This report was based on the above submitted sample being representative of all
original evidence. If you have questions or comments concerning the above
observations and conclusions, please contact us at your convenience.

Respectfully,

Michael A. Throckmorton



EXHIBIT
3

# Exhibit "P-4"



# Exhibit "P-5"



# Exhibit "P-6"



# Exhibit "P-7"

# Exhibit "P-8"

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                        WACO DIVISION
3    JOSHUA BLANCETT,          §          CASE NO.
                  PLAINTIFF,   §    6:16-CV-00024-RP-JCM
4                              §
     v.                        §
5                              §
     CARGILL MEAT SOLUTIONS    §
6    CORP.,                    §
                  DEFENDANT.   §
7

8
                     VIDEO DEPOSITION OF
9
                   CATHERINE ADAMS HUTT
10
                     December 7, 2016
11

12
13           VIDEO DEPOSITION OF CATHERINE ADAMS HUTT,
14   produced as a witness at the instance of the Plaintiff,
15   and duly sworn, taken in the above-styled and numbered
16   cause on December 7, 2016, from 12:59 p.m. to 3:45
17   p.m., before Joseph D. Hendrick, Notary Public and
18   Certified Shorthand Reporter in and for the State of
19   Texas, reported by machine shorthand, in the offices of
20   the Underwood Law Firm, 1008 Macon Street, Suite 101,
21   Fort Worth, Texas, pursuant to Notice and the Federal
22   Rules of Civil Procedure and any provisions stated on
23   the record or attached hereto.
24
25   Job No. TX 2486858

Veritext Legal Solutions
800-336-4000

PLAINTIFF'S
EXHIBIT
P-8

**Page 2**

1
2                    INDEX
3   Appearances .......................... 4
4   CATHERINE ADAMS HUTT
5     EXAMINATION BY MR. TRUJILLO ............. 5
      EXAMINATION BY MR. ELZA ................. 51
6     RE-EXAMINATION BY MR. TRUJILLO ........... 105
      RE-EXAMINATION BY MR. ELZA ............... 115
7
    Signature and Changes ...................... 144
8
    Reporter's Certification ...................... 146
9
10                  EXHIBITS
    NO.   DESCRIPTION            PAGE(S)
11
12   EXHIBIT 1  Curriculum vitae of Catherine   7
       Adams Hutt, Ph.D.
13   EXHIBIT 2  November 2, 2016,             8
       Summary of My Expert Opinion -
14     Catherine Adams Hutt, PhD, RD,
       CFS
15
     EXHIBIT 3  March 12, 2015, Alteca       21
16     Laboratories Report of
       Microscopic Examination
17
     EXHIBIT 4  Photograph depicting one     48
18     unopened chub of ground turkey
       meat
19
     EXHIBIT 5  Photograph depicting bone    48
20     fragments in package from
       which product was consumed
21
     EXHIBIT 6  Photograph depicting bone    48
22     fragments in package from
       which product was consumed,
23     evaluated by Certified
       Laboratories of the Midwest
24
25

**Page 3**

1   EXHIBIT 7  Photograph depicting       48
      connective tissue, meat,
2     tendons and ligaments from
      cooked product
3
    EXHIBIT 8  Compilation of documents    57
4     received by the witness,
      expert report, and documents
5     responsive to subpoena duces
      tecum
6
    EXHIBIT 9  Photograph depicting fragments 109
7     of turkey connective tissue
8   EXHIBIT 10  Photograph depicting fragments 109
      of turkey connective tissue
9
    EXHIBIT 11  Notice of Intention to Take   115
10    Oral Deposition of Expert
      Catherine Adams Hutt, PhD, RE,
11    CFS
12
13         REQUESTED DOCUMENTS/INFORMATION
14   NO.   DESCRIPTION            PAGE
15              None
16
17
18       CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER
19  NO.              PAGE/LINE
20              None
21
22
23
24
25

**Page 4**

1        A P P E A R A N C E S
2  FOR THE PLAINTIFF:
      James D. Trujillo
3      MCKEY & SANCHEZ, P.C.
      1349 Empire Central
4      Suite 700
      Dallas, TX 75247
5      (972) 529-3476
      james@972lawfirm.com
6
    FOR THE DEFENDANT:
7      Slater Elza
      UNDERWOOD LAW FIRM, P.C.
8      P.O. Box 9158
      Amarillo, Texas 79105
9      (806) 376-5613
      Slater.Elza@uwlaw.com
10
    ALSO PRESENT:
11     Cody Modro, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1        VIDEOGRAPHER:  This is the videotape
2  deposition of Dr. Catherine Adams held in Fort Worth,
3  Texas.  The time is now 12:59 p.m. on December 7, 2016.
4  We are now on the record.
5        At this time will the counsel please
6  introduce themselves and whom they represent, and the
7  witness will then be sworn in.
8        MR. TRUJILLO:  Attorney James Trujillo for
9  the plaintiff, Joshua Blancett.
10        MR. ELZA:  Slater Elza for Cargill Meat
11  Solutions.
12        THE REPORTER:  Doctor, would you raise your
13  right hand, please.
14        Do you swear or affirm that the testimony
15  you are about to give in this case will be the truth,
16  the whole truth, and nothing but the truth, so help you
17  God?
18        THE WITNESS:  I do.
19        CATHERINE ADAMS HUTT
20  having been duly sworn, testified as follows:
21        EXAMINATION
22  BY MR. TRUJILLO:
23   Q.   Good afternoon, Dr. Hutt.  My name is James
24  Trujillo and I represent Mr. Blancett in this case.
25  Would you please state your complete legal name?

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

Page 6

1    A.    My name is Catherine Estelle Adams Hutt.
2 My last name is actually two words, Adams Hutt.
3    Q.    Okay.  And what is your current occupation
4 or profession?
5    A.    I am a consultant.
6    Q.    Okay.  And do you consult in a specific
7 discipline?
8    A.    Yes.  I consult on food safety, regulatory
9 compliance.  Also I do regulatory work in health
10 claims, labeling work from dietary supplements,
11 functional foods, and I'm also chief science and
12 regulatory officer for a consumer trends company called
13 Sloan Trends which I do as a consultant also.
14    Q.    Okay.  And have you brought your CV with
15 you today?
16    A.    I did.
17    Q.    May I please see that?
18    A.    Yes.
19        Excuse me.  Something else back here.
20    Q.    Thank you.
21    A.    Mm-hmm.
22    Q.    Dr. Hutt, I am going to mark your CV as
23 Exhibit Number 1 to your deposition and then I will
24 hand it back to you.  I will be asking you some
25 questions about that in just a minute.

Page 7

1    A.    Okay.
2        MR. ELZA:  May I see it first?  Because
3 I've got several duplicate pages in what's been
4 provided to me, or I think they're duplicate.
5        I've got two page 3's and two page 4's.
6 But they appear to be just duplicates.  Let me
7 double-check one more thing.
8        All right.
9        (Marked Deposition Ex. 1)
10        MR. TRUJILLO:  Let me hand this to you,
11 Slater.  It's another copy for you.
12        MR. ELZA:  Okay.
13 BY MR. TRUJILLO:
14    Q.    Now, Dr. Hutt, is it your regular practice
15 to maintain and update your CV in the regular -- in the
16 regular course and scope of your business as a
17 consultant?
18    A.    Yes.
19    Q.    Okay.  And is the manner in which you have
20 kept your CV, is that manner trustworthy?
21    A.    Yes.
22    Q.    Okay.  And has -- is all the information
23 that's on your CV, is that all based on personal
24 knowledge?
25    A.    Yes.

Page 8

1    Q.    Okay.  And you also were paid in this case
2 to render an opinion regarding to -- regarding the
3 turkey bone and ossified materials that the plaintiff
4 in this case has alleged was inside of the turkey chubs
5 that he purchased.  Is that correct?
6    A.    Yes.
7    Q.    And were -- did you prepare an expert
8 report in this case?
9    A.    I did.
10    Q.    Okay.  And do you have a copy of that?
11    A.    I do.
12    Q.    Thank you very much.
13    A.    Mm-hmm.
14    Q.    Dr. Hutt, I am going to mark your report as
15 Exhibit Number 2 to your deposition.
16        (Marked Deposition Ex. 2)
17        MR. TRUJILLO:  Slater?
18        MR. ELZA:  That's fine.
19 BY MR. TRUJILLO:
20    Q.    Dr. Hutt, is it your regular practice to
21 main -- to maintain a copy of that expert report in
22 your reg -- in the regular course and scope of your
23 business as an expert or consultant?
24    A.    Yes, it is.
25    Q.    And is all the information that's

Page 9

1 transmitted onto your expert report, is that all based
2 on personal knowledge?
3    A.    Yes, it is.
4    Q.    Okay.  And do you -- in the manner in which
5 your expert report has been maintained, is that manner
6 trustworthy?
7    A.    Yes.
8    Q.    Now I'd like to talk to you a little bit
9 about your educational background.  Would you please
10 describe your educational background from the time you
11 graduated from high school until the present?
12    A.    I graduated high school from Upper
13 St. Clair High School in 1975.  '75.  That's a long way
14 back.  And I went to Penn State University studying
15 food science, graduated there with a bachelor of
16 science in 1979, first in my class.
17        I went to Michigan State University for a
18 master's in food science and human nutrition, and then
19 went to the University of Illinois for a Ph.D. in food
20 science which specialized in human nutrition, and I
21 also became a registered dietician.
22    Q.    Okay.  When you indicate that you
23 specialized in food science, would you please explain
24 to the jury what food science is?
25    A.    Food science is a combined science of food

3 (Pages 6 - 9)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 10

1 chemistry, biology, biochemistry, and then also allied
2 fields like regulatory compliance, analytical science.
3 Analytical chemistry is part of that. So it is the
4 science of food as a matrix and the different
5 components of food, both from a nutritional standpoint
6 and also a physical standpoint from the character of
7 animal proteins, plant proteins, other components of
8 food.
9    Q.    Okay. Now, are you a trained food and
10 regulatory scientist?
11    A.    Yes.
12    Q.    Okay.
13    A.    Also certified food scientist through the
14 Institute of Food Technologists, and a fellow of the
15 Institute of Food Technologists.
16    Q.    Okay. And would you explain to us what it
17 means to be a trained food and regulatory scientist?
18    A.    It means that I've taken the coursework for
19 a food science curriculum which is recognized through
20 academic institutions as a -- an accepted curriculum
21 for a degree in food science; and, again, it combines
22 all the different types of courses that you would have
23 as part of that: chemistry, biochemistry, analytical
24 chemistry, biology, those types of things.
25        And then again being recognized by the --

Page 11

1 my professional organization, which is the Institute of
2 Food Technologists, they have come out with an
3 accreditation program for certified food scientists,
4 and I am actually a charter member of their
5 accreditation program.
6    Q.    Okay. And was there some sort of test or
7 some sort of procedure that you had to undergo in order
8 to become a trained food and regulatory scientist,
9 certified?
10    A.    Certified food scientist. Yes. And that
11 accreditation includes recognition of coursework,
12 recognition of experience and then also accreditation,
13 recommendation by your peers, and an evaluation by the
14 institution which is the Institute of Food
15 Technologists. All those are compliant with their --
16 with their set of requirements.
17    Q.    Okay. And what does a trained food and
18 regulatory scientist do?
19    A.    A lot of different things, frankly. An
20 individual can work for a company in product
21 development. It can work for a company -- a person can
22 work for a company in quality management, food safety;
23 there's a lot of food safety components to a food
24 science program. So the regulatory compliance piece
25 for a manufacturer, a food service organization, would

Page 12

1 look for someone trained in -- in those, those
2 particular programs.
3    Q.    Okay. Now, when you obtained your
4 bachelor's degree in food science from Pennsylvania
5 State University, what sort of courses did you take
6 with respect to food science in order to obtain your
7 bachelor's degree in that field?
8    A.    There are many classes in chemistry. As
9 I've mentioned, food chemistry is a very big piece of
10 the foundation core of food science. Also aligned with
11 that are biology courses. Biochemistry, a very
12 important piece. And then my expertise also, which is
13 in nutrition and nutritional science, uses a lot of
14 biochemistry. There's also a lot of analytical
15 chemistry that is required both for biochemistry as
16 well as for basic chemistry as part of a food science
17 program.
18    Q.    Okay. And prior to obtaining your master's
19 degree in food science from Michigan State University,
20 did you -- did you focus in any particular field in
21 that discipline?
22    A.    I did. As part of my thesis work I looked
23 at the chemical interactions for baby food systems,
24 both wet and dry baby food systems, and interactions as
25 part of -- of effects of time and effects of the

Page 13

1 presence of iron on -- on vitamins and -- on vitamins,
2 actually, in infant food.
3    Q.    Okay. And during the time that you
4 received your Ph.D. from the University of Illinois,
5 did you focus in any specific field of study?
6    A.    I did. I focused in -- actually in two
7 different fields of study, one which is more
8 nutritional, which was the effects of -- hormonal
9 and -- and physical effects -- I'm sorry. Hormonal and
10 biochemical effects of prolonged submaximal exercise in
11 pregnant women and patients with anorexia nervosa,
12 looking at two sides of the spectrum because there's a
13 lot of analytical chemistry involved in that.
14        And then I also worked for a major
15 professor who had an expertise in vitamin A, so a lot
16 of analytical chemistry work in his laboratory as well
17 as part of his graduate student team.
18    Q.    Okay. And when you were -- when you
19 obtained your Ph.D. from the University of Illinois,
20 what courses did you take with respect to food science?
21    A.    A lot of biochemistry, a lot of analcal --
22 analytical chemistry, a lot of nutrition science as
23 well. And then as part of that there were also other
24 requirements for meat chemistry and meat science and
25 various other basics, if you will, of a food science

4 (Pages 10 - 13)

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

Page 14

1  curriculum which does deal with the components of food:
2  plant chemistry, meat chemistry.
3      Q.    Okay. Now, what sort of topics do you
4  consult with with respect to food regulation?
5      A.    I consult on a variety of different aspects
6  of food safety: quality management; standard industry
7  best practices; regulatory compliance, again both
8  for -- both for labeling compliance as well as
9  compliance with best industry practices for
10 manufacturing. Also I consult for a number of
11 different food service companies on both sides of the
12 legal fence, if you will, relative to foodborne illness
13 incidents.
14     Q.    Okay. Now, would you please just share
15 with the jury some of the companies that you work --
16 that you consult for with respect to food regulation
17 and quality management?
18     A.    I consult -- I'm on retainer with a dietary
19 supplement company called Deerland Enzymes. I consult
20 from a legal standpoint with a variety of different
21 companies which are listed in my CV which are food
22 manufacturers as well as food service. I, again, work
23 with several different food service companies in
24 food -- foodborne illness and personal injury cases.
25     Q.    Okay. Now, I noticed on your CV you also

Page 15

1  worked for McDonald's Corporation. Is that correct?
2      A.    Yes.
3      Q.    What were your job duties and
4  responsibilities when you worked for McDonald's
5  Corporation?
6      A.    My title was chief science officer in
7  charge of food safety and nutrition strategy, which is
8  a very large portfolio. We worked -- I worked in that
9  role, in that capacity as part of the supply chain
10 group which was the procurement group for McDonald's,
11 and so I worked with suppliers which are the food
12 manufacturers. I also worked with the food safety --
13 delivery in the restaurants since I worked at the
14 restaurant food safety teams as well to ensure
15 consistent application of our procedures and safety of
16 the product to the consumer.
17     Q.    Okay. And did you work for McDonald's
18 Corporation solely within the Texas region?
19     A.    No, I worked for the global organization,
20 so I was based in Chicago and I worked -- again, my
21 group and my role as chief science officer, chief
22 science officer was relative to the worldwide
23 organization.
24     Q.    Okay. So you were the chief science
25 officer for the worldwide organization of McDonald's

Page 16

1  Corporation.
2      A.    Yes.
3          MR. ELZA: Objection, form.
4  BY MR. TRUJILLO:
5      Q.    And did you also work with H. J. Heinz?
6      A.    Yes.
7      Q.    Okay. What was your -- what were your job
8  duties and responsibilities with H. J. Heinz?
9      A.    As I recall the title was director. They
10 used a more European style title, if you will, but it
11 was aligned to a vice president role and my job was
12 responsible for the North American quality team, for
13 the development of the team, the training of the team,
14 its execution for quality practices, evolution of our
15 quality systems within H. J. Heinz, evolution of our
16 food safety practices, keeping up with the industry
17 standards and actually leading, being a leading --
18 leading edge food safety team for H. J. Heinz.
19          I also dealt with many of the issues that
20 come up in our manufacturing. We had 26 manufacturing
21 plants in the United States, in North America that we
22 were responsible for, and certain complaints and
23 certain issues, defects would arise and we'd deal with
24 the disposition and proper approach in management to
25 those, those issues.

Page 17

1      Q.    Okay. Now, I notice that you worked in
2  Chicago, Pennsylvania, Michigan and Illinois. Where do
3  you currently reside?
4      A.    I reside in Aubrey, Texas.
5      Q.    Okay. And where do your -- where are your
6  parents at?
7      A.    My parents have passed.
8      Q.    They have passed. Okay.
9      A.    They're both in Waco.
10     Q.    They were both in Waco. Would you
11 please --
12     A.    Physically in Waco now.
13     Q.    I understand.
14          Would you please describe the work that you
15 did with the United States Department of Agri --
16 Agriculture or the USDA Food Safety and Inspection
17 Service?
18     A.    Yes. I did -- I had two roles within the
19 U.S. Department of Agriculture Food Safety and
20 Inspection Service. First I was special assistant to
21 the administrator, and then I was assistant
22 administrator of the agency for about three years.
23     Q.    Okay. And what were your job duties and
24 responsibilities while you were a senior regulatory
25 official with the USDA?

5 (Pages 14 - 17)

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

Page 18

1  A.  I was in charge of the food technology
2 aspects of the agency. The agency is largely a group
3 of veterinarians as well as meat inspectors. I was
4 part of the leading edge to bring in food technologists
5 which is a very important part of the delivery of
6 responsibilities for that regulatory agency, and I was
7 in effect a lead food technologist.
8       Also what we did is bring in a new food
9 safety tool for management of food safety across the
10 entire agency for all meat and poultry inspection
11 called a Hazard Analysis and Critical Control Point
12 system, or HACCP, H-A-C-C-P, and that -- that is a
13 process by which you can ensure food safety by -- by
14 looking upstream at planning for food safety events
15 before they occur and planning to prevent the
16 occurrence of those adverse events.
17  Q.  Okay. Now, in this case you have rendered
18 your opinion and you did draft the report which is
19 marked Exhibit Number 2.
20  A.  Yes.
21  Q.  Would you please summarize for the ladies
22 and gentlemen of the jury what your opinions were in
23 this case?
24  A.  My opinion is that the bone that we found
25 in -- that was found in the Honeysuckle White ground

Page 19

1 turkey product and ingested are turkey and they're not
2 a different species.
3       The other conclusion I found is that the
4 hardened and ossified connective tissues were found in
5 the two unopened Honeysuckle White ground turkey chubs
6 that I understand were purchased at the same time as
7 the -- as the product that was ingested, and also the
8 size and bone fragments as well as the hardened and
9 ossified connective tissue that were found in the
10 unopened chubs, the size of the bone fragments that
11 were consumed and the product that -- that the
12 individual did consume are consistent with the grind
13 size of that ground turkey and could have been
14 processed together by Cargill.
15  Q.  Okay. And would you please describe for
16 opinion number 1, the bone in the Honeysuckle White
17 ground turkey product and ingested foreign material is
18 from turkey and not -- not a different species, would
19 you please describe for the jury the analysis that you
20 went through in order to conclude that the bone in the
21 Honeysuckle White ground turkey product and ingested
22 foreign material is from turkey and not from a
23 different species.
24  A.  Yes. So I took custody of the product. I
25 sent it to a laboratory of my choosing, which I

Page 20

1 understand was a very strong laboratory that was well
2 experienced in this type of work, Certified
3 Laboratories of the Midwest. They took the product and
4 they did both visual microscopic as well as physical
5 examination, and also used a PCR analysis which is
6 unique to turkey species - it does not have
7 cross-reactivity to other species - and they verified
8 that indeed the bone and connective tissue that they
9 were testing from the fragments as well as the ingested
10 piece were indeed turkey.
11  Q.  Okay. Now, do you believe that the turkey
12 bone fragments and hardened/ossified turkey connective
13 tissue were ingested by Joshua Blancett from the turkey
14 product?
15  A.  I believe that they were.
16       MR. ELZA:  Objection, form.
17 BY MR. TRUJILLO:
18  Q.  Okay. And what is the basis of your
19 opinion?
20  A.  That the ingested piece was, again,
21 consistent -- the fragment in the ingested piece was
22 consistent with the other bone fragments that were
23 found in the product and were tested, that they all
24 tested to be turkey products, and, again, my
25 understanding is that they were consumed at the same

Page 21

1 time. The turkey chubs were also found -- or purchased
2 at the same time as the product that was involved and
3 ingested, and so I believe they are all consistent.
4  Q.  Okay. Did you have an opportunity to look
5 at the Alteca laboratory results that were -- where the
6 turkey chubs were sent to before you were retained in
7 this case to render an opinion?
8  A.  I did.
9  Q.  Okay. Now, this was a separate laboratory,
10 Alteca laboratories. Do you know where that laboratory
11 is located?
12  A.  I understand it's in Manhattan, Kansas.
13  Q.  Okay. And the Cargill -- Cargill has
14 retained an expert from Kansas State University that's
15 located in Manhattan, Kansas. Is that where Alteca
16 laboratories is located?
17  A.  I understand that based on my knowledge of
18 their letterhead --
19  Q.  Okay.
20  A.  -- and also their website.
21  Q.  Now, if you go -- I'd like to mark that as
22 Exhibit Number 3.
23  A.  My aunt taught at Kansas State University,
24 so I'm well familiar with Manhattan, Kansas.
25       (Marked Deposition Ex. 3)

6 (Pages 18 - 21)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 22

1 BY MR. TRUJILLO:
2   Q.   Here you go.
3        Now, if you look at Exhibit Number 3
4 towards the bottom -- or towards the middle it states,
5 "FTIR analysis gives a quality match to Honeysuckle
6 White turkey for the meat in the Ziploc bag and on the
7 bone fragment." Do you see that?
8   A.   Yes, I do.
9   Q.   What -- what is your understanding of what
10 that -- that -- that means?
11   A.   That, again, Alteca used a variety of
12 different labor -- laboratory techniques, analytical
13 techniques in order to assess the characteristics of
14 the fragments and the connective tissue, and this was
15 one type of analy -- analysis which characterizes
16 the -- the product. It actually looks -- as I
17 understand, the chemical nature of the product is
18 Fourier transform infrared test and it would
19 characterize the -- the protein to be consistent with,
20 in this case, consistent with -- with the Honeysuckle
21 White turkey.
22   Q.   Okay. In other words, the -- the meat that
23 was on the bone actually matched the meat that was
24 inside the turkey chub from the Honeysuckle White
25 turkey brand; is that correct?

Page 23

1   A.   Yes, they were consistent.
2        MR. ELZA: Objection, form.
3   A.   Yes, what -- my understanding is that -- is
4 that the analysis, again from the -- from the meat that
5 was on the bone and the connective tissue matched the
6 turkey product that was in the -- the Honeysuckle White
7 ground turkey meat.
8        MR. ELZA: Objection. non-responsive on
9 everything after her original answer.
10 BY MR. TRUJILLO:
11   Q.   Now, was the -- the laboratory that you
12 sent the product to be tested at, were those findings
13 consistent with the Altec -- Alteca laboratory findings
14 with regard to the -- the meat that was on the bone
15 matching up with the Honeysuckle White turkey meat in
16 the chub?
17   A.   Yes, they've been consistent that this is
18 turkey and not any different species.
19   Q.   Okay. And the other question I have is,
20 towards the bottom Mr. Throckmorton indicates, "The
21 physical and residual evidence shows the raw bone
22 fragments are too large in size and have been sliced,
23 indicating that these bone fragments were not processed
24 with the ground turkey. The source of the raw bone
25 fragments could not be conclusive" -- "conclusively

Page 24

1 determined based on the background information." Do
2 you see that?
3   A.   I do.
4   Q.   Do you agree with those conclusions?
5   A.   No.
6   Q.   Why not?
7   A.   I don't understand the basis for which they
8 drew those conclusions based on their evaluation of the
9 product.
10   Q.   Okay. And when you looked at the turkey
11 bones, did you see any turkey bones that had -- that
12 had been actually cooked?
13   A.   Turkey bones that had been actually cooked?
14   Q.   Yes.
15   A.   I did not do an evaluation to evaluate
16 whether they were cooked.
17   Q.   Okay. Do you know if Alteca laboratories
18 did an evaluation to see if any of the turkey bones had
19 been cooked?
20   A.   This document reports that they did a
21 cook/bake test and that they -- their discussion here
22 is about the raw bone fragments.
23   Q.   Okay. So those have not been cooked based
24 on your understanding of the Alteca laboratory
25 examination, correct?

Page 25

1   A.   Correct. I'm just responding to what the
2 report says.
3   Q.   Okay. Now, if we go back to your report,
4 what is your understanding of where those four bone
5 fragments originated from, the ones that you sent out
6 to be tested?
7   A.   My understanding is that they were from the
8 product that the individual had -- was using, was
9 cooking from and actually had consumed. So they were
10 from a chub that had been opened and that the
11 individual had prepared some food for -- for a meal.
12   Q.   Okay. Now, would you please describe the
13 procedure that the lab underwent in order to have the
14 four turkey bones tested?
15        MR. ELZA: Objection, form.
16   A.   And your question is about Certified Labs
17 of Midwest?
18 BY MR. TRUJILLO:
19   Q.   Yes.
20   A.   Again, they were -- they were visual,
21 physical and microscopic techniques, and then also
22 using PCR analysis was able to characterize the DNA,
23 and that -- the PCR test is the test which actually
24 proved that the species was turkey and not a different
25 species. So the analysis of the hardened connective

7 (Pages 22 - 25)

Page 26

1 tissues that they saw from the samples that -- from the
2 individual as well as the ingested sample, they did
3 microscopic analyses of -- of those and have pictures
4 of 10X amplification which show the nature of those, of
5 those pieces. They also found pieces in the two
6 unopened chubs of five different hardened and ossified
7 pieces, which I regard as unusual.
8    Q.    Okay. And what were the results of that
9 when the unopened turkey chubs were tested?
10    A.    The unopened turkey chubs were -- were
11 evaluated in toto, so the two chubs were -- were
12 combined and they looked for different -- they looked
13 for bone fragments. They did not find any bone
14 fragments but they found five hardened/ossified
15 fragments which could be mistaken for bone that could
16 also cause the same adverse effect, if consumed, as
17 bone would.
18    Q.    Okay. Now, do you believe that the bone
19 fragments were ossified/hardened materials were
20 found in the samples of the turkey chubs that were
21 tested, do you believe that those should have been sold
22 to the public?
23        MR. ELZA: Objection, form.
24    A.    I regard them as defects and, as defects,
25 they should not be in products that would be sold to

Page 27

1 the public.
2 BY MR. TRUJILLO:
3    Q.    Okay. And why shouldn't, as defects, why
4 shouldn't they be sold to the public?
5    A.    Because bone fragments, like other foreign
6 material particles like plastic and rubber, things like
7 that, once consumed can cause damage to not only the
8 mouth, the throat, but also the stomach and other parts
9 of the body.
10    Q.    Okay. Do you have an opinion as to whether
11 the bone fragments and ossified connective tissue are
12 consistent with the grind size of the Honeysuckle White
13 ground turkey and could have been processed by Cargill
14 Meat Solutions?
15        MR. ELZA: Objection, form.
16    A.    I did not see the unopened meat products
17 from the -- or from the meat from the unopened chubs.
18 However, Certified Laboratories of the Midwest did an
19 evaluation looking at the grind size and judged that
20 that was consistent with the -- with the size of the
21 particles, that they could have been processed together
22 and that the bone fragments could have been from the --
23 the chubs of ground turkey meat.
24 BY MR. TRUJILLO:
25    Q.    Okay. If you go to page 4 of your report,

Page 28

1 I believe page 4 has a photograph of a bone fragment.
2    A.    Yes.
3    Q.    Would you please show that photograph to
4 the jury?
5    A.    (Witness complies.)
6        MR. ELZA: Objection, form.
7 BY MR. TRUJILLO:
8    Q.    Okay. Dr. Hutt, would you please describe
9 what's depicted on that photograph.
10    A.    This is an amplification, again a 10X
11 amplification in this case, of a bone fragment with
12 connected -- connective tissue which looks hardened.
13    Q.    Should that have been inside of the turkey
14 chubs that were purchased by Mr. Blancett?
15    A.    Based on my experience this would be a
16 defect and would not be expected to be in that turkey
17 product, no.
18    Q.    Okay. Now if you go to page 5 of your
19 report. You also have a photograph there I believe of
20 a -- or strike that.
21        What is depicted on the photograph that you
22 are holding which is taken from page 5 of your report?
23    A.    This is a picture of again an amplification
24 of a bone fragment with less connective tissue attached
25 to it. That's a more precise bone fragment.

Page 29

1    Q.    And should that have been inside of the
2 turkey chub that was purchased by Mr. Blancett?
3    A.    No.
4    Q.    Okay. And what procedure was used to
5 amplify that, that photograph?
6    A.    This would have been a microscopic
7 amplification.
8    Q.    Okay. And do you know how many times it
9 was magnified?
10    A.    Yes, it's 10 times.
11    Q.    Okay. And do you know approximately, if
12 you look at the two photographs that we have already
13 looked at, approximately how large are those bone
14 fragments?
15    A.    I don't have a measurement but I know the
16 Alteca laboratory did a measurement. Would you like me
17 to look for that?
18    Q.    Sure. Or if you could just tell us more or
19 less if they're larger than 1 inch or smaller than
20 1 inch?
21    A.    They're smaller than 1 inch, and again
22 consistent with the grind size in a ground meat
23 product.
24    Q.    Okay. Now, if you go to -- strike that.
25        If those two products are ingested, could

8 (Pages 26 - 29)

Page 30

1 that pose a potential hazard to the person that eats
2 those bone fragments?
3    A.   Yes.
4         MR. ELZA: Objection, form.
5 BY MR. TRUJILLO:
6    Q.   And why do you believe that?
7    A.   Again, one of the things that we're very
8 concerned about in food manufacturing is having bone
9 in -- in a product. It -- it has been related to
10 adverse health effects. It can cause damage to, again,
11 the mouth cavity. It can cause damage to the throat
12 when swallowed, and it can also cause damage in the
13 stomach and the small and large intestine as it is
14 passing through the body, ripping mucosal lining and
15 causing internal damage and bleeding.
16    Q.   Okay. Now, if you look at page 6, there is
17 a photograph there.
18    A.   Mm-hmm.
19    Q.   What is -- what does the photograph on page
20 6 of your report, what does that depict?
21    A.   This is a 10-fold magnification again of
22 the sample that was labeled as ingested.
23    Q.   Okay. And in your opinion, what was the --
24 what does that show?
25    A.   I'm not really clear what this picture is

Page 31

1 showing and I did look at the sample before it was sent
2 to the laboratory, but clearly this is from a product
3 that was prepared and then apparently ingested.
4    Q.   Okay. And should that have been inside of
5 the turkey chubs that were purchased by Mr. Blancett?
6    A.   No.
7    Q.   Was that -- would that also be a defect?
8    A.   Yes.
9    Q.   And is that dangerous?
10    A.   Yes.
11    Q.   Now if you look at page number 7, and I
12 believe your opinion was that the hardened/ossified
13 connective tissue were found in the two open ground
14 turkey chubs. Would you please describe the
15 methodology for that opinion that you gave in order to
16 test the, what was -- what's depicted on page 7 of your
17 report?
18         MR. ELZA: And I am going to object to the
19 form because it, I mean, that's the exact opposite of
20 what it says. I mean you changed the words --
21         MR. TRUJILLO: Okay.
22         MR. ELZA: -- from "unopened" to "opened."
23 So, I mean, I just -- I don't normally do speaking
24 objections but that's --
25         MR. TRUJILLO: Okay.

Page 32

1         MR. ELZA: -- a bit much.
2         MR. TRUJILLO: That's fine.
3 BY MR. TRUJILLO:
4    Q.   Would you please describe the methodology
5 that you used when you rendered your opinion on opinion
6 number 2 regarding the hardened/ossified connective
7 tissue were found in the two unopened ground turkey
8 chubs?
9    A.   Okay. For clarification, the picture is
10 actually showing the bone fragments from the product
11 that was consumed as well as the ingested, and then a
12 small sample of the product taken from the unopened
13 chubs once they opened it.
14         My conclusions based on -- on the -- on
15 their findings of the five hardened/ossified fragments
16 that came from the unopened chubs was based on
17 Certified Laboratories of the Midwest's analysis of
18 those two unopened chubs. They opened them up and
19 spread them out on a tray and then went through them
20 methodically and using an evaluation so they'd cover
21 the entire -- entire spectrum of the product, and they
22 simply looked for physical -- they physically and
23 tactilely looked for bone fragments or hardened
24 material and they found the five hardened/ossified
25 connective tissue, but then they looked at

Page 33

1 microscopically to evaluate their size and their --
2 their composition.
3    Q.   Okay. Now if you look at -- if we can show
4 that to the -- the jury. I believe those are petri
5 dishes; is that correct?
6    A.   They're petri dishes.
7    Q.   Okay.
8    A.   This would be standard procedure in a
9 analytical lab where you are taking a record of -- of
10 samples.
11    Q.   Okay. And I'll point at, since there's
12 four dishes there, I'll go ahead and point.
13         What is depicted on -- in this petri dish
14 right here?
15    A.   You are talking about that petri dish right
16 there.
17    Q.   Yes.
18    A.   It's one of the bone fragments that came
19 from the product that had been ingested or that had
20 been consumed. It was not the ingested sampled but it
21 was from the product that had been consumed.
22    Q.   Okay. And do you know approximate --
23 approximately how large that bone fragment is?
24    A.   Again, Alteca measured this bone fragments,
25 but yes, less than an inch.

9 (Pages 30 - 33)

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

Page 34

1    Q.   Okay. Now, if you look at what's depicted
2  on number -- or letter C, what would that be?
3    A.   Letter C was the picture of the product
4  that was labeled "Injested [sic]."
5    Q.   Okay. And approximately how large was
6  that; do you know?
7    A.   The -- the bone fragment is hard to tell
8  from my visual analysis because it is -- it is
9  obviously a prepared product and I don't see a bone
10 fragment, but the laboratories, both Alteca and as well
11 as Certified Laboratories of the Midwest have verified
12 that the bone fragments are in that, are in that
13 product.
14   Q.   And should that have been inside of the
15 turkey chubs that were purchased by Mr. Blancett?
16   A.   No.
17   Q.   And are those considered defects?
18   A.   They are indeed.
19   Q.   And are those dangerous to the public?
20   A.   Yes.
21   Q.   Okay. Now if we look at this one that's on
22 the bottom first quadrant of the photograph, let --
23   A.   Okay.
24   Q.   -- letter D.
25   A.   Letter D.

Page 35

1    Q.   What is that?
2    A.   That is a sample from the, one of -- from
3  the combined two unopened chubs that then obviously
4  were opened by Certified Laboratories of the Midwest
5  for visual and physical examination.
6    Q.   Were there any bone fragments found in
7  letter D?
8    A.   There are no bone fragments found in D.
9  They found five hardened/ossified connective tissue
10 pieces.
11   Q.   Okay. And then the last one, it's very
12 small. I believe it's letter A?
13   A.   Yes.
14   Q.   What is that?
15   A.   Letter A would be the other bone fragment
16 that came from the product that the individual opened
17 and had consumed product from.
18   Q.   Okay. And is that dangerous material?
19   A.   Yes.
20   Q.   Okay. Not -- not something that should be
21 sold to the public.
22   A.   No.
23   Q.   Okay. And that's considered a defect as
24 well?
25   A.   Indeed, yes.

Page 36

1    Q.   Okay. Now if you go to page 8 of your
2  report. Would you hold that photograph up for the
3  jury, please?
4    A.   Mm-hmm. (Witness complies.)
5    Q.   What is pho -- what is depicted on
6  photograph number 8? I'm -- photograph, figure 4, page
7  8 of your expert report.
8    A.   This is labeled "Contents of two ground
9  turkey packages received in consumer packaging."
10       They were physically examined for bone
11 fragments. I had asked Certified Laboratories of the
12 Midwest to do a physical examination on the two
13 unapp -- unopened packages to check for bone fragments
14 or any other foreign material.
15   Q.   Okay. And I believe you've already
16 described the procedure that they went through
17 tactilely to go through and pick out turkey bones; is
18 that correct?
19   A.   Yes.
20   Q.   Okay. Now if you would go to page number
21 9, figure 5, would you describe what's depicted on
22 figure 5.A. for the jury?
23   A.   This is a hard fragment. This is the first
24 of the five hard fragments that they isolated from the
25 ground turkey in consumer packaging, and they state

Page 37

1  that it "consisted of a tough connective tissue
2  fragment," and this is a 1-fold magnification.
3    Q.   Okay. And do you know approximately how
4  large that small fragment is?
5    A.   I don't have an exact measurement, but
6  clearly less than an inch.
7    Q.   Okay. And is that fragment, is that a
8  defect?
9    A.   It would be considered a defect in my
10 experience.
11   Q.   Okay. And is that something that should be
12 sold to the public?
13   A.   This would -- should not be sold to the
14 public.
15   Q.   Do you believe that fragment is dangerous?
16   A.   It could be.
17   Q.   Okay. Now, if you go to page 10, would you
18 please hold up figure 5.B. and describe what's depicted
19 on 5.B.B for the jury?
20   A.   This is a 10-fold magnification of the same
21 piece that we saw in the earlier picture which was a
22 1-fold magnification. So here we see again, as they
23 described, the hardened "tough connective tissue
24 fragment" coming from the ground turkey in the consumer
25 packaging. This is just a larger amplification showing

10 (Pages 34 - 37)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 38

1 that it is not -- not smooth, has connective tissue,
2 which again is described as hardened, ossified and
3 would be sharp and not -- not meant to be consumed.
4    Q.    Okay.  And would that be dangerous to the
5 public?
6    A.    I believe it would be.
7    Q.    And that would also -- would that be a
8 defect?
9    A.    Yes.
10    Q.    Okay.  Now, if we go to page 12, or I'm
11 sorry, page 11?
12    A.    Okay.
13    Q.    Would you please show that to the jury and
14 describe what's depicted in that photograph?
15    A.    This is a second of the five pieces that
16 Certified Laboratories of the Midwest isolated from the
17 ground turkey in consumer packaging.  They labeled it
18 as consisting "of a connective tissue fragment
19 consistent with the characteristics of a partially
20 hardened/ossified tendon or ligament associated with
21 turkey connective tissue."  And again this is a 1-fold
22 magnification.
23    Q.    Okay.  And what is connective tissue?
24    A.    Connective tissue is ligament, muscle
25 tissue that would come from a joint, for example, that

Page 39

1 would be used in a live animal to operate that joint.
2    Q.    Okay.  And then you also indicate I believe
3 in your report that that would be a partially hardened
4 or ossified tendon or ligament?
5         MR. ELZA:  Objection, form.
6    A.    Yes.
7 BY MR. TRUJILLO:
8    Q.    Correct?
9    A.    Yes.
10    Q.    Is that -- is that something that should be
11 sold to the public?
12    A.    No.
13    Q.    Okay.  Do you believe that that's a defect?
14    A.    Yes.
15    Q.    Okay.  Now if we go to page 12, would you
16 please show and describe for the jury what is depicted
17 on that photograph?
18    A.    This is a larger amplification, a 10-fold
19 amplification of the -- of the second of the five
20 pieces of hardened/ossified connective tissue that they
21 found from the previously unopened chubs of turkey
22 product, ground turkey product.
23    Q.    And do you believe that to be a defect?
24    A.    Yes.
25    Q.    Is that dangerous to the public?

Page 40

1    A.    It could be, yes.
2    Q.    If you go to the next page.
3         Would you please describe what's depicted
4 on that photograph for the jury?
5    A.    The previous picture was actually the left
6 side of the second fragment, second of five fragments.
7 This is the right side of the hard fragment isolated
8 from the ground turkey in the consumer packaging, again
9 labeled that it "consisted of connective tissue
10 fragment consistent with the characteristics of
11 partially hardened/ossified tendons or ligaments
12 associated with connective" -- "with turkey connective
13 tissue," again at 10-fold magnification.
14    Q.    And approximately how large is that
15 fragment?
16    A.    It is small, less than an inch, but again I
17 don't have the exact measurements.  They are in the
18 Alteca report.
19    Q.    Okay.  Do you believe that that fragment is
20 something that would have been inside or that was
21 inside the chubs of turkey that were purchased by
22 Mr. Blancett?
23         MR. ELZA:  Objection, form.
24    A.    Yes, I believe that this is the product
25 that was found or the fragment that was found by

Page 41

1 Certified Laboratories of the Midwest in their analysis
2 of the unopened chubs.
3 BY MR. TRUJILLO:
4    Q.    Okay.  Would that be considered a defect
5 also?
6    A.    Yes.
7    Q.    Okay.  And is that dangerous to the public?
8    A.    It could be, yes.
9    Q.    Okay.  If you go to the next page of your
10 report, would you please describe what's depicted on
11 that photograph?
12    A.    This is the third of the five
13 hardened/ossified connective tissue fragments that they
14 found from the ground turkey when they opened the
15 previously unopened chubs.  This is a 1-fold
16 magnification.
17    Q.    Okay.  Is that a defect?
18    A.    Yes.
19    Q.    Is that dangerous to the public?
20    A.    It could be.
21    Q.    Okay.  And approximately how large is that
22 fragment?
23    A.    It's less than an inch.
24    Q.    Okay.  If you'd go to the next page, what's
25 depicted -- would you please show that to the jury and

11 (Pages 38 - 41)

Page 42

1 describe what's depicted on that photograph?
2   A.   This is the same, third of the five
3 connective tissue fragments that they found when
4 looking at the previously unopened chubs, and this is a
5 10-fold magnification of the same piece but it is
6 showing the irregular nature of the fragment, rough,
7 and again described as hardened partially ossified
8 connective tissue, which would be rough to the touch as
9 well as something that should not be consumed.
10   Q.   Okay. And is that dangerous to the public?
11   A.   It could be.
12   Q.   Would that be considered a defect?
13   A.   Yes.
14   Q.   And approximately how large is that
15 fragment?
16   A.   I don't have exact measurements. Clearly
17 less than an inch but consistent with the grind size of
18 the -- of the turkey.
19   Q.   Okay. If we go to the next photograph,
20 would you please show that to the jury and describe
21 what's depicted on that photograph?
22   A.   This is the fourth of five fragments that
23 were isolated from the previously unopened two chubs of
24 ground turkey product, and this is a 1-fold
25 magnification of a -- described as "connective

Page 43

1 tissue ... consistent with the characteristics of
2 partially hardened/ossified tendons or ligaments
3 associated with turkey connective tissue."
4   Q.   Okay. Would that be considered a defect?
5   A.   Yes.
6   Q.   Do you know approximately how large that
7 fragment is?
8   A.   I don't know how large the fragment is in
9 measurements but it is much larger than any of the
10 other pieces, and then again in a 1-fold magnification
11 it is quite large.
12   Q.   Is that something that should be
13 manufactured and sold to the public?
14   A.   No.
15   Q.   Is it dangerous to public?
16   A.   It certainly could be.
17   Q.   Okay. If we go to the next page, would you
18 please show the jury what's depicted on that
19 photograph?
20   A.   This is the same piece, again the fourth of
21 five different pieces that were found in the previously
22 unopened two chubs of ground turkey. This is a 10-fold
23 magnification focusing on the left side of the
24 fragment.
25   Q.   Okay. Do you know approximately how large

Page 44

1 that fragment is?
2   A.   I don't. I don't know the measurements. I
3 don't know the measurements exactly, no.
4   Q.   Okay. But it was magnified at
5 approximately how much?
6   A.   This is the left side of the -- of the
7 particle that's magnified 10-fold.
8   Q.   Okay. And would you consider that to be a
9 defect?
10   A.   Yes.
11   Q.   Is that something that's dangerous to the
12 public?
13   A.   It certainly could be.
14   Q.   Okay. And is that something that should be
15 manufactured and sold to the public?
16   A.   No.
17   Q.   Okay. If we go to the next page, would you
18 please describe -- or would you please show and
19 describe what's depicted on that photograph?
20   A.   This is the same piece. Because of its
21 large nature, they actually divided this into three
22 different pictures. The previous picture was left
23 side, and this is the center of that same fragment that
24 is magnified 10-fold.
25   Q.   Okay. And do you consider that to be a

Page 45

1 defect?
2   A.   Yes.
3   Q.   Okay. Approximately how large do you think
4 that fragment is?
5   A.   I don't have the exact measurements, but
6 it's larger than any of the other pieces that were
7 found.
8   Q.   Okay. And is that something that should be
9 manufactured and sold to the public?
10   A.   No.
11   Q.   Okay. Do you believe that that fragment
12 poses a danger to the public?
13   A.   It certainly could.
14   Q.   Okay. If you go to the next photograph,
15 would you please show that to the jury and describe
16 what's depicted on that photograph?
17   A.   Again, this is the same piece, the fourth
18 of five pieces of connective tissue, hardened/ossified
19 connective tissue that were isolated from the
20 previously unopened two chubs of ground turkey meat.
21 This is focusing on the right side of that same piece.
22 Again, this is now a 10-fold magnification.
23   Q.   Okay. Do you know approximately how large
24 that fragment is?
25   A.   I don't know exactly its precise size, no.

12 (Pages 42 - 45)

Page 46

1  Q.  Okay. And is that something that you would
2  consider to be a defect?
3  A.  Yes.
4  Q.  Is that something that should be sold to
5  the public?
6  A.  No.
7  Q.  Do you believe that that pose -- that
8  fragment poses a danger to the public?
9  A.  It certainly could.
10  Q.  Okay. If we go to the next photograph,
11  would you please show that to the jury and describe
12  what's depicted on that photograph.
13  A.  This is the fifth of five fragments that
14  were found, again hardened/ossified connective tissue.
15  This is a 1-fold magnification.
16  Q.  Okay. Now, for all of the photographs that
17  we have asked, do those photographs true -- do they
18  truly and accurately depict the bone fragments that
19  were tested and upon which you have rendered your
20  opinions on?
21  A.  Yes, I --
22  MR. ELZA: Objection, form.
23  A.  I extracted these photographs from the
24  report of Certified Laboratories of the Midwest and
25  inserted them into my report.

Page 47

1  BY MR. TRUJILLO:
2  Q.  Okay. Now, would you consider what's
3  depicted on that photograph as a defect?
4  A.  Yes.
5  Q.  And do you believe that that's dangerous to
6  the public?
7  A.  It could be.
8  Q.  If we'd go to the next photograph, would
9  you please show that to the jury and explain or
10  describe what's depicted on that photograph?
11  A.  This is a 10-fold magnification of the
12  piece we looked at previously, the fifth of the five
13  pieces that were found, and again with a 10-fold
14  magnification you see the irregular nature of the
15  hardened and ossified connective tissue which would be
16  sharp to touch.
17  Q.  And do you consider that fragment to be
18  a -- a defect?
19  A.  Yes.
20  Q.  Would that be dangerous to the public if
21  consumed?
22  A.  It certainly could be.
23  Q.  Is that something that should have been
24  manufactured and sold to the public?
25  A.  No, not in my opinion.

Page 48

1  Q.  Okay. Now I've got some other photographs
2  here which I'd like to mark as well. This is
3  photograph number 4.
4  MR. ELZA: What do you mean "photograph
5  number 4"?
6  MR. TRUJILLO: I'm sorry. Exhibit Number
7  4 --
8  MR. ELZA: Okay.
9  MR. TRUJILLO: -- which is a photograph. I
10  apologize.
11  (Marked Deposition Ex. 4)
12  BY MR. TRUJILLO:
13  Q.  Do you recall, is that -- what's depicted
14  on the exhibit that you are holding?
15  A.  This is a picture of the unopened, one of
16  the unopened chubs of ground turkey meat.
17  Q.  Okay. And was ossified connective tissue
18  found in that turkey chub?
19  A.  Yes. This is one of the turkey chubs that
20  was evaluated by Certified Laboratories of the Midwest,
21  where five pieces of hardened/ossified connective
22  tissue were found.
23  Q.  Okay. And I've got Exhibit Number 5, 6 and
24  7.
25  (Marked Deposition Exs. 5 - 7)

Page 49

1  BY MR. TRUJILLO:
2  Q.  Have you seen these photographs before?
3  A.  Yes.
4  Q.  Would you please show Exhibit Number 5 to
5  the jury and describe what's depicted on Exhibit Number
6  5?
7  A.  I understand these are pictures of the bone
8  fragments taken from the individual's chub that he --
9  that he did consume product from, and that these were
10  the five fragments before they had been evaluated
11  multiple times and so they have changed nature somewhat
12  as they were evaluated by multiple laboratories over
13  time, but these -- these are the original photographs.
14  Q.  Okay. And the fragment that's depicted on
15  Exhibit Number 5, do you believe that that was cooked?
16  A.  It appears that it has been cooked.
17  Q.  Okay. Would you hold up Exhibit Number 6
18  and describe for the jury what's depicted on Exhibit
19  Number 6?
20  A.  Number 6 is showing the multiple bone
21  fragments, as again I understand these were taken from
22  the chub that the individual had opened and had
23  prepared food that -- prepared food from and also
24  ingested this food, but these are -- these are the bone
25  fragments that were ultimately evaluated by the

13 (Pages 46 - 49)

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

Page 50

1 Certified Laboratories of the Midwest.
2    Q.    Okay. And would you consider -- or if you
3 could hold up Exhibit Number 7 and describe for the
4 jury what's depicted on Exhibit Number 7?
5    A.    Well, this is a particularly good picture
6 of the -- of the connective tissue and the meat and
7 also the tendons and ligaments coming off of this that
8 were again hardened, semi-hardened, but this -- this
9 product does look like it has been cooked by its nature
10 of the -- of the meat that surrounds the connective
11 tissue and bone.
12    Q.    Okay. Now, based on what's depicted on
13 Exhibit Number 5, 6 and 7, do you consider those
14 fragments to be defects?
15    A.    Yes. I don't know the exact magnification
16 from these, but clearly bone fragments of any size and
17 nature should not be in product intended for sale to
18 the consumer.
19    Q.    Okay. And are those fragments, in your
20 opinion, based on your expertise in food science, do
21 you believe that those fragments are dangerous to the
22 public?
23    A.    Yes, certainly could be.
24    Q.    And do you believe that they are defects?
25    A.    Yes.

Page 51

1    Q.    Okay. Now, have your opinions been based
2 upon a reasonable degree of scientific certainty?
3    A.    Yes.
4    Q.    Okay.
5        MR. TRUJILLO: Dr. Hutt, I have no further
6 questions. I pass the witness.
7        THE WITNESS: Thank you.
8            EXAMINATION
9 BY MR. ELZA:
10    Q.    What does a reasonable degree of scientific
11 certainty mean in -- in your field?
12    A.    My assessment, it is an evaluation based on
13 my experience, my scientific background and training
14 and my understanding of industry practices and
15 regulations that are part of the food products that we
16 regulate.
17    Q.    And so as I read your report and I hear
18 your testimony today, your reasonable degree of
19 scientific certainty is looking at certain materials
20 and making a determination of what could have happened
21 or what they could have caused?
22        MR. TRUJILLO: Objection, form.
23    A.    Can you be more specific? I'm not sure.
24 You mentioned cost?
25 BY MR. ELZA:

Page 52

1    Q.    I mentioned what?
2    A.    You mentioned cost?
3    Q.    Not at all.
4    A.    Okay. I'm sorry. Would you please repeat
5 your question?
6    Q.    It's my understanding from reading through
7 your report and listening to your testimony today that
8 your reasonable degree of scientific certainty is
9 looking at certain materials and information and making
10 a determination of what they could have caused or --
11 could have "caused," that's where you heard --
12    A.    I'm sorry.
13    Q.    -- or the possibility that events could
14 have arisen from those materials.
15        MR. TRUJILLO: Objection, form.
16    A.    I based my -- my statements on my
17 experience, my training, as well as having been in this
18 field of actually dealing with foreign material defects
19 in products, meat-containing products, other types of
20 products as well, and what we do in the industry to
21 prevent these products, these foreign materials being
22 in product and what we do in the dispositioning and --
23 and management of -- of complaints.
24        MR. ELZA: Objection, non-responsive.
25 BY MR. ELZA:

Page 53

1    Q.    My question is what you are doing is you
2 are taking the information that's been provided to you
3 and you're formulating opinions on what that
4 information could mean or the possibilities that could
5 arise out of that information that you've been
6 provided, correct?
7        MR. TRUJILLO: Objection, form.
8    A.    I don't understand your question.
9 BY MR. ELZA:
10    Q.    Well, all through your report you talk
11 about this could have caused this, this could have come
12 from this. You've used the word "could" in your
13 testimony probably a hundred times. That's what you're
14 looking at, is the information that you've been
15 provided and what it could have caused or the
16 possibilities of what might have happened as a result
17 of those materials or that information, correct?
18        MR. TRUJILLO: Objection, form.
19    A.    Regulatory language as well as regulatory
20 enforcement is -- is predicated on what could happen,
21 that something could be injurious to health, that it
22 may cause potential harm. It is not required to
23 actually cause harm in order to be a regulatory
24 violation.
25 BY MR. ELZA:

14 (Pages 50 - 53)

Page 54

1  Q.  Right. And would you agree with me that
2  you're not qualified to talk about how any of these
3  materials that you have discussed here today actually
4  caused some type of injury to a person?
5        MR. TRUJILLO: Objection, form.
6     A.  I am qualified to render judgment whether
7  they should be in a product and whether or not they
8  would be a regulatory violation based on their
9  potential to cause harm, yes.
10 BY MR. ELZA:
11    Q.  Again, so it's a potential or the
12 possibility that something could happen, correct?
13    A.  And that is the regulatory language as well
14 as the requirement that it not be there because of the
15 possibility and the potential to cause harm.
16    Q.  But you're not here to testify about what
17 types of injuries were actually caused by any of these
18 items that you have shown us pictures of, correct?
19    A.  That is correct.
20    Q.  Now, I understand one of the predicate
21 questions from the attorney who hired you is that all
22 of your opinions in your report and in your testimony
23 would be based on your personal knowledge. Did I
24 understand that correctly?
25    A.  My personal knowledge and experience, yes.

Page 55

1     Q.  There is lots of material in your report
2  and your testimony today that is not based on your
3  personal knowledge. Would you agree with me?
4        MR. TRUJILLO: Objection, form.
5     A.  I would ask you to be more specific in
6  terms of what you are referring to.
7  BY MR. ELZA:
8     Q.  Okay. We'll move on.
9        What assumptions did you make in coming to
10 your conclusions?
11       MR. TRUJILLO: Objection, form.
12       MR. ELZA: What's the basis?
13       MR. TRUJILLO: The basis is that it's --
14 it's confusing with regard to she made any assumptions
15 in arriving at her conclusions.
16 BY MR. ELZA:
17    Q.  Okay. What assumptions did you make in
18 coming to your conclusions?
19       MR. TRUJILLO: Objection, form.
20    A.  I don't believe I made any assumptions.
21 BY MR. ELZA:
22    Q.  Okay. And that's because everything that
23 you have opined about in your report and in your
24 testimony is based on your personal knowledge, correct?
25    A.  It is based on the procedure which would be

Page 56

1  the investigative procedure used in this type of case,
2  it's based on previous experience in pursuing this type
3  of defect and understanding the nature of its source as
4  well as its potential impact on a consumer.
5     Q.  So what was the investigative procedure
6  that you used in your consulting with the plaintiff's
7  attorneys on this matter?
8     A.  I received the product, I sent it to a
9  laboratory whose methodology and procedures and
10 experience I -- I trust, and received the report and
11 opined based on their evaluation.
12    Q.  And do you have a copy of their report?
13       THE WITNESS: Excuse me. Can I just -- I
14 need to cough.
15    A.  Yes, I do.
16 BY MR. ELZA:
17    Q.  And where is that?
18    A.  One moment.
19       Right here.
20    Q.  Okay. And you have a notebook there. What
21 is that notebook?
22    A.  This is the compilation of my documents
23 based on this case that I have received, as well as my
24 expert report and other documents that were requested
25 in the subpoena for deposition.

Page 57

1        MR. ELZA: Okay, I'd like to mark this
2  entire notebook as Exhibit 8.
3        (Marked Deposition Ex. 8)
4        MR. ELZA: I'm going to ask that the court
5  reporter make a copy of this document as you have kept
6  it.
7  BY MR. ELZA:
8     Q.  Now, does it have everything that you have
9  reviewed in coming to your conclusions?
10    A.  Yes.
11    Q.  Does it have a copy of the videotape that
12 was made of the manufacturing process by the
13 plaintiff's attorneys?
14    A.  It does not.
15    Q.  Where is your copy of that?
16    A.  I have not seen a videotape.
17    Q.  Okay, let's make sure we're on the same
18 page.
19       There was a videotape of the entire
20 manufacturing process from the plant this turkey came
21 from that was completed by the plaintiff and his
22 representatives, and you're saying you never saw that?
23    A.  I've never seen that.
24    Q.  Would that be something you would like to
25 see?

15 (Pages 54 - 57)

Page 58

1    A.    I may see it. I haven't seen it.
2    Q.    Okay. Is that something that you would
3 like to see?
4    A.    I've rendered my opinion based on what I
5 have been presented with.
6    Q.    Okay. Would it be fair to say that if you
7 had a chance to study the manufacturing process of this
8 product that it might change your opinions one way or
9 the other?
10    A.    Absolutely not.
11    Q.    And why is that?
12    A.    Because my experience in meat manufacturing
13 plants involves the knowledge and awareness of how this
14 product would have been processed. I've worked in meat
15 manufacturing plants most of my professional life --
16    Q.    Okay, and what --
17    A.    -- including the types of product that
18 Cargill manufactures.
19    Q.    Cargill manufactures thousands of types of
20 products all over the world, correct?
21    A.    Yes.
22    Q.    So, have you worked in turkey processing
23 plants?
24    A.    I have worked in turkey processing plants,
25 yes.

Page 59

1    Q.    Okay. Where?
2    A.    I have worked in turkey processing plants
3 as part of my experience with the regulatory agency
4 that enforces regulations for meat and poultry
5 inspection. I've been in many turkey processing plants
6 also with Campbell Soup Company, and chicken processing
7 plants with my experience with McDonald's as part of
8 supply chain management and head of quality. I've also
9 been in many of our suppliers' plants, which include
10 Cargill plants.
11    Q.    Okay. Which Cargill plants that work with
12 turkey products have you been in?
13    A.    Been in a Cargill plant in -- I can't --
14 can't remember the exact locations. I've been with
15 Cargill team members in multiple other plants including
16 OSI plants in this country as well as foreign
17 countries, in Brazil, and been in -- with the agency,
18 been in chicken processing plants in Puerto Rico, in
19 Arkansas, in Minnesota.
20    Q.    And just so we are on the same page, those
21 are all -- all those locations you just mentioned were
22 Cargill --
23    A.    No.
24    Q.    -- turkey plants that you've been in?
25    A.    No. These are multiple other plants that

Page 60

1 include Cargill, but I honestly don't remember exactly
2 which ones were Cargill.
3    Q.    Okay. You --
4    A.    I know I was in Cargill plants when I was
5 part of the federal agency, meat and poultry inspection
6 agency, and I've been in Cargill plants with various
7 companies where Cargill was a supplier.
8    Q.    And how does the manufacturing process that
9 was used for the turkey that we are here discussing
10 today differ from the process when you were in Cargill
11 plants at some point in your past?
12    A.    I have no basis of knowledge.
13    Q.    Okay.
14    A.    If it differs at all.
15    Q.    Make sure I didn't cut you off.
16          On the investigative procedure, you
17 received product, you sent it to a lab that you think
18 is a solid lab, you received their report, and I think
19 I took us off there.
20          Anything else in your investigative
21 procedure other than what you have testified to at this
22 point?
23    A.    Not to my recollection that would be
24 germane.
25    Q.    Now, one of the things you keep talking

Page 61

1 about is your experience in regulatory compliance,
2 correct?
3    A.    Yes.
4    Q.    What regulations in the federal code apply
5 to the manufacturing of ground turkey?
6    A.    Can you be more specific?
7    Q.    Well, I mean, you're here to look at a
8 specific type of product, correct?
9    A.    I'm not looking at anything. I'm looking
10 at the evidence of foreign material in a particular
11 product.
12    Q.    Does that material that you looked at
13 violate any regulation?
14    A.    Yes.
15    Q.    Which regulations?
16    A.    Presence of foreign material. It's
17 adulterated product.
18    Q.    Okay, and where do we find the presence of
19 foreign material?
20    A.    The presence of foreign material is the
21 bone fragments and the hardened/ossified connective
22 tissue, which are defects and foreign material in the
23 ground turkey meat.
24    Q.    Okay. Where do we find those regulations?
25    A.    In 9 CFR.

16 (Pages 58 - 61)

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

Page 62

1 Q. Now, you have not made any reference to any
2 federal regulations in your report. Would that be a
3 fair statement?
4 A. I did not make reference to any regulations
5 in my report, true.
6 Q. Now, one of the issues in this case relates
7 to labeling of a product, which you stated that you had
8 some significant experience in. Did I understand you
9 correctly?
10 A. I have experience in food regulations
11 regarding labeling, yes.
12 Q. Okay. Do you have any criticisms of the
13 labeling of the product in this case?
14 A. The labeling is compliant. It certainly
15 doesn't warn of any bone fragments that might be
16 present.
17 Q. And what is the purpose of warning somebody
18 that bone fragments might be present?
19 A. There shouldn't be a warning that bone
20 fragments might be present because they're not allowed
21 to be in the product.
22 Q. That's not a true statement, though, is it?
23 A. Well, they're not -- they're not allowed to
24 be in the product. If they can cause injury to an
25 individual, they're not allowed to be in the product,

Page 63

1 making it an adulterated product.
2 Q. Well, there are regulations that are very
3 specific on what type of bone matter can be allowed in
4 a product; would you agree with that?
5 A. There are regulations regarding the type of
6 material that could be allowed that would be derived
7 from bone, but bone fragments are not allowed.
8 Q. And so if I understand what you're saying,
9 you would label about a potential concern to provide
10 somebody notice to so they would know that there was a
11 potential danger in a food product. Is that correct?
12 A. No, that's not correct.
13 Q. What is the purpose of warning labels?
14 A. What type of warning label are you
15 referring to?
16 Q. On a food product.
17 A. What type of warning label on a food
18 product?
19 Q. Okay. What I'm telling you is you've been
20 hired as an expert by the plaintiffs, and one of their
21 complaints is that we did not label these properly. Do
22 you agree with the plaintiffs who have hired you or do
23 you disagree with the plaintiffs who have hired you?
24 A. Bone fragments are not something that
25 should be labeled as a warning. There are warning

Page 64

1 statements on meat and poultry labels with regard to
2 proper cooking, not to be consumed raw, other types of
3 consumer instructions to cook fully, cooking
4 temperatures for cooking. Bone fragments that can
5 cause injury should not be the content of a warning
6 label because you have no way of safeguarding yourself
7 from that danger.
8 Q. So if there's a bone in a product, there's
9 no way to safeguard yourself from that danger; do I
10 understand your testimony correctly?
11 A. Bones should not be in products that aren't
12 intended to have bones in them.
13 Q. Okay.
14 A. Ground turkey is not intended to have bone
15 in it that you would have to be concerned about.
16 Q. Okay. What is your opinion on if somebody
17 knew there were bones in ground turkey and went ahead
18 and ate it anyway, would that still be the fault of the
19 manufacturer for any damages that arose from that
20 decision to eat a material that had bone in it?
21     MR. TRUJILLO: Objection, form.
22 A. Bone should not be in ground turkey.
23 Specifically, the ground turkey product, that
24 Honeysuckle ground white turkey that is the subject of
25 this case, it should not have contained bone. Ground

Page 65

1 turkey should not contain bone.
2 BY MR. ELZA:
3 Q. Would you be critical of someone who ate a
4 material that they had been told had bone in it?
5     MR. TRUJILLO: Objection, form.
6 A. I don't --
7 BY MR. ELZA:
8 Q. Okay.
9 A. -- understand your question.
10 Q. Well, the -- the sworn testimony by the
11 plaintiff is that he had been told that there were
12 bones in this turkey and he took a bite of it anyway,
13 bit down on a bone and spit it out. Are those the
14 facts as you understand them?
15 A. I was not aware --
16     MR. TRUJILLO: Objection, form.
17 A. -- that he understood there might be a bone
18 in the product.
19 BY MR. ELZA:
20 Q. Well, you read his deposition, didn't you?
21 A. I've not seen his deposition.
22 Q. Nobody's provided you his sworn testimony
23 in this case about how he thinks he may have ingested
24 or not ingested a bone?
25 A. I don't believe I've seen his deposition.

17 (Pages 62 - 65)

Job No. 2486858     CATHERINE ADAMS HUTT - 12/07/2016

Page 66

1     MR. TRUJILLO: Objection, form.
2 BY MR. ELZA:
3     Q.    Would you like to see his deposition?
4     A.    I'd be happy to read it.
5     Q.    Okay. So back to my question:
6     Would you be critical of someone who ate a
7 material that they had been told had bones in it?
8     A.    If it were --
9     MR. TRUJILLO: Objection, form.
10     A.    If it were a piece of fish where you expect
11 the bones to be found, then you eat the product,
12 looking for bone.
13 BY MR. ELZA:
14     Q.    Similarly, would you agree with me that if
15 somebody tells you a product has bones in it, when you
16 take a bite of it you'd be looking to see if it had
17 bones in it, fair?
18     MR. TRUJILLO: Objection, form.
19     A.    Well, I'm not aware that this product was
20 so labeled, so I don't understand the nature of the
21 question.
22 BY MR. ELZA:
23     Q.    Well, what I'm telling you is there's sworn
24 testimony by the plaintiff that he had been told by the
25 person cooking the material that it had bones in it,

Page 67

1 and he went ahead and took a single bite of it, bit
2 down and then spit it out.
3     Are you critical of him for eating food
4 that he had been warned had bone in it?
5     MR. TRUJILLO: Objection, form.
6     A.    The product should not have had bone in it.
7 BY MR. ELZA:
8     Q.    I realize that.
9     A.    I don't understand why a person who is
10 preparing the product would comment that there is bone
11 unless they found bone; and if that were the case,
12 they -- the product should not be consumed.
13     Q.    Okay. Moving on from there, do you have
14 any personal knowledge that any bones were actually
15 swallowed by the plaintiff?
16     A.    I understand they were ingested. I don't
17 have any knowledge whether or not they were swallowed.
18     Q.    Who told you they were ingested?
19     A.    The label -- the evidence has been labeled
20 "ingested," and the Alteca laboratory did a test to
21 evaluate the presence of saliva on the sample, which
22 was positive.
23     Q.    Was that on cooked or uncooked material
24 that they did the saliva test?
25     A.    I don't know the nature of the product that

Page 68

1 they -- they did the test on.
2     Q.    Are you aware that Mr. Blancett, who
3 ultimately is the person who hired you, has testified
4 under oath that that material that was labeled
5 "ingested" was never ingested by him?
6     A.    I have no knowledge.
7     Q.    But one of the assumptions that you made in
8 this case is that he had in fact ingested that bone or
9 ossified fragment, correct?
10     A.    I don't believe I made an assumption. I'm
11 responding to what has been written and that I've read.
12     Q.    Okay. Well, you assumed it was true,
13 correct?
14     A.    I believed it to be true.
15     Q.    Okay. And nobody told you that he had
16 testified under oath that it was in fact not true, did
17 they?
18     A.    I'm not aware of that, no.
19     Q.    Okay. Are you aware of his statements in
20 the past that he does not recall swallowing a bone?
21     A.    I'm not aware of that, no.
22     Q.    That would be important information for you
23 to know, wouldn't it?
24     A.    No.
25     Q.    And why wouldn't it be important to know

Page 69

1 that he does not recall swallowing a bone?
2     A.    Because my testimony is on the evidence as
3 I see it that the fragments should not be in the
4 bone -- in the ground turkey product, they are not
5 intended to be there, there is no -- not -- there is no
6 warning that I see on the product that warns of such
7 bone presence, and the hardened/ossified connective
8 tissue as well as the bone fragments that I've observed
9 through the evaluation by Certified Laboratories of the
10 Midwest as well as Alteca show -- show fragments and
11 other components that could be injurious to health.
12     Q.    But you're not aware of them actually being
13 injurious to Mr. Blancett, are you?
14     MR. TRUJILLO: Objection, form.
15     A.    I have seen pictures of an individual in a
16 hospital bed. I have seen statements that he's been
17 treated medically and that the cause was the -- was the
18 consumption of a -- of a bone fragment.
19 BY MR. ELZA:
20     Q.    Okay. Now, I'm unaware of any medical
21 professional who has ever made a determination that he
22 was hurt or injured in any way by some type of turkey
23 bone or ossified material. Where did you learn that
24 information?
25     MR. TRUJILLO: Objection, form.

18 (Pages 66 - 69)

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

---

Page 70

1    A.    In reading the documents that I've --
2 provided here; and again, it's all here in terms of the
3 medical records.
4 BY MR. ELZA:
5    Q.    Okay. We have been going for a little over
6 an hour. Let's take a break and I'll give you a chance
7 to find where the medical professionals have made that
8 determination - okay? - and then we'll talk about it.
9    A.    I didn't say the medical professionals have
10 made the determination. I said it's in the documents
11 that I read.
12    Q.    I'm sorry, what's in the documents that you
13 read?
14    A.    That he has been injured and that there
15 are -- there are records that he's produced for --
16 showing his medical history, medical treatment.
17    Q.    Okay. But -- so can I take from that that
18 you have not seen any type of medical documentation
19 that says that somebody believes that he has an injury
20 that results from turkey bones?
21    A.    My testimony is about the presence of bone
22 fragments in the meat sample that I was asked to
23 evaluate --
24    Q.    Right.
25    A.    -- and that's the -- that's my testimony.

---

Page 71

1    Q.    Okay. But my understanding is you said you
2 had been provided materials that showed that he had
3 been injured from swallowing turkey bones. Did I
4 misunderstand you?
5    A.    My recollection is that in the documents
6 that I reviewed there is reference to him being in a
7 hospital for -- and being treated for symptoms that
8 would be consistent with injury to an intestine.
9         MR. ELZA: Okay, we'll pick up on that as
10 soon as we're done with our break.
11         VIDEOGRAPHER: The time is now 2:09 p.m.
12 We are now off the record.
13         (Break from 2:09 p.m. until 2:19 p.m.)
14         VIDEOGRAPHER: The time is now 2:19 p.m.
15 We are now on record.
16 BY MR. ELZA:
17    Q.    All right. Now, tell me your understanding
18 of the injury allegedly suffered by Mr. Blancett.
19    A.    I don't have knowledge of the injury.
20    Q.    Okay. If I were to tell you it was
21 diverticulitis, do you have any type of specialized
22 knowledge about diverticulitis and what may cause it?
23    A.    My doctoral work was in clinical nutrition
24 and I did work in a hospital and worked with
25 physicians, but I have no medical training and no

---

Page 72

1 particular other than layman's knowledge of
2 diverticulitis.
3    Q.    Okay. So your knowledge wouldn't be any
4 greater than the average layman, do I understand?
5    A.    I hope it's better than the average, but
6 no, certainly not --
7    Q.    Okay.
8    A.    -- of medical origin.
9    Q.    You would defer to the medical
10 professionals in this case as to what the diagnosis was
11 and the possible causes; is that fair?
12    A.    That is correct.
13    Q.    Now, in the summaries of your opinion, you
14 can turn to that page in your report.
15         And are you there?
16    A.    Yes.
17    Q.    I believe that's page 2 of 22 on your
18 report; is that correct?
19    A.    Correct.
20    Q.    And so as we talk about the summaries of
21 your opinion, it's my understanding from your testimony
22 earlier today that you -- you had essentially three
23 opinions in this matter.
24    A.    Correct.
25    Q.    And the first one is that the bone found in

---

Page 73

1 the ingested turkey came from a turkey. Is that fair?
2    A.    It was turkey; the species was turkey
3 definitively, yes.
4    Q.    And when you were talking about something
5 that had been ingested, what was your understanding of
6 what had been ingested?
7    A.    My understanding from the evidence that had
8 been labeled "ingested" and my understanding of what
9 had occurred was that the individual had consumed,
10 taken in the product that contained a bone fragment.
11    Q.    Okay. Now, the second opinion, if I
12 understood you correctly, dealt with ossified material
13 that was found in two unopened chubs. Is that correct?
14    A.    Correct.
15    Q.    And based on your understanding of the
16 facts of this case and the investigation that you have
17 done, did any of those ossified materials in the two
18 unopened chubs have any possible way of being ingested
19 by plaintiff?
20    A.    They were unopened, so no.
21    Q.    Okay. And do you have an opinion on
22 whether he was injured, if he was so injured, by
23 ossified material, bone, or both?
24    A.    I have no knowledge of how he was injured,
25 but my testimony is in the effect that there are bone

---

19 (Pages 70 - 73)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 74

1  fragments that were in -- were allege -- what I
2  understand to be in the chub that he had opened and
3  consumed product from. That bone, those bone fragments
4  could have included other connective hardened/ossified
5  material for which I have no knowledge, but those bone
6  fragments should not have been there.
7      Q.  Based on your investigation, are you aware
8  of any ossified materials that were in the half chub
9  that the plaintiff or his partner cooked on the night
10  in question?
11     A.  I have no means of knowing.
12     Q.  Okay. As it relates to the plaintiff's
13  injuries, do you know of any way that the ossified
14  material could be related to those injuries?
15     A.  I know only that consumption of
16  hardened/ossified material that was rough should not be
17  something that is consumed and could cause injury, and
18  is not -- and not something that USDA regulations would
19  allow because of its potential to cause harm.
20     Q.  The third opinion as I understood it dealt
21  with your conclusion that the size of the fragments
22  consumed - your word - was consistent with the grind
23  size. Did I understand that correctly?
24     A.  Well, I'm reading my opinion and I discuss
25  the size of the bone fragments and hardened/ossified

Page 75

1  connective tissues that were found in the product and
2  that were evaluated by the laboratories is consistent
3  with the grind size of the Honeysuckle White turkey,
4  ground turkey.
5      Q.  What is the grind size of the Honeysuckle
6  ground turkey?
7      A.  We'd actually have to look at the machinery
8  from the Cargill plant, but the laboratory made this
9  analysis based on their observation of the grind size
10  from the unopened two chubs and the size of the -- of
11  the bone fragments and ossified material that they
12  found.
13     Q.  And what conclusion did they come up with
14  as it related to the grind size?
15     A.  They assessed that the grind size was
16  consistent with the size of the bone fragments that
17  were found such that the bone fragments could have
18  passed through a grinder and the ossified material
19  could have passed through a grinder along with the --
20  the ground material, the ground -- the ground turkey.
21     Q.  What would the significance be if the facts
22  showed that there were approximately 200 screens that
23  the material passed through that had a opening no
24  bigger than 2 millimeters?
25         MR. TRUJILLO: Objection, form.

Page 76

1      A.  As a quality professional, I would want to
2  know the diameter of the mesh. I would also want to
3  know the verification to make sure that those screens
4  were properly maintained and that there are no defects
5  that were found on those screens. My experience is
6  that the screens need to be maintained in order to
7  determine whether or not they're actually protecting
8  the product from the type of material that was found
9  here.
10 BY MR. ELZA:
11     Q.  Okay. And when you reviewed those
12  materials from Cargill, what were your opinions?
13     A.  I have no such materials from Cargill.
14     Q.  You don't have anything on the assessment
15  of the mesh from the day and the batch in question?
16     A.  No.
17     Q.  Is that something you would like to have
18  seen?
19         MR. TRUJILLO: Objection, form.
20     A.  It would require further evaluation.
21 BY MR. ELZA:
22     Q.  And it could affect your opinions; is that
23  fair?
24     A.  I would look at the full scope of their
25  quality program, their verification program, what was

Page 77

1  supposed to have happened, I would need to verify that
2  that -- that truly did happen, and there's a likelihood
3  no way of me knowing that.
4      Q.  Why is there a likelihood of you not ever
5  knowing that?
6      A.  First, I've not been privy to that
7  information. Secondly, I don't know that their
8  verification -- what the verification was on that
9  particular day and whether or not they found any
10  materials.
11     Q.  That's because none of that material was
12  provided to you; is that fair?
13     A.  None of that material was provided, that's
14  true.
15     Q.  Now, you talked about taking custody of the
16  material in question. Do you know what the chain of
17  custody was before it got to you?
18     A.  I have a chain of custody -- custody
19  document, a picture of that, yes.
20     Q.  And who prepared that document?
21     A.  I have no knowledge. I assume the
22  originator of the chain of custody.
23     Q.  Okay. And that would be the plaintiff,
24  correct?
25     A.  I would have to look at the chain of

20 (Pages 74 - 77)

Page 78

1 custody document.
2          And it looks like a law office is the
3 originator of the chain of custody.
4     Q.   Okay. And they got the material when?
5     A.   The chain of custody states that it was
6 released by the law office of Regis Mullen and Shane
7 Mullen on March 2nd of 2015 at 3:00 p.m.
8     Q.   So you don't know when they got it, just
9 when it was released; is that fair?
10    A.   The chain of custody does not show that
11 information.
12    Q.   Okay. So if this happened in September,
13 our chain of custody as has been provided to you starts
14 about six months later; is that fair?
15    A.   This is the only chain of custody I have.
16    Q.   Okay, and it starts about six months after
17 the incident date?
18    A.   It starts --
19    Q.   Is that correct?
20    A.   -- in March, March 2nd of 2015.
21    Q.   Now, do you know if the material was
22 properly stored during the time before it got to you?
23    A.   I know that I've been told it has been
24 frozen by the -- the analytical lab that evaluated the
25 product did comment that it appears to have been

Page 79

1 properly stored and frozen to that point.
2     Q.   Okay.
3     A.   But I have no way of knowing.
4     Q.   And so tell us what ossified materials are.
5     A.   Ossified is hardened, partially fossilized
6 material. Connective tissue can ossify. It ages, it
7 hardens. It's a -- it's a function of the age of the
8 animal, it's a function of the process, it's a function
9 of how the product was prepared, stored.
10    Q.   There are a lot of holes in that that you
11 don't know about; is that fair?
12         MR. TRUJILLO:  Objection, form.
13    A.   I know that the product, that the chub and
14 the evidence from the chub that I have seen was that it
15 was labeled to be frozen by, and I don't remember the
16 date exactly, but it was a 2014 date. So the product
17 had been frozen for quite some time.
18 BY MR. ELZA:
19    Q.   Would product that had been frozen that
20 entire time have significant mold on it?
21    A.   No.
22    Q.   So if we have a product that had
23 significant mold on it, what would that tell you?
24    A.   I'd have to know the conditions under which
25 it was stored or prepared, but the product that I

Page 80

1 received was frozen and would not be expected to have
2 mold and did not apparently have any mold, to my
3 knowledge.
4     Q.   Did you study the frozen material that was
5 provided to you?
6     A.   I examined the fragments that were frozen.
7 I did not thaw the fragments. I maintained them in a
8 frozen state and sent them to the analytical laboratory
9 that had the methodology to evaluate the samples
10 visually microscopically, and -- and -- and did so. So
11 no, I did not.
12    Q.   They also I guess did a mechanical, you
13 know, with their fingers; is that correct?
14    A.   Tactile, yes.
15    Q.   Yeah. Okay. Better word. Tactile. Did
16 you perform a tactile investigation of the material?
17    A.   No, I did not. The material that I
18 received in terms of the bone fragments were frozen and
19 I did not want to thaw them in my custody, but the
20 laboratory, the trained analytical laboratory
21 technicians did that evaluation. And of course I did
22 not thaw the unopened chubs or evaluate them in any
23 way.
24    Q.   Your understanding is the two unopened
25 chubs had no bones in them, correct?

Page 81

1     A.   The analytical laboratory reported that
2 they found no bone fragments.
3     Q.   But your opinions here today you've told us
4 are based on your personal knowledge and experience.
5 So did they have bones in it or not?
6     A.   I have no way of assessing that other than
7 to respond to the analytical report from the
8 laboratory.
9     Q.   And, now, they also did a PCR analysis,
10 correct?
11    A.   They did.
12    Q.   There are multiple ways to conduct PCR
13 analysis, from my understanding and research. Would
14 you agree with that?
15    A.   The methodology that they would use should
16 be most appropriate to the tasks that they are -- they
17 are facing.
18    Q.   Okay. And what methodology did they use in
19 their version of the PCR test that they conducted?
20 Again, understanding that we haven't been provided a
21 copy of their report.
22    A.   My understanding of their report, again,
23 result, they used a real time PCR test which is
24 designed to amplify the DNA to enable qualifications,
25 understanding what the species is, but also

21 (Pages 78 - 81)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 82

1 quantification of the -- the product. So, again,
2 there's many different preparation techniques and
3 others that -- methodology in terms of enzymes and
4 primers that are used in PCR analysis. But, again, an
5 analytical laboratory is prepared to use the correct
6 and appropriate methodology for the sample, the type of
7 the sample, the matrix that they are facing.
8    Q.   So you will defer to them on how they did
9 their methodology; is that --
10    A.   Yes.
11    Q.   -- what I'm understanding?
12        Okay. And you don't have personal
13 knowledge of the methodology they used, correct?
14    A.   Other than their report of real time PCR.
15    Q.   Okay. But there's still, again, there's
16 many ways that you can set up a real time PCR analysis.
17 That's your understanding?
18    A.   My understanding is that you set up a real
19 time PCR analysis based on the nature of the product
20 you're -- you're being -- you're evaluating and that
21 there are appropriate procedures for doing that, and I
22 would certainly assume that they have done exactly
23 that --
24    Q.   Okay.
25    A.   -- which is what they were asked.

Page 83

1    Q.   Did you come up with any opinions in this
2 matter that were not based on the report that was sent
3 to you by the laboratory you chose?
4    A.   No.
5    Q.   Okay. Now, you did have access to the
6 Alteca lab results, correct?
7    A.   Yes.
8    Q.   And your criticisms of that report were
9 what?
10    A.   I don't know that I'll characterize it as a
11 criticism, but they -- I noted that they used a variety
12 of different analytical techniques and also that
13 their -- they made a statement for which I don't know
14 the basis of regarding the fragments having been
15 sliced, indicating the bone fragments were not
16 processed with the ground turkey. I have no
17 understanding of their basis for that statement.
18    Q.   Okay. Well, based on your review of the
19 product material in question, do you disagree that they
20 appeared to be sliced?
21    A.   I would expect them to be sliced, having
22 been put through a grinder. A grinder is mechanical
23 slicing action and so I would not be surprised that
24 they would be sliced. The assessment -- the
25 connectivity of that statement to the one that follows,

Page 84

1 "indicating these bone fragments were not processed
2 with the ground turkey," is the part for which I have
3 no understanding.
4    Q.   Okay. Is that something you just need more
5 information on before you could express an opinion?
6        MR. TRUJILLO: Objection to form.
7    A.   Well, I would ask the question on what
8 basis did they make that statement, because in my
9 assessment of their analysis I see no -- no information
10 that would be helpful in making that statement.
11 BY MR. ELZA:
12    Q.   Did you call them to ask about the basis
13 for their opinion?
14    A.   No.
15    Q.   Why not?
16    A.   I wasn't asked to call them and I -- in
17 looking at their report, and took their report on its
18 face value.
19    Q.   Okay. Now, you've worked with the USDA in
20 the past, correct?
21    A.   I was assistant administrator of the USDA
22 Food Safety Inspection Service.
23    Q.   So what were your job duties as an
24 assistant administrator?
25    A.   I was number 3 in the agency of 7500

Page 85

1 people, the food technologist.
2        MR. ELZA: Object as non-responsive.
3 BY MR. ELZA:
4    Q.   I'm asking what your duties were.
5    A.   My job was to drive forward the mission of
6 the Food Safety Inspection Service which was the -- is
7 the regulatory agency for meat and poultry, and
8 specifically my role was to engineer a new and improved
9 method for doing meat and poultry inspections that
10 would enhance the public health.
11 BY MR. ELZA:
12    Q.   Okay. And is the USDA responsible for
13 inspections in poultry manufacturing plants?
14    A.   For product that crosses state line, the
15 answer is yes.
16    Q.   Okay. So in the facility in question here,
17 in Springdale, Arkansas, would the USDA have inspectors
18 at the plant at all times it was open?
19    A.   I did not know it was in Springdale,
20 Arkansas. I assumed that the product they are
21 manufacturing crosses state lines, and USDA is not
22 required to have an inspector in that facility at all
23 times if it is a further processing plant. Their
24 continuous inspection requirements occur only for
25 slaughter facilities.

22 (Pages 82 - 85)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 86

1  Q.   Okay. And so you know from your experience
2  that when we're dealing with poultry plants that the
3  birds are slaughtered on site, correct?
4     A.   My experience tells me that not
5  necessarily. Those two plants are generally separated
6  physically or segregated in some way. They could be
7  part of the same site, but they would be definitely
8  separated and not a continuous flow in every case.
9     Q.   But you don't know one way or another about
10 the plant where this material was processed; is that
11 fair?
12    A.   I've been in poultry plants in Springdale.
13 They have not been Cargill plants, so I'm not familiar
14 with this particular plant --
15    Q.   There --
16    A.   -- you reference.
17    Q.   There are two in Springdale, correct?
18    A.   I don't know.
19    Q.   Tyson, and then across the street from that
20 Cargill; is that your memory?
21    A.   I wasn't -- I wasn't sure of your reference
22 to two. There are definitely -- Tyson is definitely in
23 Springdale, Arkansas, and I've been in their plant.
24    Q.   Okay. Do you remember seeing the Cargill
25 plant directly across the street?

Page 87

1     A.   I don't remember that, no.
2     Q.   And trying to cut to the end here.
3         Questions about grind size, is it fair to
4  say we need to direct those towards the lab that you
5  sent the material to instead of directing those
6  questions to you?
7         MR. TRUJILLO: Objection to form.
8     A.   I believe the issue about grind size would
9  be twofold: number one, to look at the records of the
10 actual operation from the day, the day's operations
11 records and look at what grind size was actually
12 applied; and then also to do further evaluations to
13 measure the diameter of the grind as best that's
14 possible to be done in the ground product. Having been
15 experienced with grind sizes as part of my work at
16 McDonald's in particular, it is not necessarily a
17 precise measurement to correlate with a grind size the
18 mechanics of the grind size. So. But I believe we
19 can -- we can do an estimation.
20 BY MR. ELZA:
21    Q.   Okay. And who is "we"?
22    A.   That was perhaps a reference to a generic
23 we, whatever -- whoever is asked to do that evaluation.
24    Q.   You haven't been asked to do any type of
25 evaluation as it relates to grind size; is that fair?

Page 88

1     A.   That is correct.
2     Q.   Did you ask the lab that you hired to
3  determine the grind size?
4     A.   I asked the laboratory to give me their --
5  their experienced and knowledgeable opinion on whether
6  or not the bone fragments were consistent with the
7  grind size that they observed.
8     Q.   What was the largest bone fragment?
9     A.   I don't remember the size. Alteca has
10 measured it.
11    Q.   Would you agree that there were lots of
12 bones in this half pound of this partial chub that were
13 over 3 inches in length?
14         MR. TRUJILLO: Objection, form.
15    A.   I'm not familiar with any other bone
16 fragments from the partial chub because I haven't seen
17 the partial chub other than what was presented as
18 evidence.
19 BY MR. ELZA:
20    Q.   I will represent to you that the testimony
21 earlier today was that there were over 50 bones in that
22 part of the chub that was cooked. Have you seen those
23 bone fragments, were those made available to you?
24    A.   No.
25    Q.   And it's also from -- you've referenced the

Page 89

1  Alteca report that you have seen, correct?
2     A.   Yes.
3     Q.   And then you sent it to a different lab.
4  You've seen that report, correct?
5     A.   Yes.
6     Q.   Approximately six weeks after this
7  incident, there is a note in a medical document that
8  Mr. Blancett had sent the material, the product, to a
9  lab that had found bones in it. Have you been provided
10 that report?
11    A.   No.
12         MR. TRUJILLO: Objection, form.
13    A.   No.
14 BY MR. ELZA:
15    Q.   Okay. Neither have I. Neither have I.
16         MR. TRUJILLO: I think that's the Alteca
17 report.
18         MR. ELZA: Well, the only problem with that
19 is, is it was about nine months before it was sent to
20 Alteca.
21         MR. TRUJILLO: Hmm.
22 BY MR. ELZA:
23    Q.   But you haven't seen a November or -- an
24 October or November 2014 lab report?
25    A.   No.

23 (Pages 86 - 89)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 90

1  Q.   Is that something you would like to see is
2  all of the lab reports that have been done in this
3  matter?
4        MR. TRUJILLO: Objection, form.
5   A.   The question I was -- I was asked is to
6  evaluate the evidence that I was presented as well as
7  evaluate the two unopened chubs, and that's the basis
8  of my opinion.
9  BY MR. ELZA:
10   Q.   Why did you decide not to evaluate the two
11 unopened chubs and to send that to someone else
12 instead?
13        MR. TRUJILLO: Objection, form.
14   A.   These evaluations should be done under very
15 controlled environments by trained -- by trained
16 technicians where there is a record of the work; and,
17 once opened, they are opened and can be further
18 contaminated. Clearly this should be done within the
19 context of a third party under very controlled
20 circumstances and that's exactly what Certified
21 Laboratories of the Midwest was able to do, and did so.
22 BY MR. ELZA:
23   Q.   And you're not qualified to do the work
24 that they did; is that fair?
25   A.   I'm qualified to evaluate their results.

Page 91

1  As trained technicians in a laboratory, they are
2  experts in what I was asked -- what I asked them to do.
3   Q.   Okay. Did you come up with any opinions on
4  your own that were different than the opinions can't --
5  that the lab you hired came up with?
6   A.   No.
7   Q.   Why did you include in your report all of
8  the pictures of the materials in the unopened chubs if
9  we know that those had no effect on the lawsuit at
10 hand?
11        MR. TRUJILLO: Objection, form.
12   A.   I do believe they have an effect on the
13 lawsuit because I understood that the three chubs that
14 were in question here, the two unopened chubs and the
15 one that was opened for which product was consumed from
16 were purchased at the same time, which indicates to me
17 that they were probably processed about the same time,
18 and I would look to adjacent product to evaluate the
19 product that I -- I don't see, and that is I'm looking
20 for foreign material. Perhaps foreign material would
21 be found in an adjacent product, and upon finding the
22 hardened connective tissue which I also would consider
23 a defect, potentially injurious to health, I would
24 suspect that the chub that was consumed might also
25 contain the same sort of material.

Page 92

1  BY MR. ELZA:
2   Q.   Would it be fair to say you learned that
3  that was in fact not true in this case?
4        MR. TRUJILLO: Objection, form.
5   A.   I was surprised to find the level of
6  hardened connective ossified tissue in the two unopened
7  chubs.
8  BY MR. ELZA:
9   Q.   But no ossified materials were found in the
10 chub where the bone supposedly came from, correct?
11        MR. TRUJILLO: Objection, form.
12   A.   I have no knowledge. I have not seen any
13 evidence of that or -- or that there weren't
14 ossified/hardened materials.
15 BY MR. ELZA:
16   Q.   Now, there's been one allegation in this
17 matter that the product that was consumed was consumed
18 in the exact same manner as it left the turkey
19 processing plant. Are you aware of anybody eating raw
20 turkey in this matter?
21   A.   I'm not aware of anyone eating raw turkey,
22 no.
23   Q.   Is it your understanding that this ground
24 turkey left the plant raw?
25   A.   The two unopened chubs contained -- that

Page 93

1  were evaluated by Certified Laboratory of Midwest were
2  raw product.
3   Q.   And why did they mix those two together
4  before they did their analysis instead of looking at
5  them separately, if you know as a scientist?
6   A.   I don't believe they felt that they had any
7  reason to look at them individually since my question
8  was about the two chubs. I didn't ask them to combine
9  the two but I didn't ask them not to; and obviously I'm
10 looking at adjacent material so I would be interested
11 in the contents of the two chubs, not necessarily one
12 individual chub versus the other.
13   Q.   Do you know if the five ossified materials
14 that you discuss in your report were found in one chub,
15 the other chub, or both chubs?
16   A.   I don't know that, no.
17   Q.   Okay. And that's because of the way that
18 the experts you hired in this matter chose to do their
19 investigation; is that fair?
20   A.   That is correct.
21   Q.   Do you agree or disagree with Dr. Littrell
22 when he says there's no way to prove the plaintiff's
23 theory that his diverticulitis came from turkey bones?
24   A.   I would have no way to evaluate that
25 comment.

24 (Pages 90 - 93)

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

Page 94

1    Q.    You would defer to the medical doctor that
2  treated him?
3    A.    I would defer to the medical doctor that
4  treated him.
5    Q.    Is there any significance to the fact when
6  the plaintiff and his partner purchased this turkey
7  from Walmart that it was past the -- the sell/freeze
8  date?
9    A.    I have no information about its expiration
10 date when it was purchased.
11   Q.    I don't think that's true.  Let's look
12 here.  Exhibit Number 4, that has the sell or freeze --
13 or the "Use or freeze" date, correct?
14   A.    "Use or freeze" date by September 7th,
15 2014."
16   Q.    Okay.  And do you have a copy of the
17 lawsuit that's been filed in this matter?
18   A.    No.
19   Q.    I thought that was something you were
20 provided.  So you don't know when this matter was
21 cooked?
22   A.    I -- I don't recollect seeing a date when
23 it was cooked.
24   Q.    Okay.  You don't know when it was
25 purchased?

Page 95

1    A.    I don't recollect seeing any information
2  about when it was purchased.
3    Q.    If the information was that approximately
4  somewhere between the 10th and the 15th of September it
5  was purchased, is there any significance to the fact
6  that that's after the use or freeze by date?
7          MR. TRUJILLO:  Objection, form.
8    A.    The use or freeze by date pertains to food
9  safety, the safety relative to pathon -- pathogen
10 presence or the potential growth of pathogens in the
11 product.  It would not relate to safety relative to
12 bone fragments or hardened/ossified connective
13 material.
14 BY MR. ELZA:
15   Q.    Well, one of the things that you told us is
16 that the age of the product is something that could
17 affect ossification, correct?
18   A.    The age of the animals that were part of
19 the product.
20   Q.    Okay.  But you also testified that the
21 length of time since manufacturing, correct?
22   A.    That is also a variable in the equation,
23 but I would also not say that five days is of
24 relevance.
25   Q.    How about the two years before your experts

Page 96

1  tested it?
2    A.    I don't believe that it would change the
3  nature of the connective tissue in a way that would be
4  material.
5    Q.    So ossification could not happen, based on
6  your knowledge of the chain of custody and what had
7  taken place, correct?
8    A.    The issue about ossification of connective
9  tissue had much more to do with the age and condition
10 of the animal that was slaughtered and part of the meat
11 than the condition of storage.
12   Q.    Okay.  Now, I'm going to finish where I
13 should have started.  Okay?  And that is, how much are
14 you getting paid for your work on this?
15   A.    My typical fee is $500 per hour.
16   Q.    Okay.
17          MR. ELZA:  I'm going to object as
18 non-responsive.
19 BY MR. ELZA:
20   Q.    How much are you being paid on this matter?
21   A.    I'm being paid my typical fee of $500 per
22 hour.
23   Q.    Thank you.
24          And how many hours of investigation and
25 work do you have prior to today in this matter?

Page 97

1    A.    I have not summed it up, but I'd say I have
2  probably worked a total of 10 hours or so in developing
3  my expert opinion and documenting it.
4    Q.    And so have you sent a bill for your work
5  yet?
6    A.    Yes.
7    Q.    Okay.  And how much was that -- is that
8  bill in your folder that relates to your work on this
9  case?
10   A.    Yes.
11   Q.    Under which tab; do you remember?
12   A.    It's at the back of, I believe -- there it
13 is right there, which includes the, specifically the
14 time that I had - again, that's dated November 1st -
15 which included the time I had put in to that time, to
16 that date, and included specifically the custody of the
17 product, sending it to the laboratory, and I paid for
18 the laboratory's evaluation which --
19   Q.    So the experts you hired and whose opinions
20 that you adopted, their fee was $3,000; is that
21 correct?
22   A.    Yes.  They did some unique evaluations for
23 the -- the sample because my question was about
24 speciation and they wanted to make sure that their test
25 was specific to this turkey product, or a turkey

25 (Pages 94 - 97)

Page 98

1 product I should say, so they had to make sure that
2 their -- their methodology was correct and appropriate
3 and they had to do some control testing in order to
4 evaluate that, which added to the cost.
5    Q.    Okay. And you think -- you have almost
6 four and a half hours of time in October. Did you have
7 any time before October?
8    A.    No.
9    Q.    Approximately how much time do you think
10 you had in November?
11    A.    I developed the expert opinion and reviewed
12 the documents that you see there contained in my
13 folder. Again, I believe it's about 10 hours or so of
14 work.
15    Q.    Okay. An additional 10 --
16    A.    Yes.
17    Q.    -- over and above?
18         Okay. So you had 4.45 hours in October,
19 you think about 10 hours in November, and then how much
20 time did you spend preparing for today?
21    A.    I spent an hour and a half preparing for
22 today.
23    Q.    Okay. And so you will send a bill later
24 for that preparation and the time you have spent here
25 today?

Page 99

1    A.    Yes.
2    Q.    Is your fee the same for deposition
3 testimony as it is for your other work on this matter?
4    A.    My on-the-record fee is the same. I have a
5 lower fee for off-the-record time during deposition.
6    Q.    Okay. And how -- how many times have you
7 talked with attorneys for Mr. Blancett?
8    A.    I believe we have had two or three
9 conversations, all of which occurred prior to my
10 receipt of the sample, and -- and that the -- by the
11 time I had custody of the sample, I don't recollect any
12 other conversations with them.
13    Q.    How did you know to be here today?
14    A.    I received an email which included the
15 request for my appearance, which is included in the
16 document that you have there in the front.
17    Q.    Okay. And so it's my understanding that
18 you were given certain materials to review to help you
19 formulate your opinions, correct?
20    A.    That's correct.
21    Q.    And let's go through those so we understand
22 how and what effect they had on your rulings.
23         Plaintiff's Rule 26 Initial Disclosures.
24 Anything in those serve to help you formulate your
25 opinion?

Page 100

1    A.    I see reference to some medical records
2 there, medical costs I should say, but nothing that
3 helped me formulate my opinion, no.
4    Q.    Did you review any medical records other
5 than bills?
6    A.    I have not seen that I recall medical
7 records other than billing documentation and some
8 insurance documentation which is included here.
9    Q.    Okay. What's the significance of you
10 looking at billing information in coming up with your
11 opinions?
12    A.    None.
13    Q.    Okay. Anything in Plaintiff's 26(e) First
14 Supplemental Disclosures that played into the
15 conclusions that you reached?
16    A.    No.
17    Q.    You also have a copy of Cargill Meat
18 Solution Corp.'s Responses to Plaintiff's First Request
19 for Production of Documents, and I see that you have
20 the answers that were prepared on 47 requests for
21 production. Did they give you the actual documents
22 that were produced?
23    A.    I don't believe I've seen those documents,
24 no.
25    Q.    Okay. Anything about the responses in

Page 101

1 Cargill's first request for production responses that
2 played into your opinions?
3    A.    No.
4    Q.    Cargill Meat Solution Corporation's
5 Responses to Plaintiff's First Set of Admissions, there
6 were approximately 26 requests for admissions that were
7 sent to Cargill. Did you use any of those in
8 formulating your opinions?
9    A.    No.
10    Q.    There were Cargill Meat Solution
11 Corporation's Responses to Plaintiffs First Set of
12 Interrogatory Requests. Any of those responses play
13 into the formulation of your opinions in this matter?
14    A.    No.
15    Q.    Now, you have a page marked, page 8 of 9 in
16 Cargill's responses to first set of interrogatories.
17 Is there a reason that that was marked?
18    A.    I marked that during our time here during a
19 break in order to be prepared to answer your questions,
20 if you asked them, about anything I'd read regarding
21 warning labels. That page includes some reference to
22 warning labels which I did not find very helpful and
23 did not use in order to formulate my opinion.
24    Q.    Plaintiff's Response to Defendant's Request
25 for Production, that was also provided to you, correct?

26 (Pages 98 - 101)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 102

1   A.   Correct.
2   Q.   And I notice you've got a page 5 of 9
3   marked. Any particular reason?
4   A.   There's some reference, again, I was going
5   to refer to it if you pursued the line of questioning
6   about -- about information I had read about the
7   gentleman's condition.
8   Q.   Okay. Did you find anything where a
9   medical or healthcare provider had determined that any
10  of his medical conditions related to the ingestion of
11  turkey in any form or fashion?
12  A.   I found reference to diverticulosis but I
13  found no -- I have no other documents that would be
14  more conclusive.
15  Q.   Okay. And pretty much anything you eat
16  could end up causing diverticulitis; is that your
17  understanding as a trained nutritionist?
18  A.   As a -- as a trained clinical nutritionist,
19  there are certain food items that are more likely to
20  cause diverticulitis than others, which includes
21  irregular-shaped objects, foreign material and fibrous
22  material, if you -- particularly if you don't have a
23  very active digestive system.
24  Q.   Okay. There are other non-food causes of
25  diverticulitis, correct?

Page 103

1   A.   Foreign material, yes, mm-hmm.
2   Q.   Even without foreign material there are
3   other causes, correct?
4   A.   There are multiple causes.
5   Q.   Okay. There -- these pictures here, are
6   those part of the requests for production that the
7   plaintiff sent that you reviewed?
8   A.   They were sent to me, and so I did review
9   them, yes.
10  Q.   Okay. Do you know what this
11  hospitalization -- pictures that appear to be from a
12  hospital, what they relate to?
13  A.   I do not know, other than they were sent to
14  me in the context of the case and I understood that
15  they were the individual affected.
16  Q.   Is that an assumption you made?
17  A.   That is -- that is a conclusion based on
18  the fact they were included in the materials sent
19  regarding this case.
20  Q.   Okay. And there's some pictures of
21  materials. Looking at this picture here where it says
22  "Injested," do you know who wrote "Injested"?
23  A.   I do not.
24  Q.   Do you see anything about the materials in
25  that bag labeled "Injested" that made it appear that

Page 104

1   those materials had been ingested?
2   A.   I read the Alteca report, which did
3   identify saliva through one of their methodologies that
4   they used that would indicate it had been ingested.
5   Q.   Okay, we're almost done.
6        Plaintiff's Answers to Defendant's First
7   Set of Interrogatories, did those have anything to do
8   with the opinions that you formulated?
9   A.   No.
10  Q.   Chain of Custody Record we've already
11  discussed. And then your bill.
12       So that is everything in your file,
13  correct?
14  A.   My understanding and my recollection, that
15  is everything that I have received to date.
16  Q.   Now, you did talk about your email
17  correspondence with the attorneys for the plaintiff.
18  Where are those?
19  A.   I don't have any email correspondence. I
20  corresponded directly with the attorney in the case.
21  Q.   Corresponded by email with him?
22  A.   Majority of our -- of our communication has
23  been simply by email with requests and timing to
24  receive the materials.
25  Q.   Have you produced those emails today?

Page 105

1   A.   I have not.
2   Q.   Okay. And who is the attorney for the
3   plaintiff that you have been corresponding with
4   primarily by email?
5   A.   Mr. Trujillo.
6        MR. ELZA: Do you have any more questions
7   for her?
8        MR. TRUJILLO: Yeah.
9        MR. ELZA: Okay. I'm going to pass the
10  witness so that you can ask her some questions, and
11  I'll probably have one or two, but that way we're using
12  our time well.
13       MR. TRUJILLO: Okay. You are passing her?
14       MR. ELZA: Yes, I've passed.
15       RE-EXAMINATION
16  BY MR. TRUJILLO:
17  Q.   Dr. Hutt, you indicated in your report
18  that -- and you identified that the meat that was on
19  the bone was the same meat that was in the turkey chubs
20  that were tested; is that correct?
21       MR. ELZA: Objection, form.
22  A.   The meat that was on the bones I understood
23  were from a chub that I have not seen but that would
24  have been purchased at the same time as the two chubs
25  that we evaluated.

27 (Pages 102 - 105)

Page 106

1 BY MR. TRUJILLO:
2    Q.    Okay. And I apologize. That was a bad
3 question on my part.
4         If you look at the Alteca lab report --
5    A.    May I?
6    Q.    Yes.
7         Okay. If you look at the Alteca
8 Laboratory -- Laboratories report dated March 12th of
9 2012 (sic) --
10    A.    Mm-hmm.
11    Q.    -- the report indicates that the "FTIR
12 analysis gives a quality match to Honey Suckle White
13 turkey for the meat in the Ziploc bag and on the bone
14 fragment." Do you see that?
15    A.    Yes.
16    Q.    Okay. And was it your understanding that
17 the meat and the bone originated from the turkey chub?
18         MR. ELZA: Objection, form.
19    A.    That is my understanding.
20 BY MR. TRUJILLO:
21    Q.    Okay. And did you rely upon the Alteca
22 laboratory examination in formulating your opinions?
23    A.    No.
24    Q.    Okay. Well, with regard to that
25 specific --

Page 107

1    A.    Yes.
2    Q.    -- portion?
3    A.    From the standpoint that they did analyses
4 that further confirmed what Certified Laboratories of
5 the Midwest also found through PCR analysis.
6    Q.    Okay. So it's a different type of test but
7 the same conclusion.
8    A.    That's correct.
9    Q.    Okay. And do you know of any other place
10 other than Cargill where the turkey meat could have
11 come from?
12    A.    I don't have any reason to believe that
13 there would be another source of the meat other than
14 the labeled turkey chubs, and my understanding that
15 the -- the product that was consumed was from an
16 adjoining, adjacent turkey chub from Cargill.
17         MR. ELZA: Objection, non-responsive.
18 BY MR. TRUJILLO:
19    Q.    Okay. Now, you also indicated that you
20 worked for the USDA, correct?
21    A.    Correct.
22    Q.    And how many employees worked for the USDA
23 during the time that you were employed there?
24    A.    About 7500.
25    Q.    Okay. And what was your title when you

Page 108

1 worked there?
2    A.    Assistant administrator.
3    Q.    Okay. Now, were the employees ranked at
4 the USDA?
5    A.    There is a ranking of the -- of the agency
6 administration, and I was the third ranking highest
7 official.
8    Q.    Okay. So out of 7500 employees, you were
9 number 3 out of sev -- 7500, correct?
10    A.    Correct. There was an administrator, an
11 associate administrator and I was the assistant
12 administrator.
13    Q.    Okay. Now, when you wrote your report, did
14 you rely on the opinions that were provided by
15 Certified Labato -- Laboratories of Midwest?
16    A.    That's correct.
17    Q.    So when you formulated your opinions, did
18 you rely on Certified Laboratories Midwest when they
19 did the tactile examination and found that there had
20 been ossified connective tissue in the chubs that they
21 tactic -- tactically (sic) examined?
22    A.    Yes.
23    Q.    Okay. Now, you were also shown photographs
24 previous, and if you look at Exhibit Number ...
25 Number 7, do you see any connective tissue that is

Page 109

1 consistent with the ossified connective tissue that
2 were found in the two unopened turkey chubs that were
3 tactically examined by Certified Laboratories of
4 Midwest?
5    A.    Yes.
6    Q.    Okay. And is that, that connective tissue
7 consistent with what was found in the two unopened
8 turkey chubs?
9    A.    They would be similar, yes.
10    Q.    Okay. And have you also seen what I will
11 mark as Exhibit Number --
12         MR. TRUJILLO: What are we up to now?
13         THE REPORTER: 9.
14         MR. TRUJILLO: 9.
15 BY MR. TRUJILLO:
16    Q.    I'll mark Exhibit 9 and 10 to your
17 deposition.
18         (Marked Deposition Exs. 9 - 10)
19 BY MR. TRUJILLO:
20    Q.    If you will look at Exhibit 9, these were
21 photographs that I believe were taken by either
22 Mr. Blancett or Mr. Hernandez, and I'll hand these over
23 to you.
24         Have you seen those photographs before?
25    A.    Yes.

Page 110

1    Q.    Okay. And in looking at Exhibit 9 or 10,
2  do you see any ossified connective material?
3    A.    Yes.
4    Q.    Okay.
5    A.    That, again, I -- I don't have the
6  opportunity to touch this to evaluate how hard it is,
7  but it is consistent with the type of material that --
8  connective tissue that -- that we saw in the two
9  unopened chubs.
10   Q.    Okay.
11       MR. ELZA: Objection, non-responsive.
12 BY MR. TRUJILLO:
13   Q.    And if you look at Exhibit Number 9, would
14 you hold that up and point to the jury where the
15 ossified connective tissue is on that photograph?
16   A.    The connective tissue would be at the ends
17 of perhaps this -- again, I don't know if there's a
18 bone in here or not, but that is connective tissue and
19 the ossified pieces are probably more likely at the
20 ends of the -- of the connective tissue. This appears
21 to be a bone piece with some connective tissue which
22 also could be ossified.
23   Q.    Okay. And you also pointed to this right
24 here?
25   A.    Right. That's a small --

Page 111

1       MR. ELZA: Objection. That is leading.
2  That is not what she did.
3  BY MR. TRUJILLO:
4    Q.    What is that?
5    A.    Well, I did point to this piece that is
6  small. It looks like a piece of ossified/hardened
7  material, but again, I don't have the opportunity to
8  touch it.
9    Q.    Okay. And is it your understanding that
10 that was -- that what's depicted on Exhibit Number 9
11 was the cooked -- came from the cooked chub, or did
12 that originate from the two unopened chubs?
13   A.    This material, again, was not part of the
14 two unopened chubs. Those were subsequently evaluated
15 by Certified Laboratories of the Midwest.
16   Q.    Okay. And if you look at Exhibit Number
17 10.
18   A.    Mm-hmm.
19   Q.    Would you please point out the connective
20 tissue that's depicted, the ossified connective tissue
21 that's depicted on Exhibit Number 10?
22   A.    Could be connective tissue here from the
23 bone fragment. This could be ossified connective
24 tissue here and here (indicating).
25   Q.    Okay. And is it -- is it your

Page 112

1  understanding that what's depicted on Exhibit Number 10
2  was the cooked turkey and fragments that Mr. Blancett
3  and Mr. Hernandez had cooked, or did those originate
4  from the two unopened turk -- turkey chubs?
5    A.    These did not originate from the two
6  unopened turkey chubs. Again, as I mentioned, this
7  appears to be some cooked material here because of the
8  hardening of the edges.
9    Q.    Okay. And earlier you testified that you
10 didn't know whether or not there was connective tissue
11 in the cooked turkey chub that Mr. Blancett and
12 Mr. Hernandez cooked; is that correct?
13   A.    I have no way of knowing what was in that
14 chub. I just know that there were hardened/ossified
15 materials found in the two chubs purchased at the same
16 time as the chub they consumed.
17   Q.    Okay. Now having been shown the
18 photographs and pointing out what you have pointed out,
19 does that change your opinion as to whether or not
20 there was ossified connective tissue in the turkey chub
21 that Mr. Blancett and Mr. Hernandez had cooked?
22   A.    It makes me believe that it is likely that
23 given that that was adjacent material from the same
24 time of production, that -- that they would have --
25 they would have potentially also contained ossified

Page 113

1  hardened material.
2    Q.    Okay. Have you, during the time that you
3  have been a consultant and opined in various matters
4  related to food science, have you heard of any
5  instances where Cargill has produced meat that contains
6  salmonella?
7       MR. ELZA: Objection --
8    A.    Yes.
9       MR. ELZA: -- form. Ridiculous.
10      MR. TRUJILLO: Okay.
11 BY MR. TRUJILLO:
12   Q.    Okay. When was that? When did you become
13 aware that Cargill had actually manufactured and
14 produced meat that contained salmonella?
15   A.    I don't remember the dates, but I do follow
16 the news in terms of food recall incidents and Cargill
17 has been associated with both E. coli foodborne events
18 as well as salmonella.
19   Q.    And in your work as a consultant in the
20 area of food science, what is Cargill's reputation
21 amongst those companies or consultants or experts in
22 your field with regard to how they handle or
23 manufacture certain products in terms of safety?
24      MR. ELZA: Objection, form.
25 BY MR. TRUJILLO:

Page 114

1    Q.    Safety for the public.
2         MR. ELZA: Objection, form.
3    A.    As I mentioned, Cargill has been involved
4 in some food safety incidents. Cargill is a very large
5 company with a lot of different manufacturing
6 facilities. They -- I've understood them in the past
7 to have good quality procedures in place but they're
8 very difficult to enforce, and the evidence of
9 foodborne pathogens being in their product and the
10 source of recalls, as well as I believe food safety
11 events, foodborne illness events, does tell me that
12 things go wrong sometimes.
13 BY MR. TRUJILLO:
14    Q.    Okay. And in your opinion as an expert in
15 the field of food science, do you believe that E. coli
16 and salmonella are defects?
17    A.    They're adulterants and not -- not allowed
18 from a regulatory standpoint.
19    Q.    They're not allowed like -- like connective
20 tissue is not allowed, correct?
21         MR. ELZA: Objection, form.
22    A.    Foreign material that can cause injury
23 is -- is not allowed. Pathogens are another source of
24 potential injury to a human being.
25 BY MR. TRUJILLO:

Page 115

1    Q.    Okay. And if consumed, does -- is E. coli
2 or salmonella, is that harmful to the public?
3    A.    Certainly E. coli and salmonella can harm
4 an individual and cause foodborne illness if it is
5 consumed and the product is not properly prepared and
6 cooked.
7         MR. TRUJILLO: Okay. Pass the witness.
8 Thank you.
9         MR. ELZA: Probably ought to go ahead and
10 change the tape. It's going to be a while now.
11         VIDEOGRAPHER: The time is now 3:08 p.m.
12 We are now off the record.
13         (Break from 3:08 p.m. until 3:14 p.m.)
14         VIDEOGRAPHER: Time is now 3:14 p.m. We
15 are on the record.
16         (Marked Deposition Ex. 11)
17         RE-EXAMINATION
18 BY MR. ELZA:
19    Q.    Let me hand you what's been marked as
20 Deposition Exhibit Number 11.
21         When is the first time you saw that
22 document?
23    A.    I don't recall the exact date. It's been a
24 few weeks.
25    Q.    You've had plenty of time to comply with

Page 116

1 all the requirements in it; is that fair?
2    A.    I believe I have.
3    Q.    Okay. So go ahead and turn to Exhibit A.
4 In number 1 you were requested to bring with you, "All
5 correspondence and other tangible records and the
6 documents of any kind regarding and reflecting any and
7 all communications to or from the deponent, and anyone
8 working for or in association with" you "regarding any
9 opinion, report, analysis, examination or review
10 undertaken by" you or your associates "in connection
11 with this cause."
12         Have you provided your email correspondence
13 or any other types of correspondence with the
14 plaintiff's attorneys?
15    A.    Can you be more specific about anything
16 that would not be attorney-client privileged?
17    Q.    Okay. And I apologize. I did not
18 understand that the plaintiff's lawyers were also your
19 lawyers. When did you hire them to be your lawyers?
20    A.    I work for the attorney. I have not hired
21 an attorney. I am not their -- I'm not -- I am being
22 hired to do work for the attorney.
23    Q.    Okay.
24    A.    I understand that any correspondence would
25 be under privilege. If I'm incorrect in that, I'll be

Page 117

1 happy to copy all of my email records and provide them.
2    Q.    Okay. Will you make yourself available for
3 a future deposition so that we will have the
4 opportunity to look at those like we should have today?
5    A.    I will make myself available.
6    Q.    Okay. What about your communications with
7 the lab you hired and whose opinions you simply adopted
8 in this matter, have you provided those?
9    A.    I did not speak directly with the
10 laboratory in preparation for their examination.
11    Q.    How did they know what to do when they got
12 the materials?
13    A.    I sent them a request.
14    Q.    Okay. Have you provided that request here
15 today?
16    A.    I have not, but I'll be happy to do so.
17    Q.    Now, one of the things that we asked for
18 were "all reports, statements, outlines, films, video
19 or audio tapes, photographs, models, or other
20 documents, of tangible things of any kind which
21 reflect" your opinions that you have given here today.
22         Now, you have chosen to give opinions about
23 the food safety practices of Cargill Meat, correct?
24    A.    I gave my opinion about my experience as a
25 quality professional --

30 (Pages 114 - 117)

Page 118

1  Q.  Okay.
2  A.  -- in food safety practices and industry
3  practices, best industry practices.
4  Q.  But you also talked about their reputation
5  in the field, correct?
6  A.  I've been working with Cargill food safety
7  programs for about 20 years --
8       MR. ELZA: Objection, non-responsive.
9  A.  -- and I have knowledge.
10 BY MR. ELZA:
11 Q.  Okay. And so you have knowledge. You also
12 talked about other people in the industry that have
13 that same knowledge and I believe documentation that's
14 out there regarding those opinions. What types of
15 documents or tangible materials exist that show or
16 reflect on the food safety practices of any kinds by
17 Cargill Meat?
18 A.  There is documentation internal to the
19 company that would include quality procedures. As an
20 executive with McDonald's Corporation, we were in
21 Cargill's operations and I had access to their quality
22 procedures, dealt closely with their quality
23 professionals, presented as an expert to their quality
24 professionals and food safety professionals
25 internationally. So I have experience within the

Page 119

1  industry, not limited to Cargill but to other
2  suppliers, to McDonald's and other companies that I
3  work for. As part of a quality program have
4  supplier approval, which means you assess the
5  procedures in food safety practices of your suppliers
6  and that those are documented.
7       MR. ELZA: Objection, non-responsive.
8  BY MR. ELZA:
9  Q.  Are you aware of any documents or tangible
10 things out in your field of practice that refer to or
11 reference or support your opinions about the quality of
12 Cargill Meat and how it relates to food safety --
13 A.  Yes.
14 Q.  -- yes or no?
15    Okay. And show me in your notebook where
16 you provided those to us today as requested and
17 directed in Exhibit A.
18 A.  Those documents do not pertain to the
19 examination of the product, so I did not provide them.
20 Q.  Okay. But you gave opinions on them today,
21 right?
22 A.  I was asked specific questions regarding
23 food safety incidents regarding Cargill for which I am
24 aware of through media and also industry information
25 that I read on a routine basis.

Page 120

1  Q.  Okay. Where in your report do you discuss
2  those opinions?
3  A.  Those opinions are not part of my
4  examination of the product. My opinion --
5  Q.  They're not why -- they were not what you
6  were hired to do in this case, are they?
7  A.  I was asked to evaluate the product that is
8  the subject of this investigation.
9  Q.  And you asked somebody else to do that for
10 you, correct?
11 A.  I asked technical experts who are
12 recognized as experts in the field to do exactly what
13 they are experts to do.
14 Q.  How long do you think it will take you to
15 compile the documents and tangible things that would
16 support your opinions as it relates to Cargill's food
17 safety practices?
18 A.  Inasmuch as I have discussed their food
19 safety events that are public knowledge, it will
20 probably take me a couple of hours.
21 Q.  Okay. Now, you also said that there were
22 other consultants in your industry that held these same
23 opinions in your sworn testimony while ago. What are
24 the names of those consultants?
25    THE WITNESS: Can I get a readback of what

Page 121

1  I said?
2       MR. TRUJILLO: Sure.
3  BY MR. ELZA:
4  Q.  I'd like for you to answer the question.
5  There's been no objection to form of the question.
6       MR. TRUJILLO: Objection to form.
7       Go ahead and read it back.
8       THE REPORTER: Question: "And in your work
9  as a consultant in the area of food science, what is
10 Cargill's reputation amongst those companies or
11 consultants or experts in your field with regard to how
12 they handle or manufacture certain products in terms of
13 safety?
14    "Objection, form."
15    Question: "Safety for the public."
16    Answer: "As I mentioned, Cargill has been
17 involved in some food safety incidents. Cargill is a
18 very large company with a lot of different
19 manufacturing facilities. They -- I've understood them
20 in the past to have good quality procedures in place
21 but they're very difficult to enforce, and the evidence
22 of foodborne pathogens being in their product and the
23 source of recalls, as well as I believe food safety
24 events, foodborne illness events, does tell me that
25 things go wrong sometimes. "

31 (Pages 118 - 121)

Page 122

1 BY MR. ELZA:
2    Q.    So who are the consultants that share those
3 opinions?
4    A.    As I understood the readback of my -- of
5 the question and my answer, I did not refer to other
6 consultants.
7    Q.    But you understand the question was about
8 other companies' consultants and experts and their
9 opinions regarding the question.
10        THE WITNESS:  Can you read --
11 BY MR. ELZA:
12    Q.    And you answered it, correct?
13        THE WITNESS:  Can you read back that
14 particular part of the question?  I don't need the
15 answer, please.
16        THE REPORTER:  Question:  "And in your work
17 as a consultant in the area of food science, what is
18 Cargill's reputation amongst those companies or
19 consultants or experts in your field with regard to how
20 they handle or manufacture certain products in terms of
21 safety?"
22    A.    As I understand the question, it is about
23 my experience as a consultant and their reputation
24 within the industry, and I responded to the question as
25 a consultant in my personal experience as well as the

Page 123

1 dialog at professional meetings with Cargill officials,
2 food safety officials about food safety, and my
3 awareness of some food safety events where Cargill has
4 been involved.
5 BY MR. ELZA:
6    Q.    Who are the Cargill officials you spoke
7 with?
8    A.    Well, Mike Robach.
9    Q.    Where did that discussion take place?
10    A.    I've spoken with Mike Robach multiple times
11 over the past 20 years.
12    Q.    Let's start with the first time.  Start
13 going through them.
14    A.    Okay.  When I was in USDA, I was assistant
15 administrator of USDA and I invited Mike Robach to be a
16 member of an advisory board for meat and poultry.  That
17 was about -- and he actually did not work for Cargill
18 at that time.  I apologize.  He worked for a poultry
19 company.
20    Q.    And so how does that play into your --
21    A.    I'm sorry.
22    Q.    -- or other companies', other consultants'
23 and other experts' opinions of Cargill?
24    A.    I have spoken to Cargill --
25    Q.    No.  Please answer my question.

Page 124

1    A.    Rephrase your question, please.  Repeat
2 your question.
3    Q.    Did you not understand it?
4    A.    I'm asking you to repeat your question.
5    Q.    Did you not understand it?
6    A.    I'm asking you to repeat your question.
7        MR. ELZA:  Read the question back to her.
8        THE REPORTER:  Question:  "And so how does
9 that play into your or other companies', other
10 consultants' and other experts' opinions of Cargill?"
11    A.    I've been a part of industry meetings that
12 have included Cargill officials as well as others and
13 we talked about food safety.  We talked about food
14 safety as not being a competitive issue and so we're
15 fairly frank about our food safety practices and
16 procedures.
17        I've been a part of the development of
18 audit programs that have included Cargill's quality
19 procedures as part of other quality procedures we've
20 put on the table and we've developed the best standard.
21 BY MR. ELZA:
22    Q.    When was the last time you participated in
23 one of those?
24    A.    It would have been with the National Food
25 Processors Association, we developed the gold standard

Page 125

1 audit program --
2        MR. ELZA:  Objection, non-responsive.
3 BY MR. ELZA:
4    Q.    When would be the last time --
5        MR. TRUJILLO:  I'd ask for her --
6 BY MR. ELZA:
7    Q.    -- you talked about those?
8        MR. TRUJILLO:  -- to be allowed to answer
9 the question before you object to the
10 non-responsiveness of the answer.  That way she can
11 fully answer your question.
12    A.    When I worked for H. J. Heinz I was
13 involved in the development of a gold standard food
14 safety audit.  As I recall, Cargill was involved with
15 that along with 26 -- 25 other companies, and we shared
16 our quality procedures in order to design the best
17 procedure, and I believe that was around the year 2001,
18 2000.
19 BY MR. ELZA:
20    Q.    And what did Cargill share with you at
21 Heinz in 2000 or 2001?
22    A.    The sharing was not specifically with me at
23 Heinz.  It was in the context of the National Food
24 Processors Association development of a gold standard
25 food safety program, and they shared their quality

32 (Pages 122 - 125)

Page 126

1 procedures as did Kraft and ConAgra and Nestle and
2 others.
3     Q.     What all products of Cargill's were
4 discussed?
5     A.     We discussed procedures and not specific
6 products.
7     Q.     And what did the procedures relate to as to
8 Cargill's participation in this conference?
9     A.     Quality and food safety standards and
10 practices for verification and auditing.
11    Q.     Anything to do with poultry?
12    A.     Poultry is one of Cargill's products; I
13 assume that it pertained to their poultry procedures as
14 well.
15    Q.     Okay. One of their products is also
16 seawall development. Did they talk about that?
17    A.     Seawall?
18    Q.     Yes.
19    A.     Is that a food?
20    Q.     No.
21    A.     This is only in reference to food.
22    Q.     Okay. So not -- not Cargill itself, just
23 Cargill food.
24    A.     Cargill Food Solutions I believe is -- or
25 Meat Solutions or Cargill.

Page 127

1     Q.     And so what did they tell you about their
2 quality control in their quality as it related just
3 generally --
4     A.     Well --
5     Q.     -- since that forms the basis of your
6 opinion as it relates to their food safety?
7     A.     Well, first, I did not say that that
8 incident alone formed the basis of my opinion --
9     Q.     Well --
10    A.     -- relative to the food safety. You asked
11 me to explain all my different interactions with
12 Cargill and that was an initial effort to explain one
13 of them.
14    Q.     Okay.
15    A.     My interactions continued throughout the
16 next decade, actually the next decade, and specifically
17 Cargill is a significant supplier to McDonald's
18 Corporation, one of the top seven suppliers in the
19 Cargill -- correction, the McDonald's system at that
20 time, and we had a very close interaction with Cargill.
21    Q.     Okay. And what about that helped you form
22 your opinion that they had problems with their quality
23 control of their foodborne illness?
24    A.     My statement was not in regards to Cargill
25 having problems with their food safety practices. My

Page 128

1 statement was specifically in reference to the fact
2 that even though we as quality professionals and
3 companies with quality procedures, as much as we want
4 them to be installed rigorously, robustly implemented
5 and fully executed every day, that some things do go
6 wrong. I speak as a quality professional from my own
7 personal involvement with companies as well as that
8 experience I have with suppliers to McDonald's, that
9 not everything that we want and expect to be done on a
10 daily basis actually happens.
11         The evidence from food safety events that
12 Cargill has experienced since I've left McDonald's,
13 frankly, which have been of public knowledge, tells me
14 that indeed things do go wrong. Similarly ConAgra,
15 which I believe has had good quality procedures and
16 food safety procedures with -- with high intent of
17 integrity, have issues, namely salmonella in peanut
18 butter, salmonella from frozen pot pies. These are
19 things that are not expected, but things do go wrong
20 sometimes. That was the nature of my comment.
21    Q.     And those are what formed the basis of your
22 opinion of those companies, correct?
23    A.     They do not form the basis of my opinion of
24 those companies. I'm specifically referring to
25 incidents and the fact that as much as we'd like

Page 129

1 everything to go well according to our plan, our
2 quality and food safety plan, things sometimes go
3 wrong.
4     Q.     In companies all kinds of different things
5 can go wrong, correct?
6     A.     I -- can you be more specific?
7     Q.     Let's talk about the bakery that you were
8 the -- briefly the CEO of.
9     A.     Mm-hmm.
10    Q.     They had lots of problems with safety
11 issues, correct?
12    A.     No, they did not have safety issues.
13    Q.     Okay. Well, they had multiple fines of
14 over a hundred thousand dollars for safety-related
15 issues based on multiple media reports, correct?
16         MR. TRUJILLO: Objection, form.
17    A.     I have no knowledge of that, and your
18 reference to safety might be in reference to worker
19 safety that preceded my -- my tenure there, but I -- we
20 had no issues relative to food safety.
21 BY MR. ELZA:
22    Q.     And ultimately they had to sell out to a
23 competitor, correct?
24    A.     That is, number one, something that I have
25 no knowledge of, but I don't believe they had to

33 (Pages 126 - 129)

Page 130

1 because of any issues. The owner chose to sell his
2 company to a competitor because he wanted out of the
3 business.
4    Q.    Okay. Now, would you hand me these
5 documents that you just reviewed.
6        Now, let's look at Exhibit Number 9, and
7 tell me and tell the jury how you determine the level
8 of ossification of any piece of product on that plate.
9    A.    I don't believe I made any remark about the
10 level of ossification.
11    Q.    Okay. You said there was ossification,
12 though, correct?
13    A.    I was asked to point out any ossified
14 materials and I suggested that the pieces that I made
15 reference to would be evidence of ossification.
16    Q.    And this middle deal that you are referring
17 to, you referred to as a bone on multiple occasions,
18 correct?
19    A.    I said it appears to be a bone.
20    Q.    Okay. And it's not a bone. Is that
21 correct?
22    A.    I have no knowledge. I think it was a
23 bone.
24    Q.    The prior --
25    A.    I think it is a bone.

Page 131

1    Q.    The prior sworn testimony in this case is
2 that that's not a bone, correct?
3    A.    Not my prior sworn testimony.
4    Q.    Have you been made aware of the prior sworn
5 testimony that that's not a bone?
6    A.    No.
7    Q.    Okay. You expressed some doubts over here
8 on your left-hand side of the picture as to whether
9 that had any material in it that was a bone. Why have
10 you changed your opinion on that?
11    A.    I explained that that appears to be
12 connective tissue. I don't know that there's a bone in
13 that material, but it appears to be hardened tissue,
14 hardened connective tissue.
15    Q.    And how -- how do you determine that it
16 looks like hardened material or tissue?
17    A.    Because it has frayed edges and what looks
18 like hardened gristle-type material on this -- on the
19 edges of this main product here, the main -- main
20 piece.
21    Q.    My understanding was that was because it
22 had been cooked. Is that incorrect?
23    A.    Well, I believe that it has been cooked,
24 but I, again, am just asking -- or answering the
25 question about what appears to be hardened material.

Page 132

1    Q.    And one of the things that would cause that
2 material to harden is exposure to oxygen, correct?
3    A.    It would harden to a certain degree but not
4 to the degree that it would be hard and -- and
5 potentially cause injury.
6    Q.    Okay. Well, the -- the prior testimony on
7 this middle piece is that it was not hardened. Have
8 you been made aware of that?
9    A.    No, sir.
10    Q.    Would you defer to the people who examined
11 that?
12    A.    I don't know who the people were.
13    Q.    Okay. And so you know how long this
14 material sat out before these pictures were made?
15    A.    I have no knowledge.
16    Q.    Okay. Would it affect your opinions on the
17 ossification levels if this were several weeks after
18 the material had been cooked?
19    A.    I don't have any experience that helps me
20 to answer that question.
21    Q.    And you've said that this little piece is
22 ossified material; is that correct?
23    A.    I said it appears to be ossified material,
24 it appears to be hardened/ossified material, but I --
25 it's very difficult to judge from this particular

Page 133

1 picture. I base my evaluation of ossified material
2 based on the laboratory evaluation of what they saw in
3 the two unopened chubs.
4    Q.    Okay. And they didn't do any testing of
5 this material; you didn't ask them to, correct?
6    A.    My -- I don't know what this material is,
7 but my understanding was that this was a material that
8 was sent to me, which I sent to Certified Laboratories
9 of the Midwest that they -- they tested as bone
10 fragments with connective material attached.
11    Q.    Did you send these little pieces, including
12 the one that you were just referring to --
13    A.    I --
14    Q.    -- the little red piece?
15    A.    I sent the three pieces that were sent to
16 me and also the ingested piece that were sent to me
17 as -- as material. I -- you know, I don't know. I
18 assume that these are connected to those materials, but
19 I don't -- I don't know.
20    Q.    You assume that the Exhibit 9 materials are
21 connected to what?
22    A.    My understanding when I saw these pictures
23 the first time is that these were the original, the
24 pictures of the original material before they were
25 packaged and sent to the two laboratories which has

34 (Pages 130 - 133)

Page 134

1 subsequently evaluated them.
2    Q.    Okay. Were they done before the very first
3 one in November of 2014, that laboratory, do you know?
4    A.    I have no knowledge of that, of any
5 laboratory analysis in November of 2014.
6    Q.    How about October of 2014?
7    A.    I have no knowledge of any laboratory
8 analysis in October of 2014.
9    Q.    What major food companies in your
10 experience have avoided a foodborne illness issue?
11    A.    I think that in my experience most
12 companies that I'm aware of at one time or another have
13 had a food -- have had experience with food pathogens
14 that resulted in some action, be it regulatory or
15 voluntary.
16    Q.    Based on your analysis and the work that
17 you were hired to be done in this case, do you see
18 anything that points to a foodborne illness such as
19 salmonella or E. coli resulting from the material that
20 you had tested?
21    A.    I was not asked to evaluate the ground meat
22 product for any presence of pathogens and I have no way
23 of knowing.
24    Q.    That's something you could have done had
25 you been asked, correct?

Page 135

1    A.    It could have been done, yes.
2    Q.    But you weren't asked to do that.
3    A.    That is correct.
4    Q.    In the materials that you have been
5 provided and reviewed, have you seen any concern that
6 Mr. Blancett suffered from any type of foodborne
7 illness?
8    A.    I've seen no reference to foodborne illness
9 in relationship to this case, and one cannot see
10 pathogens.
11    Q.    But the experts that you hired to come up
12 with opinions in this matter, they could have, correct?
13    A.    They would have had to perform analytical
14 tests specific to identification of any pathogens and
15 quantification of any pathogens.
16    Q.    I think my question was could they have
17 done it, and the answer would be "yes," correct?
18    A.    The analytical laboratory had the -- has
19 the technology to do the tests if they were asked.
20    Q.    Do you intend to follow up with them and
21 have them do those tests?
22    A.    It is not my intention at this time.
23    Q.    What effect could it have on foodborne
24 pathogens that the material was purchased after the use
25 or freeze date and was kept in a refrigerator instead

Page 136

1 of being frozen?
2    A.    The question would involve duration of time
3 post expiration. Usually expiration dates for
4 processed meat such as ground meat in a chub are
5 quality based as much as food safety based. There's
6 deterioration of quality, color, things like that that
7 were -- are affected by the use by date or the freeze
8 by date. It's very hard to speculate. It would depend
9 on the pathogen load from the raw product, how it was
10 stored, what temperature it was stored in, and a
11 duration of five days post expiration date would not
12 necessarily present a food safety hazard but it could.
13    Q.    If it was 17 days after it, could it also
14 present a potential problem as it relates to foodborne
15 pathogens?
16    A.    It could more likely result in spoilage
17 organisms than foodborne pathogens, if the product was
18 properly refrigerated. Food spoilage microorganisms
19 grow faster than -- than do pathogens in -- as a
20 general case.
21    Q.    What is Cargill's reputation in the field
22 as it relates to foodborne pathogens as compared to its
23 competitors? Better, the same, or worse?
24        MR. TRUJILLO: Objection, form.
25    A.    In my experience directly with Cargill as

Page 137

1 well as other which I would regard as peer company
2 large multinationals, Cargill has a good food safety
3 program that would be similar to other companies that
4 they would I think see themselves as peers with. I
5 point to ConAgra perhaps as a good one. Nestle is
6 another, another good example. Tyson's perhaps also.
7 And I think that they are as good as those other
8 companies, all of which have issues from time to time.
9 BY MR. ELZA:
10    Q.    Anything about a foodborne pathogen issue
11 that makes it more or less likely that ossified
12 materials or bones may or may not show up in a product?
13    A.    I believe that the presence, and based on
14 my experience, the presence of foreign material in a
15 packaged product, consumer goods product, is evidence
16 that something is not right with the process, something
17 is not working according to a plan, because certainly
18 these are objects that we work very hard as quality
19 professionals to preclude from finished goods. There
20 is not a direct correlation between foreign objects and
21 pathogens, but I would simply -- I would simply state
22 based on my experience that something is not working
23 well if there's presence of foreign material in a -- in
24 a finished good.
25    Q.    Okay. And what is your opinion as to what

35 (Pages 134 - 137)

Page 138

1 is not working good in this case?
2    A.   Their quality procedures are not working as
3 they have planned them.
4    Q.   Okay. And which quality procedures in
5 particular?
6    A.   In this case, relative to foreign material,
7 their inspection of raw materials, their control of
8 foreign materials in the incoming stream, upstream raw
9 materials, their supplier management, perhaps, where
10 these materials should be precluded, their -- if they
11 are vertically integrated, then their own management of
12 those upstream materials which should be working to
13 preclude foreign material from getting to the point of
14 grind, and then the grinding procedures themselves,
15 including other screens and other -- other safety
16 guards that we have in place for ground meat products
17 to preclude the presence of foreign material.
18 Something appears not to be working according to good
19 quality practices.
20    Q.   Okay. And you can't tell us specifically
21 what that, quote, "something," end quote, would be; is
22 that fair?
23      MR. TRUJILLO: Objection, form.
24    A.   In these matters where we have a defect in
25 the finished product, it's very hard to pinpoint, but

Page 139

1 there are many steps upstream to that finished product
2 being packaged that we work to preclude foreign
3 material or other food safety hazards from being in the
4 product, and something appears not to have worked as
5 well -- as well as I'm sure it was designed to do so.
6 BY MR. ELZA:
7    Q.   So do I understand it could be one of any
8 number of things that went wrong, in your opinion?
9    A.   When we have presence of foreign material
10 in product, it can be a number of -- one of many
11 different types of things that -- that could go -- go
12 wrong.
13    Q.   Are you able to eliminate any possible
14 causes as you go vertically upstream and have testified
15 to?
16      MR. TRUJILLO: Objection, form.
17    A.   I don't understand your question. Based
18 on --
19 BY MR. ELZA:
20    Q.   Well, you said there are all kinds of steps
21 where something can go wrong from where they get the
22 turkeys from, correct?
23    A.   Yes.
24    Q.   And so are any one of those steps that you
25 are referencing more or less likely to be the culprit

Page 140

1 here, or do you know?
2    A.   I have no basis of knowing without knowing
3 much more information about their procedure, their
4 manufacturing process and the verification steps as
5 well as the procedures that actually happened, the
6 operations that actually happened on the day of
7 manufacture.
8    Q.   And none of that was provided to you,
9 correct?
10    A.   No.
11      MR. TRUJILLO: Objection to form.
12    A.   No.
13      MR. ELZA: What's the basis?
14      MR. TRUJILLO: Well, the basis is we
15 haven't taken your corporate representative's
16 deposition, which I think is scheduled for sometime
17 next week. So without having reviewed his testimony,
18 the questions that you are asking are confusing to her
19 because she -- she hasn't had an opportunity to review
20 his testimony.
21      MR. ELZA: Okay.
22      MR. TRUJILLO: And -- and her -- her
23 inability to answer the questions stem from us not
24 having deposed your corporate representative which you
25 made available later than what we made Dr. Hutt's

Page 141

1 testimony available to you.
2      MR. ELZA: And you remember that I agreed
3 to delay hers, correct?
4      MR. TRUJILLO: No. I remember you
5 complaining about not getting dates.
6      MR. ELZA: Okay.
7 BY MR. ELZA:
8    Q.   And so the manufacturing process, if that
9 was filmed from beginning to end, is that the type of
10 material that could have helped you answer these
11 questions?
12      MR. TRUJILLO: Objection, form.
13    A.   It could be one piece, but I would
14 certainly not depend on any video of the manufacturing
15 process in order to establish my opinion.
16 BY MR. ELZA:
17    Q.   Why wouldn't you rely on video of the
18 manufacturing process?
19    A.   There are many more elements of the quality
20 process that is not visible by simple video.
21    Q.   Okay. Did you advise -- and if you still
22 believe it's attorney-client privilege between you and
23 your attorneys, don't answer.
24      Did you advise them --
25      MR. TRUJILLO: Object to the side-bar.

36 (Pages 138 - 141)

Page 142

1  BY MR. ELZA:
2      Q.   -- that you would like to see video of any
3  particular type of the manufacturing process?
4      A.   No.
5      Q.   Did you help them determine how to best
6  video the manufacturing process when they did so?
7      A.   I have no knowledge of a video and nor is a
8  video relevant to my opinion that I've presented here.
9      Q.   Okay.  What about, you said there were some
10 materials you would like to see that would help you
11 formalize your opinions.  Did I understand that
12 correctly?
13     A.   I formalized my opinions based on the
14 information that I have collected.
15     Q.   Okay.  And that -- and I think we're almost
16 done.
17          That information was collected from your
18 attorneys that also represent Mr. Blancett, correct?
19          MR. TRUJILLO:  Objection, form.
20     A.   The -- no, the information that I'm
21 depending on for my opinion is the examination done by
22 Midwest - correction - Certified Laboratories of
23 Midwest --
24 BY MR. ELZA:
25     Q.   Okay.

Page 143

1      A.   -- and evaluation of the product that I
2  provided to them.
3          MR. ELZA:  Pass the witness.
4          MR. TRUJILLO:  We will reserve.  Thank you.
5          VIDEOGRAPHER:  The time is now 3:45 p.m.
6  We are now off the record.
7               -oOo-
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1          CHANGES AND SIGNATURE
2  WITNESS:  CATHERINE ADAMS HUTT
   DATE:  December 7, 2016
3
   Page  Line  Change        Reason
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 145

1          I, CATHERINE ADAMS HUTT, have read the
2  foregoing deposition and hereby affix my signature that
3  same is true and correct, except as noted above.
4
5          _____
          CATHERINE ADAMS HUTT
6
7  STATE OF _____)
8  COUNTY OF _____)
9
10         Before me _____ on this day
11 personally appeared CATHERINE ADAMS HUTT, known to me
12 (or proved to me on the oath of _____ or
13 through _____ (description of identity card
14 or other document)) to be the person whose name is
15 subscribed to the foregoing instrument and acknowledged
16 to me that he executed the same for the purposes and
17 consideration therein expressed.
18         Given under my hand and seal of office this
19 _____ day of _____, _____.
20
21         _____
          Notary Public in and for the
22         State of _____
23
24
25

37 (Pages 142 - 145)

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

Page 146

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2              WACO DIVISION
3    JOSHUA BLANCETT,    §    CASE NO.
          PLAINTIFF,    §    6:16-CV-00024-RP-JCM
4                       §
     v.                 §
5                       §
     CARGILL MEAT SOLUTIONS  §
6    CORP.,              §
          DEFENDANT.     §
7
8         REPORTER'S CERTIFICATION
     DEPOSITION OF CATHERINE ADAMS HUTT
9         December 7, 2016
10
11        I, Joseph D. Hendrick, Certified Shorthand
12   Reporter in the State of Texas, do hereby certify to
13   the following:
14        That the witness, CATHERINE ADAMS HUTT, was
15   duly sworn by the officer and that the transcript of
16   the oral deposition is a true record of the testimony
17   given by the witness;
18        That the deposition transcript was
19   submitted on December 12, 2016, to the witness, or to
20   the attorney for CATHERINE ADAMS HUTT, for examination,
21   signature, and return to me by January 16, 2017;
22        That the amount of time used by each party
23   at the deposition is as follows:
24
25        Slater Elza - 01:29;
          James Trujillo - 01:01;

Page 147

1         That pursuant to information given to the
2    deposition officer at the time said testimony was
3    taken, the following includes counsel for all parties
4    of record:
5    FOR THE PLAINTIFF:
          James D. Trujillo
6    MCKEY & SANCHEZ, P.C.
          1349 Empire Central
7    Suite 700
          Dallas, TX 75247
8    (972) 529-3476
          james@972lawfirm.com
9
     FOR THE DEFENDANT:
10   Slater Elza
     UNDERWOOD LAW FIRM, P.C.
11   P.O. Box 9158
     Amarillo, Texas 79105
12   (806) 376-5613
     Slater.Elza@uwlaw.com
13
14        I further certify that I am neither counsel
15   for, related to, nor employed by any of the parties to
16   the action in which this proceeding was taken, and
17   further that I am not financially or otherwise
18   interested in the outcome of the action.
19        Further certification requirements will be
20   certified to after they have occurred.
21
22
23
24
25

Page 148

1    Certified this date:  December 9, 2016.
2
3
4
5
6    _____
     Joseph D. Hendrick, CSR #947
7    Expiration Date: 12/31/16
     Veritext Legal Solutions
8    Firm Registration No. 571
     300 Throckmorton Street
9    Suite 1600
     Fort Worth, Texas 76102
10   Phone: (817) 336-3042
     Fax: (817) 335-1203
11   Toll-Free: (800) 336-4000
12        FURTHER CERTIFICATION
13        The original deposition was / was not
14   returned to the deposition officer on _____;
15        If returned, the attached Changes and
16   Signature page contains any changes and the reasons
17   therefor;
18        If returned, the original deposition was
19   delivered to James Trujillo, Custodial Attorney;
20        That $_____ is the deposition officer's
21   charges to the PLAINTIFF, for preparing the original
22   deposition transcript and any copies of exhibits.
23
24
25

Page 149

1    Certified to by me this _____ day of
2    _____, _____.
3
4
5
6    _____
     Joseph D. Hendrick, CSR #947
7    Expiration Date: 12/31/16
     Veritext Legal Solutions
8    Firm Registration No. 571
     300 Throckmorton Street
9    Suite 1600
     Fort Worth, Texas 76102
10   Phone: (817) 336-3042
     Fax: (817) 335-1203
11   Toll-Free: (800) 336-4000
12   Job No. TX 2486858
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 - 149)

| **&** |
| --- |
| **&**   4:3 147:6 |

| **0** |
| --- |
| **00024**   1:3 146:3 |
| **01:01**   146:25 |
| **01:29**   146:24 |

| **1** |
| --- |
| **1**   2:11 6:23 7:9 |
| 19:16 29:19,20,21 |
| 37:2,22 38:21 |
| 41:15 42:24 43:10 |
| 46:15 116:4 |
| **10**   3:8 29:10 30:21 |
| 37:17,20 39:18 |
| 40:13 42:5 43:22 |
| 44:7,24 45:22 |
| 47:11,13 97:2 |
| 98:13,15,19 |
| 109:16,18 110:1 |
| 111:17,21 112:1 |
| **1008**   1:20 |
| **101**   1:20 |
| **105**   2:6 |
| **109**   3:6,8 |
| **10th**   95:4 |
| **10x**   26:4 28:10 |
| **11**   3:9 38:11 |
| 115:16,20 |
| **115**   2:6 3:9 |
| **12**   2:15 38:10 |
| 39:15 146:19 |
| **12/31/16**   148:7 |
| 149:7 |
| **12:59**   1:16 5:3 |
| **12th**   106:8 |
| **1349**   4:3 147:6 |
| **144**   2:7 |
| **146**   2:8 |
| **15th**   95:4 |

| **16**   146:21 |
| --- |
| **1600**   148:9 149:9 |
| **17**   136:13 |
| **1975**   9:13 |
| **1979**   9:16 |
| **1st**   97:14 |

| **2** |
| --- |
| **2**   2:13,13 8:15,16 |
| 18:19 32:6 72:17 |
| 75:24 |
| **20**   118:7 123:11 |
| **200**   75:22 |
| **2000**   125:18,21 |
| **2001**   125:17,21 |
| **2012**   106:9 |
| **2014**   79:16 89:24 |
| 94:15 134:3,5,6,8 |
| **2015**   2:15 78:7,20 |
| **2016**   1:10,16 2:13 |
| 5:3 144:2 146:9 |
| 146:19 148:1 |
| **2017**   146:21 |
| **21**   2:15 |
| **22**   72:17 |
| **2486858**   1:25 |
| 149:12 |
| **25**   125:15 |
| **26**   16:20 99:23 |
| 100:13 101:6 |
| 125:15 |
| **2:09**   71:11,13 |
| **2:19**   71:13,14 |
| **2nd**   78:7,20 |

| **3** |
| --- |
| **3**   2:15 21:22,25 |
| 22:3 84:25 88:13 |
| 108:9 |
| **3's**   7:5 |
| **3,000**   97:20 |

| **300**   148:8 149:8 |
| --- |
| **335-1203**   148:10 |
| 149:10 |
| **336-3042**   148:10 |
| 149:10 |
| **336-4000**   148:11 |
| 149:11 |
| **376-5613**   4:9 |
| 147:12 |
| **3:00**   78:7 |
| **3:08**   115:11,13 |
| **3:14**   115:13,14 |

| **4** |
| --- |
| **4**   2:2,17 27:25 |
| 28:1 36:6 48:3,5,7 |
| 48:11 94:12 |
| **4's**   7:5 |
| **4.45**   98:18 |
| **47**   100:20 |
| **48**   2:17,19,21 3:1 |

| **5** |
| --- |
| **5**   2:5,19 28:18,22 |
| 36:21 48:23,25 |
| 49:4,6,15 50:13 |
| 102:2 |
| **5.a.**   36:22 |
| **5.b.**   37:18 |
| **5.b.b**   37:19 |
| **50**   88:21 |
| **500**   96:15,21 |
| **51**   2:5 |
| **529-3476**   4:5 |
| 147:8 |
| **57**   3:3 |
| **571**   148:8 149:8 |

| **6** |
| --- |
| **6**   2:21 30:16,20 |
| 48:23 49:17,19,20 |
| 50:13 |

| **6:16**   1:3 146:3 |
| --- |

| **7** |
| --- |
| **7**   1:10,16 2:11 3:1 |
| 5:3 31:11,16 |
| 48:24,25 50:3,4,13 |
| 108:25 144:2 |
| 146:9 |
| **700**   4:4 147:7 |
| **75**   9:13 |
| **7500**   84:25 107:24 |
| 108:8,9 |
| **75247**   4:4 147:7 |
| **76102**   148:9 149:9 |
| **79105**   4:8 147:11 |
| **7th**   94:14 |

| **8** |
| --- |
| **8**   2:13 3:3 36:1,6,7 |
| 57:2,3 101:15 |
| **800**   148:11 149:11 |
| **806**   4:9 147:12 |
| **817**   148:10,10 |
| 149:10,10 |

| **9** |
| --- |
| **9**   3:6 36:21 61:25 |
| 101:15 102:2 |
| 109:13,14,16,18 |
| 109:20 110:1,13 |
| 111:10 130:6 |
| 133:20 148:1 |
| **9158**   4:8 147:11 |
| **947**   148:6 149:6 |
| **972**   4:5 147:8 |
| **972lawfirm.com** |
| 4:5 147:8 |

| **a** |
| --- |
| **able**   25:22 90:21 |
| 139:13 |
| **absolutely**   58:10 |

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

[academic - approximately]                                        Page 2

academic 10:20
accepted 10:20
access 83:5 118:21
accreditation 11:3
  11:5,11,12
accurately 46:18
acknowledged
  145:15
action 83:23
  134:14 147:16,18
active 102:23
actual 87:10
  100:21
adams 1:9,13 2:4
  2:12,14 3:10 5:2
  5:19 6:1,2 144:2
  145:1,5,11 146:8
  146:14,20
added 98:4
additional 98:15
adjacent 91:18,21
  93:10 107:16
  112:23
adjoining 107:16
administration
  108:6
administrator
  17:21,22 84:21,24
  108:2,10,11,12
  123:15
admissions 101:5
  101:6
adopted 97:20
  117:7
adulterants
  114:17
adulterated 61:17
  63:1
adverse 18:16
  26:16 30:10

advise 141:21,24
advisory 123:16
affect 76:22 95:17
  132:16
affirm 5:14
affix 145:2
afternoon 5:23
age 79:7 95:16,18
  96:9
agency 17:22 18:2
  18:2,6,10 59:3,17
  60:5,6 84:25 85:7
  108:5
ages 79:6
ago 120:23
agree 24:4 54:1
  55:3 63:4,22
  66:14 81:14 88:11
  93:21
agreed 141:2
agri 17:15
agriculture 17:16
  17:19
ahead 33:12 64:17
  67:1 115:9 116:3
  121:7
aligned 12:10
  16:11
allegation 92:16
allege 74:1
alleged 8:4
allegedly 71:18
allied 10:1
allow 74:19
allowed 62:20,23
  62:25 63:3,6,7
  114:17,19,20,23
  125:8
altec 23:13
alteca 2:15 21:5,10
  21:15 22:11 23:13

24:17,24 29:16
  33:24 34:10 40:18
  67:20 69:10 83:6
  88:9 89:1,16,20
  104:2 106:4,7,21
amarillo 4:8
  147:11
america 16:21
american 16:12
amount 146:22
amplification 26:4
  28:10,11,23 29:7
  37:25 39:18,19
amplify 29:5
  81:24
analcal 13:21
analy 22:15
analyses 26:3
  107:3
analysis 18:11
  19:19 20:5 22:5
  22:15 23:4 25:22
  25:25 32:17 34:8
  41:1 75:9 81:9,13
  82:4,16,19 84:9
  93:4 106:12 107:5
  116:9 134:5,8,16
analytical 10:2,3
  10:23 12:14 13:13
  13:16,22 22:12
  33:9 78:24 80:8
  80:20 81:1,7 82:5
  83:12 135:13,18
animal 10:7 39:1
  79:8 96:10
animals 95:18
anorexia 13:11
answer 3:18 23:9
  85:15 101:19
  121:4,16 122:5,15
  123:25 125:8,10

125:11 132:20
  135:17 140:23
  141:10,23
answered 122:12
answering 131:24
answers 100:20
  104:6
anybody 92:19
anyway 64:18
  65:12
apologize 48:10
  106:2 116:17
  123:18
apparently 31:3
  80:2
appear 7:6 103:11
  103:25
appearance 99:15
appearances 2:2
appeared 83:20
  145:11
appears 49:16
  78:25 110:20
  112:7 130:19
  131:11,13,25
  132:23,24 138:18
  139:4
application 15:15
applied 87:12
apply 61:4
approach 16:24
appropriate 81:16
  82:6,21 98:2
approval 119:4
approximate
  33:22
approximately
  29:11,13 33:23
  34:5 37:3 40:14
  41:21 42:14 43:6
  43:25 44:5 45:3

45:23 75:22 89:6
95:3 98:9 101:6
**area** 113:20 121:9
122:17
**arisen** 52:14
**arkansas** 59:19
85:17,20 86:23
**arose** 64:19
**arriving** 55:15
**asked** 36:11 46:17
70:22 82:25 84:16
87:23,24 88:4
90:5 91:2,2
101:20 117:17
119:22 120:7,9,11
127:10 130:13
134:21,25 135:2
135:19
**asking** 6:24 85:4
124:4,6 131:24
140:18
**aspects** 14:5 18:2
**assess** 22:13 119:4
**assessed** 75:15
**assessing** 81:6
**assessment** 51:12
76:14 83:24 84:9
**assistant** 17:20,21
84:21,24 108:2,11
123:14
**associate** 108:11
**associated** 38:20
40:12 43:3 113:17
**associates** 116:10
**association** 116:8
124:25 125:24
**assume** 77:21
82:22 126:13
133:18,20
**assumed** 68:12
85:20

**assumption** 68:10
103:16
**assumptions** 55:9
55:14,17,20 68:7
**ate** 64:18 65:3
66:6
**attached** 1:23
28:24 133:10
148:15
**attorney** 5:8 54:21
104:20 105:2
116:16,20,21,22
141:22 146:20
148:19
**attorneys** 56:7
57:13 99:7 104:17
116:14 141:23
142:18
**aubrey** 17:4
**audio** 117:19
**audit** 124:18 125:1
125:14
**auditing** 126:10
**aunt** 21:23
**available** 88:23
117:2,5 140:25
141:1
**average** 72:4,5
**avoided** 134:10
**aware** 65:15 66:19
68:2,18,19,21
69:12 74:7 92:19
92:21 113:13
119:9,24 131:4
132:8 134:12
**awareness** 58:13
123:3

**b**

**baby** 12:23,24
**bachelor** 9:15

**bachelor's** 12:4,7
**back** 6:19,24 9:14
25:3 66:5 97:12
121:7 122:13
124:7
**background** 9:9
9:10 24:1 51:13
**bad** 106:2
**bag** 22:6 103:25
106:13
**bake** 24:21
**bakery** 129:7
**bar** 141:25
**base** 133:1
**based** 7:23 9:1
15:20 21:17 24:1
24:8,23 28:15
32:14,16 50:12,20
51:1,12 52:16
54:8,23 55:2,24,25
56:2,11,23 58:4
73:15 74:7 75:9
81:4 82:19 83:2
83:18 96:5 103:17
129:15 133:2
134:16 136:5,5
137:13,22 139:17
142:13
**basic** 12:16
**basics** 13:25
**basis** 20:18 24:7
55:12,13 60:12
83:14,17 84:8,12
90:7 119:25 127:5
127:8 128:10,21
128:23 140:2,13
140:14
**batch** 76:15
**bed** 69:16
**beginning** 141:9

**believe** 20:11,15
21:3 26:18,21
28:1,19 30:6
31:12 33:4 35:12
36:15 37:15 38:6
39:2,13,23 40:19
40:24 45:11 46:7
47:5 49:15 50:21
50:24 55:20 65:25
68:10 72:17 87:8
87:18 91:12 93:6
96:2 97:12 98:13
99:8 100:23
107:12 109:21
112:22 114:10,15
116:2 118:13
121:23 125:17
126:24 128:15
129:25 130:9
131:23 137:13
141:22
**believed** 68:14
**believes** 70:19
**best** 14:7,9 87:13
118:3 124:20
125:16 142:5
**better** 72:5 80:15
136:23
**big** 12:9
**bigger** 75:24
**bill** 97:4,8 98:23
104:11
**billing** 100:7,10
**bills** 100:5
**biochemical** 13:10
**biochemistry** 10:1
10:23 12:11,14,15
13:21
**biology** 10:1,24
12:11

**birds** 86:3
**bit** 9:8 32:1 65:13
67:1
**bite** 65:12 66:16
67:1
**blancett** 1:3 5:9,24
20:13 28:14 29:2
31:5 34:15 40:22
68:2 69:13 71:18
89:8 99:7 109:22
112:2,11,21 135:6
142:18 146:3
**bleeding** 30:15
**board** 123:16
**body** 27:9 30:14
**bone** 2:19,21 8:3
18:24 19:8,10,16
19:20 20:8,12,22
22:7,23 23:5,14,21
23:23,24 24:22
25:4 26:13,13,15
26:17,18 27:5,11
27:22 28:1,11,24
28:25 29:13 30:2
30:8 32:10,23
33:18,23,24 34:7,9
34:12 35:6,8,15
36:10,13 46:18
49:7,20,24 50:11
50:16 61:21 62:15
62:18,19 63:3,7,7
63:24 64:4,8,14,20
64:22,25 65:1,4,13
65:17,24 66:12
67:4,6,10,11 68:8
68:20 69:1,4,7,8
69:18,23 70:21
72:25 73:10,23,25
74:3,3,5,25 75:11
75:16,17 80:18
81:2 83:15 84:1

88:6,8,15,23 92:10
95:12 105:19
106:13,17 110:18
110:21 111:23
130:17,19,20,23
130:25 131:2,5,9
131:12 133:9
**bones** 24:11,11,13
24:18 25:14 36:17
64:11,12,17 65:12
66:7,11,15,17,25
67:14 70:20 71:3
80:25 81:5 88:12
88:21 89:9 93:23
105:22 137:12
**bottom** 22:4 23:20
34:22
**box** 4:8 147:11
**brand** 22:25
**brazil** 59:17
**break** 70:6 71:10
71:13 101:19
115:13
**briefly** 129:8
**bring** 18:4,8 116:4
**brought** 6:14
**business** 7:16 8:23
130:3
**butter** 128:18

**c**

**c** 4:1 18:12,12 34:2
34:3
**call** 84:12,16
**called** 6:12 14:19
18:11
**campbell** 59:6
**capacity** 15:9
**card** 145:13
**cargill** 1:5 5:10
19:14 21:13,13
27:13 58:18,19

59:10,11,13,15,22
60:1,2,4,6,7,10
75:8 76:12,13
86:13,20,24
100:17 101:4,7,10
107:10,16 113:5
113:13,16 114:3,4
117:23 118:6,17
119:1,12,23
121:16,17 123:1,3
123:6,17,23,24
124:10,12 125:14
125:20 126:22,23
126:24,25 127:12
127:17,19,20,24
128:12 136:25
137:2 146:5
**cargill's** 101:1,16
113:20 118:21
120:16 121:10
122:18 124:18
126:3,8,12 136:21
**case** 1:3 5:15,24
8:1,4,8 18:17,23
21:7 22:20 28:11
56:1,23 62:6,13
64:25 65:23 67:11
68:8 72:10 73:16
86:8 92:3 97:9
103:14,19 104:20
120:6 131:1
134:17 135:9
136:20 138:1,6
146:3
**cases** 14:24
**catherine** 1:9,13
2:4,11,14 3:10 5:2
5:19 6:1 144:2
145:1,5,11 146:8
146:14,20

**cause** 1:16 26:16
27:7 30:10,11,12
53:22,23 54:9,15
62:24 64:5 69:17
71:22 74:17,19
102:20 114:22
115:4 116:11
132:1,5
**caused** 51:21
52:10,11 53:11,15
54:4,17
**causes** 72:11
102:24 103:3,4
139:14
**causing** 30:15
102:16
**cavity** 30:11
**center** 44:23
**central** 4:3 147:6
**ceo** 129:8
**certain** 16:22,23
51:19 52:9 99:18
102:19 113:23
121:12 122:20
132:3
**certainly** 43:16
44:13 45:13 46:9
47:22 50:23 62:14
72:6 82:22 115:3
137:17 141:14
**certainty** 51:2,11
51:19 52:8
**certification** 2:8
146:8 147:19
148:12
**certified** 1:18 2:23
3:18 10:13 11:3,9
11:10 20:2 25:16
27:18 32:17 34:11
35:4 36:11 38:16
41:1 46:24 48:20

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

[certified - concerned]                                    Page 5

| | | | |
|---|---|---|---|
| 50:1 69:9 90:20 | chicago  15:20 17:2 | clarification  32:9 | 123:22 124:9 |
| 93:1 107:4 108:15 | chicken  59:6,18 | class  9:16 | 125:15 128:3,7,22 |
| 108:18 109:3 | chief  6:11 15:6,21 | classes  12:8 | 128:24 129:4 |
| 111:15 133:8 | 15:21,24 | clear  30:25 | 134:9,12 137:3,8 |
| 142:22 146:11 | choosing  19:25 | clearly  31:2 37:6 | company  6:12 |
| 147:20 148:1 | chose  83:3 93:18 | 42:16 50:16 90:18 | 11:20,21,22 14:19 |
| 149:1 | 130:1 | client  116:16 | 59:6 114:5 118:19 |
| certify  146:12 | chosen  117:22 | 141:22 | 121:18 123:19 |
| 147:14 | chub  2:18 22:24 | clinical  71:23 | 130:2 137:1 |
| cfr  61:25 | 23:16 25:10 29:2 | 102:18 | compared  136:22 |
| cfs  3:11 | 74:2,8 79:13,14 | close  127:20 | competitive |
| chain  15:9 59:8 | 88:12,16,17,22 | closely  118:22 | 124:14 |
| 77:16,18,22,25 | 91:24 92:10 93:12 | code  61:4 | competitor  129:23 |
| 78:3,5,10,13,15 | 93:14,15 105:23 | cody  4:11 | 130:2 |
| 96:6 104:10 | 106:17 107:16 | coli  113:17 114:15 | competitors |
| chance  58:7 70:6 | 111:11 112:11,14 | 115:1,3 134:19 | 136:23 |
| change  58:8 96:2 | 112:16,20 136:4 | collected  142:14 | compilation  3:3 |
| 112:19 115:10 | chubs  8:4 19:5,10 | 142:17 | 56:22 |
| 144:3 | 21:1,6 26:6,9,10 | color  136:6 | compile  120:15 |
| changed  31:20 | 26:11,20 27:17,23 | combine  93:8 | complaining  141:5 |
| 49:11 131:10 | 28:14 31:5,14 | combined  9:25 | complaints  16:22 |
| changes  2:7 144:1 | 32:8,13,16,18 | 26:12 35:3 | 52:23 63:21 |
| 148:15,16 | 34:15 35:3 39:21 | combines  10:21 | complete  5:25 |
| character  10:6 | 40:21 41:2,15 | come  11:2 16:20 | completed  57:21 |
| characteristics | 42:4,23 43:22 | 38:25 53:11 75:13 | compliance  6:9 |
| 22:13 38:19 40:10 | 45:20 48:16,19 | 83:1 91:3 107:11 | 10:2 11:24 14:7,8 |
| 43:1 | 73:13,18 75:10 | 135:11 | 14:9 61:1 |
| characterize  22:19 | 80:22,25 90:7,11 | coming  37:24 50:7 | compliant  11:15 |
| 25:22 83:10 | 91:8,13,14 92:7,25 | 55:9,18 57:9 | 62:14 |
| characterizes | 93:8,11,15 105:19 | 100:10 | complies  28:5 36:4 |
| 22:15 | 105:24 107:14 | comment  67:10 | comply  115:25 |
| charge  15:7 18:1 | 108:20 109:2,8 | 78:25 93:25 | components  10:5 |
| charges  148:21 | 110:9 111:12,14 | 128:20 | 10:7 11:23 14:1 |
| charter  11:4 | 112:4,6,15 133:3 | communication | 69:11 |
| check  7:7 36:13 | circumstances | 104:22 | composition  33:2 |
| chemical  12:23 | 90:20 | communications | conagra  126:1 |
| 22:17 | civil  1:22 | 116:7 117:6 | 128:14 137:5 |
| chemistry  10:1,3 | claims  6:10 | companies  14:11 | concern  63:9 |
| 10:23,24 12:8,9,15 | clair  9:13 | 14:15,21,23 60:7 | 135:5 |
| 12:16 13:13,16,22 | | 113:21 119:2 | concerned  30:8 |
| 13:24 14:2,2 | | 121:10 122:8,18 | 64:15 |

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

[conclude - correct]                                                    Page 6

| | | | |
|---|---|---|---|
| conclude 19:20 | 111:20,22,23 | 33:20,21 35:17 | 67:23 74:9 88:22 |
| conclusion 19:3 | 112:10,20 114:19 | 38:3 42:9 47:21 | 94:21,23 111:11 |
| 74:21 75:13 | 131:12,14 133:10 | 64:2 67:12 73:9 | 111:11 112:2,3,7 |
| 103:17 107:7 | connectivity 83:25 | 74:3,17,22 91:15 | 112:11,12,21 |
| conclusions 24:4,8 | consider 44:8,25 | 91:24 92:17,17 | 115:6 131:22,23 |
| 32:14 55:10,15,18 | 46:2 47:2,17 50:2 | 107:15 112:16 | 132:18 |
| 57:9 100:15 | 50:13 91:22 | 115:1,5 | cooking 25:9 64:2 |
| conclusive 23:25 | consideration | consumer 6:12 | 64:3,4 66:25 |
| 102:14 | 145:17 | 15:16 36:9,25 | copies 148:22 |
| conclusively 23:25 | considered 34:17 | 37:24 38:17 40:8 | copy 7:11 8:10,21 |
| condition 96:9,11 | 35:23 37:9 41:4 | 50:18 56:4 64:3 | 56:12 57:5,11,15 |
| 102:7 | 42:12 43:4 | 137:15 | 81:21 94:16 |
| conditions 79:24 | consisted 37:1 | consumption | 100:17 117:1 |
| 102:10 | 40:9 | 69:18 74:15 | core 12:10 |
| conduct 81:12 | consistent 15:15 | contain 65:1 91:25 | corp 1:6 146:6 |
| conducted 81:19 | 19:12 20:21,22 | contained 64:25 | corp.'s 100:18 |
| conference 126:8 | 21:3 22:19,20 | 73:10 92:25 98:12 | corporate 140:15 |
| confirmed 107:4 | 23:1,13,17 27:12 | 112:25 113:14 | 140:24 |
| confusing 55:14 | 27:20 29:22 38:19 | containing 52:19 | corporation 15:1 |
| 140:18 | 40:10 42:17 43:1 | contains 113:5 | 15:5,18 16:1 |
| connected 28:12 | 71:8 74:22 75:2 | 148:16 | 118:20 127:18 |
| 133:18,21 | 75:16 88:6 109:1 | contaminated | corporation's |
| connection 116:10 | 109:7 110:7 | 90:18 | 101:4,11 |
| connective 3:1,7,8 | consisting 38:18 | content 64:5 | correct 8:5 15:1 |
| 19:4,9 20:8,12 | consult 6:6,8 14:4 | contents 36:8 | 22:25 24:25 25:1 |
| 22:14 23:5 25:25 | 14:5,10,16,18,19 | 93:11 | 33:5 36:18 39:8 |
| 27:11 28:12,24 | consultant 6:5,13 | context 90:19 | 53:6,17 54:12,18 |
| 31:13 32:6,25 | 7:17 8:23 113:3 | 103:14 125:23 | 54:19 55:24 58:20 |
| 35:9 37:1,23 38:1 | 113:19 121:9 | continued 127:15 | 61:2,8 63:11,12 |
| 38:18,21,23,24 | 122:17,23,25 | continuous 85:24 | 68:9,13 72:12,18 |
| 39:20 40:9,12,12 | consultants | 86:8 | 72:19,24 73:13,14 |
| 41:13 42:3,8,25 | 113:21 120:22,24 | control 18:11 98:3 | 77:24 78:19 80:13 |
| 43:3 45:18,19 | 121:11 122:2,6,8 | 127:2,23 138:7 | 80:25 81:10 82:5 |
| 46:14 47:15 48:17 | 122:19 123:22 | controlled 90:15 | 82:13 83:6 84:20 |
| 48:21 50:6,10 | 124:10 | 90:19 | 86:3,17 88:1 89:1 |
| 61:21 69:7 74:4 | consulting 56:6 | conversations | 89:4 92:10 93:20 |
| 75:1 79:6 91:22 | consume 19:12 | 99:9,12 | 94:13 95:17,21 |
| 92:6 95:12 96:3,8 | 49:9 | cook 24:21 64:3 | 96:7 97:21 98:2 |
| 108:20,25 109:1,6 | consumed 2:20,22 | cooked 3:2 24:12 | 99:19,20 101:25 |
| 110:2,8,15,16,18 | 19:11 20:25 25:9 | 24:13,16,19,23 | 102:1,25 103:3 |
| 110:20,21 111:19 | 26:16 27:7 32:11 | 49:15,16 50:9 | 104:13 105:20 |

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

[correct - deponent]    Page 7

107:8,20,21 108:9
108:10,16 112:12
114:20 117:23
118:5 120:10
122:12 128:22
129:5,11,15,23
130:12,18,21
131:2 132:2,22
133:5 134:25
135:3,12,17
139:22 140:9
141:3 142:18
145:3
**correction** 127:19
142:22
**correctly** 54:24
62:9 64:10 73:12
74:23 142:12
**correlate** 87:17
**correlation** 137:20
**corresponded**
104:20,21
**correspondence**
104:17,19 116:5
116:12,13,24
**corresponding**
105:3
**cost** 51:24 52:2
98:4
**costs** 100:2
**cough** 56:14
**counsel** 5:5 147:3
147:14
**countries** 59:17
**country** 59:16
**county** 145:8
**couple** 120:20
**course** 7:16 8:22
80:21
**courses** 10:22 12:5
12:11 13:20

**coursework** 10:18
11:11
**court** 1:1 57:4
146:1
**cover** 32:20
**cps** 2:14
**critical** 18:11 65:3
66:6 67:3
**criticism** 83:11
**criticisms** 62:12
83:8
**cross** 20:7
**crosses** 85:14,21
**csr** 148:6 149:6
**culprit** 139:25
**current** 6:3
**currently** 17:3
**curriculum** 2:11
10:19,20 14:1
**custodial** 148:19
**custody** 19:24
77:15,17,18,22
78:1,3,5,10,13,15
80:19 96:6 97:16
99:11 104:10
**cut** 60:15 87:2
**cv** 1:3 6:14,22 7:15
7:20,23 14:21,25
146:3

**d**

**d** 1:17 4:2 34:24
34:25 35:7,8
146:11 147:5
148:6 149:6
**daily** 128:10
**dallas** 4:4 147:7
**damage** 27:7
30:10,11,12,15
**damages** 64:19
**danger** 45:12 46:8
63:11 64:7,9

**dangerous** 31:9
34:19 35:18 37:15
38:4 39:25 41:7
41:19 42:10 43:15
44:11 47:5,20
50:21
**date** 78:17 79:16
79:16 94:8,10,13
94:14,22 95:6,8
97:16 104:15
115:23 135:25
136:7,8,11 144:2
148:1,7 149:7
**dated** 97:14 106:8
**dates** 113:15 136:3
141:5
**day** 76:15 77:9
87:10 128:5 140:6
145:10,19 149:1
**day's** 87:10
**days** 95:23 136:11
136:13
**deal** 14:1 16:23
130:16
**dealing** 52:18 86:2
**dealt** 16:19 73:12
74:20 118:22
**decade** 127:16,16
**december** 1:10,16
5:3 144:2 146:9
146:19 148:1
**decide** 90:10
**decision** 64:20
**deerland** 14:19
**defect** 28:16 31:7
35:23 37:8,9 38:8
39:13,23 41:4,17
42:12 43:4 44:9
45:1 46:2 47:3,18
56:3 91:23 138:24

**defects** 16:23
26:24,24 27:3
34:17 50:14,24
52:18 61:22 76:4
114:16
**defendant** 1:6 4:6
146:6 147:9
**defendant's**
101:24 104:6
**defer** 72:9 82:8
94:1,3 132:10
**definitely** 86:7,22
86:22
**definitively** 73:3
**degree** 10:21 12:4
12:7,19 51:2,10,18
52:8 132:3,4
**delay** 141:3
**delivered** 148:19
**delivery** 15:13
18:5
**department** 17:15
17:19
**depend** 136:8
141:14
**depending** 142:21
**depict** 30:20 46:18
**depicted** 28:9,21
31:16 33:13 34:1
36:5,21 37:18
38:14 39:16 40:3
41:10,25 42:1,21
43:18 44:19 45:16
46:12 47:3,10
48:13 49:5,14,18
50:4,12 111:10,20
111:21 112:1
**depicting** 2:17,19
2:21 3:1,6,8
**deponent** 116:7

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

[deposed - effect]    Page 8

deposed 140:24
deposition 1:8,13
  3:10 5:2 6:23 7:9
  8:15,16 21:25
  48:11,25 56:25
  57:3 65:20,21,25
  66:3 99:2,5
  109:17,18 115:16
  115:20 117:3
  140:16 145:2
  146:8,16,18,23
  147:2 148:13,14
  148:18,20,22
derived 63:6
describe 9:10
  17:14 19:15,19
  25:12 28:8 31:14
  32:4 36:21 37:18
  38:14 39:16 40:3
  41:10 42:1,20
  44:18,19 45:15
  46:11 47:10 49:5
  49:18 50:3
described 36:16
  37:23 38:2 42:7
  42:25
description 2:10
  3:14 145:13
design 125:16
designed 81:24
  139:5
deterioration
  136:6
determination
  51:20 52:10 69:21
  70:8,10
determine 76:7
  88:3 130:7 131:15
  142:5
determined 24:1
  102:9

developed 98:11
  124:20,25
developing 97:2
development
  11:21 16:13
  124:17 125:13,24
  126:16
diagnosis 72:10
dialog 123:1
diameter 76:2
  87:13
dietary 6:10 14:18
dietician 9:21
differ 60:10
different 10:4,22
  11:19 13:7 14:5
  14:11,20,23 19:2
  19:18,23 22:12
  23:18 25:24 26:6
  26:12 43:21 44:22
  82:2 83:12 89:3
  91:4 107:6 114:5
  121:18 127:11
  129:4 139:11
differs 60:14
difficult 114:8
  121:21 132:25
digestive 102:23
direct 87:4 137:20
directed 119:17
directing 87:5
directly 86:25
  104:20 117:9
  136:25
director 16:9
disagree 63:23
  83:19 93:21
discipline 6:7
  12:21
disclosures 99:23
  100:14

discuss 74:24
  93:14 120:1
discussed 54:3
  104:11 120:18
  126:4,5
discussing 60:9
discussion 24:21
  123:9
dish 33:13,15
dishes 33:5,6,12
disposition 16:24
dispositioning
  52:22
district 1:1,1
  146:1,1
diverticulitis
  71:21,22 72:2
  93:23 102:16,20
  102:25
diverticulosis
  102:12
divided 44:21
division 1:2 146:2
dna 25:22 81:24
doctor 5:12 94:1,3
doctoral 71:23
document 24:20
  57:5 77:19,20
  78:1 89:7 99:16
  115:22 145:14
documentation
  70:18 100:7,8
  118:13,18
documented 119:6
documenting 97:3
documents 3:3,4
  3:13 56:22,24
  70:1,10,12 71:5
  98:12 100:19,21
  100:23 102:13
  116:6 117:20

118:15 119:9,18
  120:15 130:5
doing 53:1 82:21
  85:9
dollars 129:14
double 7:7
doubts 131:7
dr 5:2,23 6:22
  7:14 8:14,20 28:8
  51:5 93:21 105:17
  140:25
draft 18:18
drew 24:8
drive 85:5
dry 12:24
duces 3:5
duly 1:15 5:20
  146:15
duplicate 7:3,4
duplicates 7:6
duration 136:2,11
duties 15:3 16:8
  17:23 84:23 85:4

e

e 4:1,1 100:13
  113:17 114:15
  115:1,3 134:19
earlier 37:21
  72:22 88:21 112:9
eat 64:20 66:11
  102:15
eating 67:3 92:19
  92:21
eats 30:1
edge 16:18 18:4
edges 112:8
  131:17,19
educational 9:9,10
effect 18:7 26:16
  73:25 91:9,12
  99:22 135:23

[effects - experience]                                                    Page 9

effects  12:25,25
  13:8,9,10 30:10
effort  127:12
either  109:21
elements  141:19
eliminate  139:13
elza  2:5,6 4:7 5:10
  5:10 7:2,12 8:18
  16:3 20:16 23:2,8
  25:15 26:23 27:15
  28:6 30:4 31:18
  31:22 32:1 39:5
  40:23 46:22 48:4
  48:8 51:9,25
  52:24,25 53:9,25
  54:10 55:7,12,16
  55:21 56:16 57:1
  57:4,7 65:2,7,19
  66:2,13,22 67:7
  69:19 70:4 71:9
  71:16 76:10,21
  79:18 84:11 85:2
  85:3,11 87:20
  88:19 89:14,18,22
  90:9,22 92:1,8,15
  95:14 96:17,19
  105:6,9,14,21
  106:18 107:17
  110:11 111:1
  113:7,9,24 114:2
  114:21 115:9,18
  118:8,10 119:7,8
  121:3 122:1,11
  123:5 124:7,21
  125:2,3,6,19
  129:21 137:9
  139:6,19 140:13
  140:21 141:2,6,7
  141:16 142:1,24
  143:3 146:24
  147:10

email  99:14
  104:16,19,21,23
  105:4 116:12
  117:1
emails  104:25
empire  4:3 147:6
employed  107:23
  147:15
employees  107:22
  108:3,8
enable  81:24
ends  110:16,20
enforce  114:8
  121:21
enforcement
  53:20
enforces  59:4
engineer  85:8
enhance  85:10
ensure  15:14
  18:13
entire  18:10 32:21
  32:21 57:2,19
  79:20
environments
  90:15
enzymes  14:19
  82:3
equation  95:22
essentially  72:22
establish  141:15
estelle  6:1
estimation  87:19
european  16:10
evaluate  24:15
  33:1 67:21 70:23
  80:9,22 90:6,7,10
  90:25 91:18 93:24
  98:4 110:6 120:7
  134:21

evaluated  2:23
  26:11 48:20 49:10
  49:12,25 75:2
  78:24 93:1 105:25
  111:14 134:1
evaluating  82:20
evaluation  11:13
  24:8,15,18 27:19
  32:20 51:12 56:11
  69:9 76:20 80:21
  87:23,25 97:18
  133:1,2 143:1
evaluations  87:12
  90:14 97:22
events  18:14,16
  52:13 113:17
  114:11,11 120:19
  121:24,24 123:3
  128:11
evidence  23:21
  61:10 67:19 69:2
  73:7 79:14 88:18
  90:6 92:13 114:8
  121:21 128:11
  130:15 137:15
evolution  16:14,15
ex  7:9 8:16 21:25
  48:11 57:3 115:16
exact  31:19 37:5
  40:17 42:16 45:5
  50:15 59:14 92:18
  115:23
exactly  44:3 45:25
  60:1 79:16 82:22
  90:20 120:12
examination  2:5,5
  2:6,6,16 5:21 20:5
  24:25 35:5 36:12
  51:8 105:15
  106:22 108:19
  115:17 116:9

117:10 119:19
  120:4 142:21
  146:20
examined  36:10
  80:6 108:21 109:3
  132:10
example  38:25
  137:6
excuse  6:19 56:13
executed  128:5
  145:16
execution  16:14
executive  118:20
exercise  13:10
exhibit  2:11,13,15
  2:17,19,21 3:1,3,6
  3:8,9 6:23 8:15
  18:19 21:22 22:3
  48:6,14,23 49:4,5
  49:15,17,18 50:3,4
  50:13 57:2 94:12
  108:24 109:11,16
  109:20 110:1,13
  111:10,16,21
  112:1 115:20
  116:3 119:17
  130:6 133:20
exhibits  2:9
  148:22
exist  118:15
expect  66:10 83:21
  128:9
expected  28:16
  80:1 128:19
experience  11:12
  28:15 37:10 51:13
  52:17 54:25 56:2
  56:10 58:12 59:3
  59:7 61:1 62:8,10
  76:5 81:4 86:1,4
  117:24 118:25

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

[experience - food]                                    Page 10

122:23,25 128:8
132:19 134:10,11
134:13 136:25
137:14,22
**experienced** 20:2
87:15 88:5 128:12
**expert** 2:13 3:4,10
8:7,21,23 9:1,5
21:14 36:7 56:24
63:20 97:3 98:11
114:14 118:23
**expertise** 12:12
13:15 50:20
**experts** 91:2 93:18
95:25 97:19
113:21 120:11,12
120:13 121:11
122:8,19 123:23
124:10 135:11
**expiration** 94:9
136:3,3,11 148:7
149:7
**explain** 9:23 10:16
47:9 127:11,12
**explained** 131:11
**exposure** 132:2
**express** 84:5
**expressed** 131:7
145:17
**exs** 48:25 109:18
**extracted** 46:23

**f**

**face** 84:18
**facilities** 85:25
114:6 121:19
**facility** 85:16,22
**facing** 81:17 82:7
**fact** 68:8,16 92:3
94:5 95:5 103:18
128:1,25

**facts** 65:14 73:16
75:21
**fair** 58:6 62:3
66:17 72:11 73:1
76:23 77:12 78:9
78:14 79:11 86:11
87:3,25 90:24
92:2 93:19 116:1
138:22
**fairly** 124:15
**familiar** 21:24
86:13 88:15
**fashion** 102:11
**faster** 136:19
**fault** 64:18
**fax** 148:10 149:10
**federal** 1:21 60:5
61:4 62:2
**fee** 96:15,21 97:20
99:2,4,5
**fellow** 10:14
**felt** 93:6
**fence** 14:12
**fibrous** 102:21
**field** 12:7,20 13:5
51:11 52:18
113:22 114:15
118:5 119:10
120:12 121:11
122:19 136:21
**fields** 10:2 13:7
**fifth** 46:13 47:12
**figure** 36:6,21,22
37:18
**file** 104:12
**filed** 94:17
**filmed** 141:9
**films** 117:18
**financially** 147:17
**find** 26:13 61:18
61:24 70:7 92:5

101:22 102:8
**finding** 91:21
**findings** 23:12,13
32:15
**fine** 8:18 32:2
**fines** 129:13
**fingers** 80:13
**finish** 96:12
**finished** 137:19,24
138:25 139:1
**firm** 1:20 4:7
147:10 148:8
149:8
**first** 7:2 9:16
17:20 34:22 36:23
72:25 77:6 100:13
100:18 101:1,5,11
101:16 104:6
115:21 123:12
127:7 133:23
134:2
**fish** 66:10
**five** 26:6,14 32:15
32:24 35:9 36:24
38:15 39:19 40:6
41:12 42:2,22
43:21 45:18 46:13
47:12 48:21 49:10
93:13 95:23
136:11
**flow** 86:8
**focus** 12:20 13:5
**focused** 13:6
**focusing** 43:23
45:21
**fold** 30:21 37:2,20
37:22 38:21 39:18
40:13 41:15 42:5
42:24 43:10,22
44:7,24 45:22
46:15 47:11,13

**folder** 97:8 98:13
**follow** 113:15
135:20
**following** 146:13
147:3
**follows** 5:20 83:25
146:23
**food** 6:8 9:15,18
9:19,23,24,25,25
10:4,5,8,9,13,14
10:15,17,19,21
11:2,3,8,10,14,17
11:22,23,23,25
12:4,6,9,10,16,19
12:23,24 13:2,20
13:25 14:1,4,6,11
14:16,21,22,23,24
15:7,11,12,14
16:16,18 17:16,19
18:1,4,7,8,9,13,14
25:11 30:8 49:23
49:23,24 50:20
51:15 62:10 63:11
63:16,17 67:3
84:22 85:1,6 95:8
102:19,24 113:4
113:16,20 114:4
114:10,15 117:23
118:2,6,16,24
119:5,12,23
120:16,18 121:9
121:17,23 122:17
123:2,2,3 124:13
124:13,15,24
125:13,23,25
126:9,19,21,23,24
127:6,10,25
128:11,16 129:2
129:20 134:9,13
134:13 136:5,12
136:18 137:2

139:3
**foodborne**  14:12
  14:24 113:17
  114:9,11 115:4
  121:22,24 127:23
  134:10,18 135:6,8
  135:23 136:14,17
  136:22 137:10
**foods**  6:11
**foregoing**  145:2
  145:15
**foreign**  19:17,22
  27:5 36:14 52:18
  52:21 59:16 61:10
  61:16,19,20,22
  91:20,20 102:21
  103:1,2 114:22
  137:14,20,23
  138:6,8,13,17
  139:2,9
**form**  16:3 20:16
  23:2 25:15 26:23
  27:15 28:6 30:4
  31:19 39:5 40:23
  46:22 51:22 52:15
  53:7,18 54:5 55:4
  55:11,19 64:21
  65:5,16 66:1,9,18
  67:5 69:14,25
  75:25 76:19 79:12
  84:6 87:7 88:14
  89:12 90:4,13
  91:11 92:4,11
  95:7 102:11
  105:21 106:18
  113:9,24 114:2,21
  121:5,6,14 127:21
  128:23 129:16
  136:24 138:23
  139:16 140:11
  141:12 142:19

**formalize**  142:11
**formalized**  142:13
**formed**  127:8
  128:21
**forms**  127:5
**formulate**  99:19
  99:24 100:3
  101:23
**formulated**  104:8
  108:17
**formulating**  53:3
  101:8 106:22
**formulation**
  101:13
**fort**  1:21 5:2 148:9
  149:9
**forward**  85:5
**fossilized**  79:5
**found**  18:24,25
  19:3,4,9 20:23
  21:1 26:5,14,20
  31:13 32:7,24
  35:6,8,9 39:21
  40:25,25 41:14
  42:3 43:21 45:7
  46:14 47:13 48:18
  48:22 66:11 67:11
  72:25 73:13 75:1
  75:12,17 76:5,8
  77:9 81:2 89:9
  91:21 92:9 93:14
  102:12,13 107:5
  108:19 109:2,7
  112:15
**foundation**  12:10
**four**  25:4,14 33:12
  98:6
**fourier**  22:18
**fourth**  42:22 43:20
  45:17

**fragment**  20:21
  22:7 28:1,11,24,25
  33:23 34:7,10
  35:15 36:23 37:2
  37:4,7,15,24 38:18
  40:6,7,10,15,19,25
  41:22 42:6,15
  43:7,8,24 44:1,23
  45:4,11,24 46:8
  47:17 49:14 68:9
  69:18 73:10 88:8
  106:14 111:23
**fragments**  2:20,22
  3:6,8 19:8,10 20:9
  20:12,22 22:14
  23:22,23,25 24:22
  25:5 26:13,14,15
  26:19 27:5,11,22
  29:14 30:2 32:10
  32:15,23 33:18,24
  34:12 35:6,8
  36:11,13,24 40:6
  41:13 42:3,22
  46:13,18 49:8,10
  49:21,25 50:14,16
  50:19,21 61:21
  62:15,18,20 63:7
  63:24 64:4 69:3,8
  69:10 70:22 74:1
  74:3,6,21,25 75:11
  75:16,17 80:6,7,18
  81:2 83:14,15
  84:1 88:6,16,23
  95:12 112:2
  133:10
**frank**  124:15
**frankly**  11:19
  128:13
**frayed**  131:17
**free**  148:11 149:11

**freeze**  94:7,12,13
  94:14 95:6,8
  135:25 136:7
**front**  99:16
**frozen**  78:24 79:1
  79:15,17,19 80:1,4
  80:6,8,18 128:18
  136:1
**ftir**  22:5 106:11
**full**  76:24
**fully**  64:3 125:11
  128:5
**function**  79:7,8,8
**functional**  6:11
**further**  51:5 76:20
  85:23 87:12 90:17
  107:4 147:14,17
  147:19 148:12
**future**  117:3

**g**

**general**  136:20
**generally**  86:5
  127:3
**generic**  87:22
**gentleman's**  102:7
**gentlemen**  18:22
**germane**  60:24
**getting**  96:14
  138:13 141:5
**give**  5:15 70:6 88:4
  100:21 117:22
**given**  99:18
  112:23 117:21
  145:18 146:17
  147:1
**gives**  22:5 106:12
**global**  15:19
**go**  21:21 22:2 25:3
  27:25 28:18 29:24
  33:12 36:1,17,20
  37:17 38:10 39:15

40:2 41:9,24
42:19 43:17 44:17
45:14 46:10 47:8
99:21 114:12
115:9 116:3 121:7
121:25 128:5,14
128:19 129:1,2,5
139:11,11,14,21
**god** 5:17
**going** 6:22 8:14
31:18 57:4 70:5
96:12,17 102:4
105:9 115:10
123:13
**gold** 124:25
125:13,24
**good** 5:23 50:5
114:7 121:20
128:15 137:2,5,6,7
137:24 138:1,18
**goods** 137:15,19
**graduate** 13:17
**graduated** 9:11,12
9:15
**greater** 72:4
**grind** 19:12 27:12
27:19 29:22 42:17
74:22 75:3,5,9,14
75:15 87:3,8,11,13
87:15,17,18,25
88:3,7 138:14
**grinder** 75:18,19
83:22,22
**grinding** 138:14
**gristle** 131:18
**ground** 2:18 18:25
19:5,13,17,21 23:7
23:24 27:13,23
29:22 31:13 32:7
36:8,25 37:24
38:17 39:22 40:8

41:14 42:24 43:22
45:20 48:16 61:5
61:23 64:14,17,22
64:23,24,25 69:4
75:4,6,20,20,20
83:16 84:2 87:14
92:23 134:21
136:4 138:16
**group** 15:10,10,21
18:2
**grow** 136:19
**growth** 95:10
**guards** 138:16
**guess** 80:12

### h

**h** 16:5,8,15,18
18:12 125:12
**haccp** 18:12
**half** 74:8 88:12
98:6,21
**hand** 5:13 6:24
7:10 91:10 109:22
115:19 130:4
131:8 145:18
**handle** 113:22
121:12 122:20
**happen** 53:20
54:12 77:2 96:5
**happened** 51:20
53:16 77:1 78:12
140:5,6
**happens** 128:10
**happy** 66:4 117:1
117:16
**hard** 34:7 36:23
36:24 40:7 110:6
132:4 136:8
137:18 138:25
**harden** 132:2,3
**hardened** 19:4,8
20:12 25:25 26:6

26:14,19 28:12
31:12 32:6,15,23
32:24 35:9 37:23
38:2,20 39:3,20
40:11 41:13 42:7
43:2 45:18 46:14
47:15 48:21 50:8
50:8 61:21 69:7
74:4,16,25 79:5
91:22 92:6,14
95:12 111:6
112:14 113:1
131:13,14,16,18
131:25 132:7,24
**hardening** 112:8
**hardens** 79:7
**harm** 53:22,23
54:9,15 74:19
115:3
**harmful** 115:2
**hazard** 18:11 30:1
136:12
**hazards** 139:3
**head** 59:8
**health** 6:9 30:10
53:21 69:11 85:10
91:23
**healthcare** 102:9
**hear** 51:17
**heard** 52:11 113:4
**heinz** 16:5,8,15,18
125:12,21,23
**held** 5:2 120:22
**help** 5:16 99:18,24
142:5,10
**helped** 100:3
127:21 141:10
**helpful** 84:10
101:22
**helps** 132:19

**hendrick** 1:17
146:11 148:6
149:6
**hereto** 1:23
**hernandez** 109:22
112:3,12,21
**high** 9:11,12,13
128:16
**highest** 108:6
**hire** 116:19
**hired** 54:21 63:20
63:22,23 68:3
88:2 91:5 93:18
97:19 116:20,22
117:7 120:6
134:17 135:11
**history** 70:16
**hmm** 6:21 8:13
30:18 36:4 89:21
103:1 106:10
111:18 129:9
**hold** 36:2 37:18
49:17 50:3 110:14
**holding** 28:22
48:14
**holes** 79:10
**honestly** 60:1
**honey** 106:12
**honeysuckle** 18:25
19:5,16,21 22:5,20
22:24 23:6,15
27:12 64:24 75:3
75:5
**hope** 72:5
**hormonal** 13:8,9
**hospital** 69:16
71:7,24 103:12
**hospitalization**
103:11
**hour** 70:6 96:15
96:22 98:21

hours  96:24 97:2 98:6,13,18,19 120:20
human  9:18,20 114:24
hundred  53:13 129:14
hurt  69:22
hutt  1:9,13 2:4,12 2:14 3:10 5:19,23 6:1,2,22 7:14 8:14 8:20 28:8 51:5 105:17 144:2 145:1,5,11 146:8 146:14,20
hutt's  140:25

**i**

identification  135:14
identified  105:18
identify  104:3
identity  145:13
illinois  9:19 13:4 13:19 17:2
illness  14:12,24 114:11 115:4 121:24 127:23 134:10,18 135:7,8
impact  56:4
implemented  128:4
important  12:12 18:5 68:22,25
improved  85:8
inability  140:23
inasmuch  120:18
inch  29:19,20,21 33:25 37:6 40:16 41:23 42:17
inches  88:13

incident  78:17 89:7 127:8
incidents  14:13 113:16 114:4 119:23 121:17 128:25
include  59:9 60:1 91:7 118:19
included  74:4 97:15,16 99:14,15 100:8 103:18 124:12,18
includes  11:11 97:13 101:21 102:20 147:3
including  58:17 59:15 133:11 138:15
incoming  138:8
incorrect  116:25 131:22
index  2:1
indicate  9:22 39:2 104:4
indicated  105:17 107:19
indicates  23:20 91:16 106:11
indicating  23:23 83:15 84:1 111:24
individual  11:20 19:12 25:8,11 26:2 35:16 49:22 62:25 69:15 73:9 93:12 103:15 115:4
individual's  49:8
individually  93:7
industry  14:6,9 16:16 51:14 52:20 118:2,3,12 119:1

119:24 120:22 122:24 124:11
infant  13:2
information  3:13 7:22 8:25 24:1 52:9 53:2,4,5,14 53:17 68:22 69:24 77:7 78:11 84:5,9 94:9 95:1,3 100:10 102:6 119:24 140:3 142:14,17,20 147:1
infrared  22:18
ingested  19:1,7,17 19:21 20:9,13,20 20:21 21:3 26:2 29:25 30:22 31:3 32:11 33:19,20 49:24 65:23,24 67:16,18,20 68:5,5 68:8 73:1,5,6,8,18 104:1,4 133:16
ingestion  102:10
initial  99:23 127:12
injested  34:4 103:22,22,25
injured  69:22 70:14 71:3 73:22 73:22,24
injuries  54:17 74:13,14
injurious  53:21 69:11,13 91:23
injury  14:24 54:4 62:24 64:5 70:19 71:8,18,19 74:17 114:22,24 132:5
inserted  46:25

inside  8:4 22:24 28:13 29:1 31:4 34:14 40:20,21
inspection  17:16 17:20 18:10 59:5 60:5 84:22 85:6 85:24 138:7
inspections  85:9 85:13
inspector  85:22
inspectors  18:3 85:17
installed  128:4
instance  1:14
instances  113:5
institute  10:14,15 11:1,14
institution  11:14
institutions  10:20
instructions  3:18 64:3
instrument  145:15
insurance  100:8
integrated  138:11
integrity  128:17
intend  135:20
intended  50:17 64:12,14 69:5
intent  128:16
intention  3:9 135:22
interaction  127:20
interactions  12:23 12:24 127:11,15
interested  93:10 147:18
internal  30:15 118:18
internationally  118:25

**interrogatories**
101:16 104:7
**interrogatory**
101:12
**intestine** 30:13
71:8
**introduce** 5:6
**investigation**
73:16 74:7 80:16
93:19 96:24 120:8
**investigative** 56:1
56:5 60:16,20
**invited** 123:15
**involve** 136:2
**involved** 13:13
21:2 114:3 121:17
123:4 125:13,14
**involvement** 128:7
**involves** 58:13
**iron** 13:1
**irregular** 42:6
47:14 102:21
**isolated** 36:24
38:16 40:7 42:23
45:19
**issue** 87:8 96:8
124:14 134:10
137:10
**issues** 16:19,23,25
62:6 128:17
129:11,12,15,20
130:1 137:8
**items** 54:18
102:19

**j**

**j** 16:5,8,15,18
125:12
**james** 4:2,5 5:8,23
146:25 147:5,8
148:19

**january** 146:21
**jcm** 1:3 146:3
**job** 1:25 15:3 16:7
16:11 17:23 84:23
85:5 149:12
**joint** 38:25 39:1
**joseph** 1:17
146:11 148:6
149:6
**joshua** 1:3 5:9
20:13 146:3
**judge** 132:25
**judged** 27:19
**judgment** 54:6
**jury** 9:24 14:15
18:22 19:19 28:4
33:4 36:3,22
37:19 38:13 39:16
40:4 41:25 42:20
43:18 45:15 46:11
47:9 49:5,18 50:4
110:14 130:7

**k**

**kansas** 21:12,14
21:15,23,24
**keep** 60:25
**keeping** 16:16
**kept** 7:20 57:5
135:25
**kind** 116:6 117:20
**kinds** 118:16
129:4 139:20
**knew** 64:17
**know** 21:10 24:17
29:8,11,15 33:22
34:6 37:3 43:6,8
43:25 44:2,3
45:23,25 50:15
60:4 63:10 67:25
68:23,25 74:13,15
76:2,3 77:7,16

78:8,21,23 79:11
79:13,24 80:13
83:10,13 85:19
86:1,9,18 91:9
93:5,13,16 94:20
94:24 99:13
103:10,13,22
107:9 110:17
112:10,14 117:11
131:12 132:12,13
133:6,17,17,19
134:3 140:1
**knowing** 74:11
77:3,5 79:3
112:13 134:23
140:2,2
**knowledge** 7:24
9:2 21:17 54:23
54:25 55:3,24
58:13 60:12 67:14
67:17 68:6 71:19
71:22 72:1,3
73:24 74:5 77:21
80:3 81:4 82:13
92:12 96:6 118:9
118:11,13 120:19
128:13 129:17,25
130:22 132:15
134:4,7 142:7
**knowledgeable**
88:5
**known** 145:11
**kraft** 126:1

**l**

**lab** 25:13 33:9
60:17,18 78:24
83:6 87:4 88:2
89:3,9,24 90:2
91:5 106:4 117:7
**labato** 108:15

**label** 63:9,14,17
63:21 64:6 67:19
**labeled** 30:22 34:4
36:8 38:17 40:9
63:25 66:20 67:19
68:4 73:8 79:15
103:25 107:14
**labeling** 6:10 14:8
62:7,11,13,14
**labels** 63:13 64:1
101:21,22
**labor** 22:12
**laboratories** 2:16
2:23 20:3 21:10
21:16 24:17 27:18
32:17 34:10,11
35:4 36:11 38:16
41:1 46:24 48:20
49:12 50:1 69:9
75:2 90:21 106:8
107:4 108:15,18
109:3 111:15
133:8,25 142:22
**laboratory** 13:16
19:25 20:1 21:5,9
21:10 22:12 23:11
23:13 24:24 29:16
31:2 56:9 67:20
75:8 80:8,20,20
81:1,8 82:5 83:3
88:4 91:1 93:1
97:17 106:8,22
117:10 133:2
134:3,5,7 135:18
**laboratory's** 97:18
**labs** 25:16
**ladies** 18:21
**language** 53:19
54:13
**large** 15:8 23:22
29:13 30:13 33:23

[interrogatories - large]

34:5 37:4 40:14
41:21 42:14 43:6
43:8,11,25 44:21
45:3,23 114:4
121:18 137:2
**largely** 18:2
**larger** 29:19 37:25
39:18 43:9 45:6
**largest** 88:8
**law** 1:20 4:7 78:2
78:6 147:10
**lawsuit** 91:9,13
94:17
**lawyers** 116:18,19
116:19
**layman** 72:4
**layman's** 72:1
**lead** 18:7
**leading** 16:17,17
16:18 18:4 111:1
**learn** 69:23
**learned** 92:2
**left** 40:5 43:23
44:6,22 92:18,24
128:12 131:8
**legal** 5:25 14:12,20
148:7 149:7
**length** 88:13 95:21
**letter** 34:2,3,24,25
35:7,12,15
**letterhead** 21:18
**level** 92:5 130:7,10
**levels** 132:17
**life** 58:15
**ligament** 38:20,24
39:4
**ligaments** 3:2
40:11 43:2 50:7
**likelihood** 77:2,4
**limited** 119:1

**line** 3:19 85:14
102:5 144:3
**lines** 85:21
**lining** 30:14
**listed** 14:21
**listening** 52:7
**little** 9:8 70:5
132:21 133:11,14
**littrell** 93:21
**live** 39:1
**load** 136:9
**located** 21:11,15
21:16
**locations** 59:14,21
**long** 9:13 120:14
132:13
**look** 12:1 21:4
22:3 29:12,17
30:16 31:1,11
33:3 34:1,21 50:9
61:7 75:7 76:24
77:25 87:9,11
91:18 93:7 94:11
106:4,7 108:24
109:20 110:13
111:16 117:4
130:6
**looked** 12:22
24:10 26:12,12
29:13 32:22,23,25
47:12 61:12
**looking** 13:12
18:14 27:19 42:4
51:19 52:9 53:14
61:9,9 66:12,16
84:17 91:19 93:4
93:10 100:10
103:21 110:1
**looks** 22:16 28:12
78:2 111:6 131:16
131:17

**lot** 11:19,23 12:13
12:14 13:13,15,21
13:21,22 79:10
114:5 121:18
**lots** 55:1 88:11
129:10
**lower** 99:5

---

**m**

---

**machine** 1:19
**machinery** 75:7
**macon** 1:20
**magnification**
30:21 37:2,20,22
38:22 40:13 41:16
42:5,25 43:10,23
45:22 46:15 47:11
47:14 50:15
**magnified** 29:9
44:4,7,24
**main** 8:21 131:19
131:19,19
**maintain** 7:15
8:21
**maintained** 9:5
76:4,6 80:7
**major** 13:14 134:9
**majority** 104:22
**making** 51:20 52:9
63:1 84:10
**management**
11:22 14:6,17
16:24 18:9 52:23
59:8 138:9,11
**manhattan** 21:12
21:15,24
**manner** 7:19,20
9:4,5 92:18
**manufacture**
113:23 121:12
122:20 140:7

**manufactured**
43:13 44:15 45:9
47:24 113:13
**manufacturer**
11:25 64:19
**manufacturers**
14:22 15:12
**manufactures**
58:18,19
**manufacturing**
14:10 16:20,20
30:8 57:12,20
58:7,12,15 60:8
61:5 85:13,21
95:21 114:5
121:19 140:4
141:8,14,18 142:3
142:6
**march** 2:15 78:7
78:20,20 106:8
**mark** 6:22 8:14
21:21 48:2 57:1
109:11,16
**marked** 7:9 8:16
18:19 21:25 48:11
48:25 57:3 101:15
101:17,18 102:3
109:18 115:16,19
**master's** 9:18
12:18
**match** 22:5 106:12
**matched** 22:23
23:5
**matching** 23:15
**material** 19:17,22
27:6 32:24 35:18
36:14 52:18 55:1
61:10,12,16,19,20
61:22 63:6 64:20
65:4 66:7,25
67:23 68:4 69:23

73:12,23 74:5,14
74:16 75:11,18,20
75:23 76:8 77:11
77:13,16 78:4,21
79:6 80:4,16,17
83:19 86:10 87:5
89:8 91:20,20,25
93:10 95:13 96:4
102:21,22 103:1,2
110:2,7 111:7,13
112:7,23 113:1
114:22 131:9,13
131:16,18,25
132:2,14,18,22,23
132:24 133:1,5,6,7
133:10,17,24
134:19 135:24
137:14,23 138:6
138:13,17 139:3,9
141:10
**materials** 8:3
26:19 51:19 52:9
52:14,21 53:17
54:3 71:2 73:17
74:8 76:12,13
77:10 79:4 91:8
92:9,14 93:13
99:18 103:18,21
103:24 104:1,24
112:15 117:12
118:15 130:14
133:18,20 135:4
137:12 138:7,8,9
138:10,12 142:10
**matrix** 10:4 82:7
**matter** 56:7 63:3
72:23 83:2 90:3
92:17,20 93:18
94:17,20 96:20,25
99:3 101:13 117:8
135:12

**matters** 113:3
138:24
**mcdonald's** 15:1,4
15:10,17,25 59:7
87:16 118:20
119:2 127:17,19
128:8,12
**mckey** 4:3 147:6
**meal** 25:11
**mean** 31:19,20,23
48:4 51:11 53:4
61:7
**means** 10:17,18
22:10 74:11 119:4
**meant** 38:3
**measure** 87:13
**measured** 33:24
88:10
**measurement**
29:15,16 37:5
87:17
**measurements**
40:17 42:16 43:9
44:2,3 45:5
**meat** 1:5 2:18 3:1
5:10 13:24,24
14:2 18:3,10 22:6
22:22,23 23:4,7,14
23:15 27:14,16,17
27:23 29:22 45:20
48:16 50:6,10
52:19 58:12,14
59:4 60:5 61:23
64:1 70:22 85:7,9
96:10 100:17
101:4,10 105:18
105:19,22 106:13
106:17 107:10,13
113:5,14 117:23
118:17 119:12
123:16 126:25

134:21 136:4,4
138:16 146:5
**mechanical** 80:12
83:22
**mechanics** 87:18
**media** 119:24
129:15
**medical** 69:20
70:3,7,9,16,16,18
71:25 72:8,9 89:7
94:1,3 100:1,2,4,6
102:9,10
**medically** 69:17
**meetings** 123:1
124:11
**member** 11:4
123:16
**members** 59:15
**memory** 86:20
**mentioned** 12:9
51:24 52:1,2
59:21 112:6 114:3
121:16
**mesh** 76:2,15
**method** 85:9
**methodically**
32:20
**methodologies**
104:3
**methodology**
31:15 32:4 56:9
80:9 81:15,18
82:3,6,9,13 98:2
**michigan** 9:17
12:19 17:2
**microorganisms**
136:18
**microscopic** 2:16
20:4 25:21 26:3
29:6

**microscopically**
33:1 80:10
**middle** 22:4
130:16 132:7
**midwest** 2:23 20:3
25:17 27:18 34:11
35:4 36:12 38:16
41:1 46:24 48:20
50:1 69:10 90:21
93:1 107:5 108:15
108:18 109:4
111:15 133:9
142:22,23
**midwest's** 32:17
**mike** 123:8,10,15
**millimeters** 75:24
**minnesota** 59:19
**minute** 6:25
**mission** 85:5
**mistaken** 26:15
**misunderstand**
71:4
**mix** 93:3
**mm** 6:21 8:13
30:18 36:4 103:1
106:10 111:18
129:9
**models** 117:19
**modro** 4:11
**mold** 79:20,23
80:2,2
**moment** 56:18
**months** 78:14,16
89:19
**mouth** 27:8 30:11
**move** 55:8
**moving** 67:13
**mucosal** 30:14
**mullen** 78:6,7
**multinationals**
137:2

**multiple** 49:11,12
  49:20 59:15,25
  81:12 103:4
  123:10 129:13,15
  130:17
**muscle** 38:24

**n**

**n** 4:1
**name** 5:23,25 6:1
  6:2 145:14
**names** 120:24
**national** 124:24
  125:23
**nature** 22:17 26:4
  42:6 44:21 47:14
  49:11 50:9,17
  56:3 66:20 67:25
  82:19 96:3 128:20
**necessarily** 86:5
  87:16 93:11
  136:12
**need** 56:14 76:6
  77:1 84:4 87:4
  122:14
**neither** 89:15,15
  147:14
**nervosa** 13:11
**nestle** 126:1 137:5
**never** 57:22,23
  68:5
**new** 18:8 85:8
**news** 113:16
**night** 74:9
**nine** 89:19
**nobody's** 65:22
**non** 23:8 52:24
  85:2 96:18 102:24
  107:17 110:11
  118:8 119:7 125:2
  125:10

**normally** 31:23
**north** 16:12,21
**notary** 1:17
  145:21
**note** 89:7
**notebook** 56:20,21
  57:2 119:15
**noted** 83:11 145:3
**notice** 1:21 3:9
  17:1 63:10 102:2
**noticed** 14:25
**november** 2:13
  89:23,24 97:14
  98:10,19 134:3,5
**number** 6:23 8:15
  14:10 18:19 19:16
  21:22 22:3 31:11
  32:6 34:2 36:6,20
  48:3,5,6,23 49:4,5
  49:15,17,19,20
  50:3,4,13 84:25
  87:9 94:12 108:9
  108:24,25 109:11
  110:13 111:10,16
  111:21 112:1
  115:20 116:4
  129:24 130:6
  139:8,10
**numbered** 1:15
**nutrition** 9:18,20
  12:13 13:22 15:7
  71:23
**nutritional** 10:5
  12:13 13:8
**nutritionist**
  102:17,18

**o**

**o0o** 143:7
**oath** 68:4,16
  145:12

**object** 31:18 85:2
  96:17 125:9
  141:25
**objection** 16:3
  20:16 23:2,8
  25:15 26:23 27:15
  28:6 30:4 39:5
  40:23 46:22 51:22
  52:15,24 53:7,18
  54:5 55:4,11,19
  64:21 65:5,16
  66:1,9,18 67:5
  69:14,25 75:25
  76:19 79:12 84:6
  87:7 88:14 89:12
  90:4,13 91:11
  92:4,11 95:7
  105:21 106:18
  107:17 110:11
  111:1 113:7,24
  114:2,21 118:8
  119:7 121:5,6,14
  125:2 129:16
  136:24 138:23
  139:16 140:11
  141:12 142:19
**objections** 31:24
**objects** 102:21
  137:18,20
**observation** 75:9
**observed** 69:8
  88:7
**obtain** 12:6
**obtained** 12:3
  13:19
**obtaining** 12:18
**obviously** 34:9
  35:3 93:9
**occasions** 130:17
**occupation** 6:3

**occur** 18:15 85:24
**occurred** 73:9
  99:9 147:20
**occurrence** 18:16
**october** 89:24 98:6
  98:7,18 134:6,8
**office** 78:2,6
  145:18
**officer** 6:12 15:6
  15:21,22,25
  146:15 147:2
  148:14
**officer's** 148:20
**offices** 1:19
**official** 17:25
  108:7
**officials** 123:1,2,6
  124:12
**okay** 6:3,6,14 7:1
  7:12,19,22 8:1,10
  9:4,22 10:9,12,16
  11:6,17 12:3,18
  13:3,18 14:3,14,25
  15:17,24 16:7
  17:1,5,8,23 18:17
  19:15 20:11,18
  21:4,9,13,19 22:22
  23:19 24:10,17,23
  25:3,12 26:8,18
  27:3,10,25 28:8,18
  29:4,8,11,24 30:16
  30:23 31:4,21,25
  32:9 33:3,7,11,22
  34:1,5,21,23 35:11
  35:18,20,23 36:1
  36:15,20 37:3,7,11
  37:17 38:4,10,12
  38:23 39:2,13,15
  40:19 41:4,7,9,17
  41:21,24 42:10,19
  43:4,17,25 44:4,8

Job No. 2486858         CATHERINE ADAMS HUTT - 12/07/2016

[okay - packaging]                                        Page 18

| | | | |
|---|---|---|---|
| 44:14,17,25 45:3,8 | 119:20 120:1,21 | 141:15 142:8,21 | 130:15 132:17 |
| 45:11,14,23 46:1 | 123:14 126:15,22 | **opinions** 18:22 | **ossified** 8:3 19:4,9 |
| 46:10,16 47:2 | 127:14,21 129:13 | 46:20 51:1 53:3 | 20:12 26:6,14,19 |
| 48:1,8,17,23 49:14 | 130:4,11,20 131:7 | 54:22 58:8 72:23 | 27:11 31:12 32:6 |
| 49:17 50:2,12,19 | 132:6,13,16 133:4 | 76:12,22 81:3 | 32:15,24 35:9 |
| 51:1,4 52:4 55:8 | 134:2 137:25 | 83:1 91:3,4 97:19 | 38:2,20 39:4,20 |
| 55:17,22 56:20 | 138:4,20 140:21 | 99:19 100:11 | 40:11 41:13 42:7 |
| 57:1,17 58:2,6,16 | 141:6,21 142:9,15 | 101:2,8,13 104:8 | 43:2 45:18 46:14 |
| 59:1,11 60:3,13 | 142:25 | 106:22 108:14,17 | 47:15 48:17,21 |
| 61:18,24 62:12 | **once** 27:7 32:13 | 117:7,21,22 | 61:21 68:9 69:7 |
| 63:19 64:13,16 | 90:17 | 118:14 119:11,20 | 69:23 73:12,17,23 |
| 65:8 66:5 67:13 | **ones** 25:5 60:2 | 120:2,3,16,23 | 74:4,8,13,16,25 |
| 68:12,15,19 69:20 | **open** 31:13 85:18 | 122:3,9 123:23 | 75:11,18 79:4,5 |
| 70:5,8,17 71:1,9 | **opened** 25:10 | 124:10 132:16 | 92:6,9,14 93:13 |
| 71:20 72:3,7 | 31:22 32:13,18 | 135:12 142:11,13 | 95:12 108:20 |
| 73:11,21 74:12 | 35:4,16 41:14 | **opportunity** 21:4 | 109:1 110:2,15,19 |
| 76:11 77:23 78:4 | 49:22 74:2 90:17 | 110:6 111:7 117:4 | 110:22 111:6,20 |
| 78:12,16 79:2 | 90:17 91:15 | 140:19 | 111:23 112:14,20 |
| 80:15 81:18 82:12 | **opening** 75:23 | **opposite** 31:19 | 112:25 130:13 |
| 82:15,24 83:5,18 | **operate** 39:1 | **oral** 3:10 146:16 | 132:22,23,24 |
| 84:4,19 85:12,16 | **operation** 87:10 | **order** 11:7 12:6 | 133:1 137:11 |
| 86:1,24 87:21 | **operations** 87:10 | 19:20 22:13 25:13 | **ossify** 79:6 |
| 89:15 91:3 93:17 | 118:21 140:6 | 31:15 53:23 76:6 | **ought** 115:9 |
| 94:16,24 95:20 | **opined** 55:23 | 98:3 101:19,23 | **outcome** 147:18 |
| 96:12,13,16 97:7 | 56:11 113:3 | 125:16 141:15 | **outlines** 117:18 |
| 98:5,15,18,23 99:6 | **opinion** 2:13 8:2 | **organisms** 136:17 | **owner** 130:1 |
| 99:17 100:9,13,25 | 18:18,24 19:16 | **organization** 11:1 | **oxygen** 132:2 |
| 102:8,15,24 103:5 | 20:19 21:7 27:10 | 11:25 15:19,23,25 | |
| 103:10,20 104:5 | 30:23 31:12,15 | **origin** 72:8 | **p** |
| 105:2,9,13 106:2,7 | 32:5,5 47:25 | **original** 23:9 | **p** 4:1,1 18:12 |
| 106:16,21,24 | 50:20 58:4 64:16 | 49:13 133:23,24 | **p.c.** 4:3,7 147:6,10 |
| 107:6,9,19,25 | 72:13,21 73:11,21 | 148:13,18,21 | **p.m.** 1:16,17 5:3 |
| 108:3,8,13,23 | 74:20,24 84:5,13 | **originate** 111:12 | 71:11,13,13,14 |
| 109:6,10 110:1,4 | 88:5 90:8 97:3 | 112:3,5 | 78:7 115:11,13,13 |
| 110:10,23 111:9 | 98:11 99:25 100:3 | **originated** 25:5 | 115:14 143:5 |
| 111:16,25 112:9 | 101:23 112:19 | 106:17 | **p.o.** 4:8 147:11 |
| 112:17 113:2,10 | 114:14 116:9 | **originator** 77:22 | **package** 2:20,22 |
| 113:12 114:14 | 117:24 120:4 | 78:3 | **packaged** 133:25 |
| 115:1,7 116:3,17 | 127:6,8,22 128:22 | **osi** 59:16 | 137:15 139:2 |
| 116:23 117:2,6,14 | 128:23 131:10 | **ossification** 95:17 | **packages** 36:9,13 |
| 118:1,11 119:15 | 137:25 139:8 | 96:5,8 130:8,10,11 | **packaging** 36:9,25 |
| | | | 37:25 38:17 40:8 |

**page** 2:10 3:14,19
7:5,5 27:25 28:1
28:18,22 30:16,19
31:11,16 36:1,6,20
37:17 38:10,11
39:15 40:2 41:9
41:24 43:17 44:17
57:18 59:20 72:14
72:17 101:15,15
101:21 102:2
144:3 148:16
**pages** 7:3
**paid** 8:1 96:14,20
96:21 97:17
**parents** 17:6,7
**part** 10:3,23 12:16
12:22,25 13:17,23
15:9 18:4,5 51:15
59:3,7 60:5 84:2
86:7 87:15 88:22
95:18 96:10 103:6
106:3 111:13
119:3 120:3
122:14 124:11,17
124:19
**partial** 88:12,16
88:17
**partially** 38:19
39:3 40:11 42:7
43:2 79:5
**participated**
124:22
**participation**
126:8
**particle** 44:7
**particles** 27:6,21
**particular** 12:2,20
61:10 72:1 77:9
86:14 87:16 102:3
122:14 132:25
138:5 142:3

**particularly** 50:5
102:22
**parties** 147:3,15
**partner** 74:9 94:6
**parts** 27:8
**party** 90:19
146:22
**pass** 51:6 105:9
115:7 143:3
**passed** 17:7,8
75:18,19,23
105:14
**passing** 30:14
105:13
**pathogen** 95:9
136:9 137:10
**pathogens** 95:10
114:9,23 121:22
134:13,22 135:10
135:14,15,24
136:15,17,19,22
137:21
**pathon** 95:9
**patients** 13:11
**pcr** 20:5 25:22,23
81:9,12,19,23 82:4
82:14,16,19 107:5
**peanut** 128:17
**peer** 137:1
**peers** 11:13 137:4
**penn** 9:14
**pennsylvania** 12:4
17:2
**people** 85:1
118:12 132:10,12
**perform** 80:16
135:13
**person** 11:21 30:1
54:4 66:25 67:9
68:3 145:14

**personal** 7:23 9:2
14:24 54:23,25
55:3,24 67:14
81:4 82:12 122:25
128:7
**personally** 145:11
**pertain** 119:18
**pertained** 126:13
**pertains** 95:8
**petri** 33:4,6,13,15
**ph.d.** 2:12 9:19
13:4,19
**phd** 2:14 3:10
**pho** 36:5
**phone** 148:10
149:10
**photograph** 2:17
2:19,21 3:1,6,8
28:1,3,9,19,21
29:5 30:17,19
34:22 36:2,6,6
38:14 39:17 40:4
41:11 42:1,19,21
43:19 44:19 45:14
45:16 46:10,12
47:3,8,10 48:3,4,9
110:15
**photographs**
29:12 46:16,17,23
48:1 49:2,13
108:23 109:21,24
112:18 117:19
**physical** 10:6 13:9
20:4 23:21 25:21
32:22 35:5 36:12
**physically** 17:12
32:22 36:10 86:6
**physicians** 71:25
**pick** 36:17 71:9
**picture** 28:23
30:25 32:9 34:3

37:21 40:5 44:22
48:15 50:5 77:19
103:21 131:8
133:1
**pictures** 26:3
44:22 49:7 54:18
69:15 91:8 103:5
103:11,20 132:14
133:22,24
**piece** 11:24 12:9
12:12 20:10,20,21
37:21 42:5 43:20
44:20 45:17,21
47:12 66:10
110:21 111:5,6
130:8 131:20
132:7,21 133:14
133:16 141:13
**pieces** 26:5,5,7
35:10 38:15 39:20
43:10,21 45:6,18
47:13 48:21
110:19 130:14
133:11,15
**pies** 128:18
**pinpoint** 138:25
**place** 96:7 107:9
114:7 121:20
123:9 138:16
**plaintiff** 1:3,14 4:2
5:9 8:3 57:21
65:11 66:24 67:15
73:19 74:9 77:23
94:6 103:7 104:17
105:3 146:3 147:5
148:21
**plaintiff's** 56:6
57:13 74:12 93:22
99:23 100:13,18
101:5,24 104:6
116:14,18

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

[plaintiffs - processed]    Page 20

plaintiffs 63:20,22
  63:23 101:11
plan 129:1,2
  137:17
planned 138:3
planning 18:14,15
plant 10:7 14:2
  57:20 59:13 75:8
  85:18,23 86:10,14
  86:23,25 92:19,24
plants 16:21 58:13
  58:15,23,24 59:2,5
  59:7,9,10,11,15,16
  59:18,24,25 60:4,6
  60:11 85:13 86:2
  86:5,12,13
plastic 27:6
plate 130:8
play 101:12
  123:20 124:9
played 100:14
  101:2
please 5:5,13,25
  6:17 9:9,23 14:14
  17:11,14 18:21
  19:15,19 25:12
  28:3,8 31:14 32:4
  36:3 37:18 38:13
  39:16 40:3 41:10
  41:25 42:20 43:18
  44:18,18 45:15
  46:11 47:9 49:4
  52:4 111:19
  122:15 123:25
  124:1
plenty 115:25
point 18:11 33:11
  33:12 60:11,22
  79:1 110:14 111:5
  111:19 130:13
  137:5 138:13

pointed 110:23
  112:18
pointing 112:18
points 134:18
portfolio 15:8
portion 107:2
pose 30:1 46:7
poses 45:12 46:8
positive 67:22
possibilities 53:4
  53:16
possibility 52:13
  54:12,15
possible 72:11
  73:18 87:14
  139:13
post 136:3,11
pot 128:18
potential 30:1
  53:22 54:9,11,15
  56:4 63:9,11
  74:19 95:10
  114:24 136:14
potentially 91:23
  112:25 132:5
poultry 18:10 59:4
  60:5 64:1 85:7,9
  85:13 86:2,12
  123:16,18 126:11
  126:12,13
pound 88:12
practice 7:14 8:20
  119:10
practices 14:7,9
  16:14,16 51:14
  117:23 118:2,3,3
  118:16 119:5
  120:17 124:15
  126:10 127:25
  138:19

preceded 129:19
precise 28:25
  45:25 87:17
preclude 137:19
  138:13,17 139:2
precluded 138:10
predicate 54:20
predicated 53:20
pregnant 13:11
preparation 82:2
  98:24 117:10
prepare 8:7
prepared 25:11
  31:3 34:9 49:23
  49:23 77:20 79:9
  79:25 82:5 100:20
  101:19 115:5
preparing 67:10
  98:20,21 148:21
presence 13:1
  61:16,18,20 67:21
  69:7 70:21 95:10
  134:22 137:13,14
  137:23 138:17
  139:9
present 4:10 9:11
  62:16,18,20
  136:12,14
presented 58:5
  88:17 90:6 118:23
  142:8
president 16:11
pretty 102:15
prevent 18:15
  52:21
previous 40:5
  44:22 56:2 108:24
previously 39:21
  41:15 42:4,23
  43:21 45:20 47:12

primarily 105:4
primers 82:4
prior 12:18 96:25
  99:9 130:24 131:1
  131:3,4 132:6
privilege 116:25
  141:22
privileged 116:16
privy 77:6
probably 53:13
  91:17 97:2 105:11
  110:19 115:9
  120:20
problem 89:18
  136:14
problems 127:22
  127:25 129:10
procedure 1:22
  11:7 25:13 29:4
  33:8 36:16 55:25
  56:1,5 60:16,21
  125:17 140:3
procedures 15:15
  56:9 82:21 114:7
  118:19,22 119:5
  121:20 124:16,19
  124:19 125:16
  126:1,5,7,13 128:3
  128:15,16 138:2,4
  138:14 140:5
proceeding 147:16
process 18:13
  57:12,20 58:7
  60:8,10 79:8
  137:16 140:4
  141:8,15,18,20
  142:3,6
processed 19:14
  23:23 27:13,21
  58:14 83:16 84:1
  86:10 91:17 136:4

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

[processing - questioning]                                    Page 21

processing  58:22
  58:24 59:2,5,6,18
  85:23 92:19
processors  124:25
  125:24
procurement
  15:10
produced  1:14
  70:15 100:22
  104:25 113:5,14
product  2:20,22
  3:2 11:20 15:16
  19:1,7,11,17,21,24
  20:3,14,23 21:2
  22:16,17 23:6,12
  24:9 25:8 28:17
  29:23 30:9 31:2
  32:10,12,21 33:19
  33:21 34:3,9,13
  35:16,17 39:22,22
  40:24 42:24 49:9
  50:9,17 52:22
  54:7 56:8 58:8,14
  58:17 60:17 61:8
  61:11,17 62:7,13
  62:21,24,25 63:1,4
  63:11,16,18 64:8
  64:23 65:18 66:11
  66:15,19 67:6,10
  67:12,25 69:4,6
  73:10 74:3 75:1
  76:8 78:25 79:9
  79:13,16,19,22,25
  82:1,19 83:19
  85:14,20 87:14
  89:8 91:15,18,19
  91:21 92:17 93:2
  95:11,16,19 97:17
  97:25 98:1 107:15
  114:9 115:5
  119:19 120:4,7

121:22 130:8
131:19 134:22
136:9,17 137:12
137:15,15 138:25
139:1,4,10 143:1
production  100:19
  100:21 101:1,25
  103:6 112:24
products  20:24
  26:25 27:16 29:25
  51:15 52:19,19,20
  52:21 58:20 59:12
  64:11 113:23
  121:12 122:20
  126:3,6,12,15
  138:16
profession  6:4
professional  11:1
  58:15 69:21 76:1
  117:25 123:1
  128:6
professionals  70:7
  70:9 72:10 118:23
  118:24,24 128:2
  137:19
professor  13:15
program  11:3,5,24
  12:17 76:25,25
  119:3 125:1,25
  137:3
programs  12:2
  118:7 124:18
prolonged  13:10
proper  16:24 64:2
properly  63:21
  76:4 78:22 79:1
  115:5 136:18
protecting  76:7
protein  22:19
proteins  10:7,7

prove  93:22
proved  25:24
  145:12
provide  63:9
  117:1 119:19
provided  7:4 53:2
  53:6,15 65:22
  70:2 71:2 77:12
  77:13 78:13 80:5
  81:20 89:9 94:20
  101:25 108:14
  116:12 117:8,14
  119:16 135:5
  140:8 143:2
provider  102:9
provisions  1:22
public  1:17 26:22
  27:1,4 34:19
  35:21 37:12,14
  38:5 39:11,25
  41:7,19 42:10
  43:13,15 44:12,15
  45:9,12 46:5,8
  47:6,20,24 50:22
  85:10 114:1 115:2
  120:19 121:15
  128:13 145:21
puerto  59:18
purchased  8:5
  19:6 21:1 28:14
  29:2 31:5 34:15
  40:21 91:16 94:6
  94:10,25 95:2,5
  105:24 112:15
  135:24
purpose  62:17
  63:13
purposes  145:16
pursuant  1:21
  147:1

pursued  102:5
pursuing  56:2
put  83:22 97:15
  124:20

q

quadrant  34:22
qualifications
  81:24
qualified  54:2,6
  90:23,25
quality  11:22 14:6
  14:17 16:12,14,15
  22:5 59:8 76:1,25
  106:12 114:7
  117:25 118:19,21
  118:22,23 119:3
  119:11 121:20
  124:18,19 125:16
  125:25 126:9
  127:2,2,22 128:2,3
  128:6,15 129:2
  136:5,6 137:18
  138:2,4,19 141:19
quantification
  82:1 135:15
question  23:19
  25:16 52:5 53:1,8
  65:9 66:5,21
  74:10 76:15 77:16
  83:19 84:7 85:16
  90:5 91:14 93:7
  97:23 106:3 121:4
  121:5,8,15 122:5,7
  122:9,14,16,22,24
  123:25 124:1,2,4,6
  124:7,8 125:9,11
  131:25 132:20
  135:16 136:2
  139:17
questioning  102:5

**questions** 3:18
6:25 51:6 54:21
87:3,6 101:19
105:6,10 119:22
140:18,23 141:11
**quite** 43:11 79:17
**quote** 138:21,21

**r**

**r** 4:1
**raise** 5:12
**ranked** 108:3
**ranking** 108:5,6
**raw** 23:21,24
24:22 64:2 92:19
92:21,24 93:2
136:9 138:7,8
**rd** 2:14
**reached** 100:15
**reactivity** 20:7
**read** 51:17 65:20
66:4 68:11 70:11
70:13 101:20
102:6 104:2
119:25 121:7
122:10,13 124:7
145:1
**readback** 120:25
122:4
**reading** 52:6 70:1
74:24
**real** 81:23 82:14
82:16,18
**realize** 67:8
**really** 30:25
**reason** 93:7
101:17 102:3
107:12 144:3
**reasonable** 51:2
51:10,18 52:8
**reasons** 148:16

**recall** 16:9 48:13
68:20 69:1 100:6
113:16 115:23
125:14
**recalls** 114:10
121:23
**receipt** 99:10
**receive** 104:24
**received** 3:4 13:4
36:9 56:8,10,23
60:17,18 80:1,18
99:14 104:15
**recognition** 11:11
11:12
**recognized** 10:19
10:25 120:12
**recollect** 94:22
95:1 99:11
**recollection** 60:23
71:5 104:14
**recommendation**
11:13
**record** 1:23 5:4
33:9 71:12,15
90:16 99:4,5
104:10 115:12,15
143:6 146:16
147:4
**records** 70:3,15
87:9,11 100:1,4,7
116:5 117:1
**red** 133:14
**refer** 102:5 119:10
122:5
**reference** 62:1,4
71:6 86:16,21
87:22 100:1
101:21 102:4,12
119:11 126:21
128:1 129:18,18
130:15 135:8

**referenced** 88:25
**referencing**
139:25
**referred** 130:17
**referring** 55:6
63:15 128:24
130:16 133:12
**reflect** 117:21
118:16
**reflecting** 116:6
**refrigerated**
136:18
**refrigerator**
135:25
**reg** 8:22
**regard** 23:14 26:7
26:24 55:14 64:1
106:24 113:22
121:11 122:19
137:1
**regarding** 8:2,2
32:6 62:11 63:5
83:14 101:20
103:19 116:6,8
118:14 119:22,23
122:9
**regards** 127:24
**region** 15:18
**regis** 78:6
**registered** 9:21
**registration** 148:8
149:8
**regular** 7:14,15,16
8:20,22
**regulate** 51:16
**regulation** 14:4,16
61:13
**regulations** 51:15
59:4 61:4,15,24
62:2,4,10 63:2,5
74:18

**regulatory** 6:8,9
6:12 10:2,10,17
11:8,18,24 14:7
17:24 18:6 53:19
53:19,23 54:8,13
59:3 61:1 85:7
114:18 134:14
**relate** 95:11
103:12 126:7
**related** 30:9 74:14
75:14 102:10
113:4 127:2
129:14 147:15
**relates** 62:6 74:12
87:25 97:8 119:12
120:16 127:6
136:14,22
**relationship** 135:9
**relative** 14:12
15:22 95:9,11
127:10 129:20
138:6
**released** 78:6,9
**relevance** 95:24
**relevant** 142:8
**rely** 106:21 108:14
108:18 141:17
**remark** 130:9
**remember** 59:14
60:1 79:15 86:24
87:1 88:9 97:11
113:15 141:2,4
**render** 8:2 21:7
54:6
**rendered** 18:17
32:5 46:19 58:4
**repeat** 52:4 124:1
124:4,6
**rephrase** 124:1
**report** 2:16 3:4 8:8
8:14,21 9:1,5

18:18 25:2,3
27:25 28:19,22
30:20 31:17 36:2
36:7 39:3 40:18
41:10 46:24,25
51:17 52:7 53:10
54:22 55:1,23
56:10,12,24 60:18
62:2,5 72:14,18
81:7,21,22 82:14
83:2,8 84:17,17
89:1,4,10,17,24
91:7 93:14 104:2
105:17 106:4,8,11
108:13 116:9
120:1
**reported** 1:19 81:1
**reporter** 1:18 5:12
57:5 109:13 121:8
122:16 124:8
146:12
**reporter's** 2:8
146:8
**reports** 24:20 90:2
117:18 129:15
**represent** 5:6,24
88:20 142:18
**representative**
140:24
**representative's**
140:15
**representatives**
57:22
**reputation** 113:20
118:4 121:10
122:18,23 136:21
**request** 99:15
100:18 101:1,24
117:13,14
**requested** 3:13
56:24 116:4

119:16
**requests** 100:20
101:6,12 103:6
104:23
**require** 76:20
**required** 12:15
53:22 85:22
**requirement**
54:14
**requirements**
11:16 13:24 85:24
116:1 147:19
**research** 81:13
**reserve** 143:4
**reside** 17:3,4
**residual** 23:21
**respect** 12:6 13:20
14:4,16
**respond** 81:7
**responded** 122:24
**responding** 25:1
68:11
**response** 101:24
**responses** 100:18
100:25 101:1,5,11
101:12,16
**responsibilities**
15:4 16:8 17:24
18:6
**responsible** 16:12
16:22 85:12
**responsive** 3:5
23:8 52:24 85:2
96:18 107:17
110:11 118:8
119:7 125:2
**responsiveness**
125:10
**restaurant** 15:14
**restaurants** 15:13

**result** 53:16 81:23
136:16
**resulted** 134:14
**resulting** 134:19
**results** 21:5 26:8
70:20 83:6 90:25
**retained** 21:6,14
**retainer** 14:18
**return** 146:21
**returned** 148:14
148:15,18
**review** 83:18
99:18 100:4 103:8
116:9 140:19
**reviewed** 57:9
71:6 76:11 98:11
103:7 130:5 135:5
140:17
**rico** 59:18
**ridiculous** 113:9
**right** 5:13 7:8
33:14,15 40:7
45:21 54:1 56:19
70:24 71:17 97:13
110:23,25 119:21
137:16
**rigorously** 128:4
**ripping** 30:14
**robach** 123:8,10
123:15
**robustly** 128:4
**role** 15:9,21 16:11
85:8
**roles** 17:18
**rough** 42:6,8
74:16
**routine** 119:25
**rp** 1:3 146:3
**rubber** 27:6
**rule** 99:23

**rules** 1:22
**rulings** 99:22

**s**

**s** 2:10 4:1
**safeguard** 64:9
**safeguarding** 64:6
**safety** 6:8 11:22
11:23 14:6 15:7
15:12,14,15 16:16
16:18 17:16,19
18:9,9,13,14 84:22
85:6 95:9,9,11
113:23 114:1,4,10
117:23 118:2,6,16
118:24 119:5,12
119:23 120:17,19
121:13,15,17,23
122:21 123:2,2,3
124:13,14,15
125:14,25 126:9
127:6,10,25
128:11,16 129:2
129:10,12,14,18
129:19,20 136:5
136:12 137:2
138:15 139:3
**sale** 50:17
**saliva** 67:21,24
104:3
**salmonella** 113:6
113:14,18 114:16
115:2,3 128:17,18
134:19
**sample** 26:2 30:22
31:1 32:12 35:2
67:21 70:22 82:6
82:7 97:23 99:10
99:11
**sampled** 33:20
**samples** 26:1,20
33:10 80:9

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

[sanchez - smooth]                                    Page 24

| | | | |
|---|---|---|---|
| sanchez  4:3 147:6 | 66:16 69:3,6 84:9 | 17:20 84:22 85:6 | significant  62:8 |
| sat  132:14 | 90:1 91:19 98:12 | set  11:16 82:16,18 | 79:20,23 127:17 |
| saw  26:1 37:21 | 100:1,19 103:24 | 101:5,11,16 104:7 | similar  109:9 |
| 57:22 110:8 | 106:14 108:25 | sev  108:9 | 137:3 |
| 115:21 133:2,22 | 110:2 134:17 | seven  127:18 | similarly  66:14 |
| saying  57:22 63:8 | 135:9 137:4 142:2 | shane  78:6 | 128:14 |
| says  25:2 31:20 | 142:10 | shaped  102:21 | simple  141:20 |
| 70:19 93:22 | seeing  86:24 94:22 | share  14:14 122:2 | simply  32:22 |
| 103:21 | 95:1 | 125:20 | 104:23 117:7 |
| scheduled  140:16 | seen  49:2 57:16,23 | shared  125:15,25 | 137:21,21 |
| school  9:11,12,13 | 58:1 65:21,25 | sharing  125:22 | single  67:1 |
| science  6:11 9:15 | 69:15,16 70:18 | sharp  38:3 47:16 | sir  132:9 |
| 9:16,18,20,23,24 | 76:18 79:14 88:16 | shorthand  1:18,19 | site  86:3,7 |
| 9:25,25 10:2,4,19 | 88:22 89:1,4,23 | 146:11 | six  78:14,16 89:6 |
| 10:21 11:24 12:4 | 92:12 100:6,23 | show  26:4 28:3 | size  19:8,10,13 |
| 12:6,10,13,16,19 | 105:23 109:10,24 | 30:24 33:3 38:13 | 23:22 27:12,19,20 |
| 13:20,22,24,25 | 135:5,8 | 39:16 41:25 42:20 | 29:22 33:1 42:17 |
| 15:6,21,22,24 | segregated  86:6 | 43:18 44:18 45:15 | 45:25 50:16 74:21 |
| 50:20 113:4,20 | sell  94:7,12 129:22 | 46:11 47:9 49:4 | 74:23,25 75:3,5,9 |
| 114:15 121:9 | 130:1 | 69:10,10 78:10 | 75:10,14,15,16 |
| 122:17 | semi  50:8 | 118:15 119:15 | 87:3,8,11,17,18,25 |
| scientific  51:2,10 | send  90:11 98:23 | 137:12 | 88:3,7,9 |
| 51:13,19 52:8 | 133:11 | showed  71:2 75:22 | sizes  87:15 |
| scientist  10:10,13 | sending  97:17 | showing  31:1 | slater  4:7 5:10 |
| 10:17 11:8,10,18 | senior  17:24 | 32:10 37:25 42:6 | 7:11 8:17 146:24 |
| 93:5 | sent  19:25 21:6 | 49:20 70:16 | 147:10 |
| scientists  11:3 | 23:12 25:5 31:1 | shown  54:18 | slater.elza  4:9 |
| scope  7:16 8:22 | 56:8 60:17 80:8 | 108:23 112:17 | 147:12 |
| 76:24 | 83:2 87:5 89:3,8 | shows  23:21 | slaughter  85:25 |
| screens  75:22 76:3 | 89:19 97:4 101:7 | sic  34:4 106:9 | slaughtered  86:3 |
| 76:5,6 138:15 | 103:7,8,13,18 | 108:21 | 96:10 |
| seal  145:18 | 117:13 133:8,8,15 | side  40:6,7 43:23 | sliced  23:22 83:15 |
| seawall  126:16,17 | 133:15,16,25 | 44:6,23 45:21 | 83:20,21,24 |
| second  38:15 | separate  21:9 | 131:8 141:25 | slicing  83:23 |
| 39:19 40:6,6 | separated  86:5,8 | sides  13:12 14:11 | sloan  6:13 |
| 73:11 | separately  93:5 | signature  2:7 | small  30:13 32:12 |
| secondly  77:7 | september  78:12 | 144:1 145:2 | 35:12 37:4 40:16 |
| see  6:17 7:2 22:7 | 94:14 95:4 | 146:21 148:6,16 | 110:25 111:6 |
| 24:2,11,18 27:16 | serve  99:24 | 149:6 | smaller  29:19,21 |
| 34:9 37:22 47:14 | service  11:25 | significance  75:21 | smooth  38:1 |
| 57:25 58:1,3 66:3 | 14:11,22,23 17:17 | 94:5 95:5 100:9 | |

Job No. 2486858          CATHERINE ADAMS HUTT - 12/07/2016

[sold - systems]                                              Page 25

sold 26:21,25 27:4
  35:21 37:12,13
  39:11 43:13 44:15
  45:9 46:4 47:24
solely 15:18
solid 60:18
solution 100:18
  101:4,10
solutions 1:5 5:11
  27:14 126:24,25
  146:5 148:7 149:7
somebody 62:17
  63:10 64:16 66:15
  70:19 120:9
somewhat 49:11
soon 71:10
sorry 13:9 38:11
  48:6 52:4,12
  70:12 123:21
sort 11:6,7 12:5
  14:3 91:25
soup 59:6
source 23:24 56:3
  107:13 114:10,23
  121:23
speak 117:9 128:6
speaking 31:23
special 17:20
specialized 9:20
  9:23 71:21
speciation 97:24
species 19:2,18,23
  20:6,7 23:18
  25:24,25 73:2
  81:25
specific 6:6 13:5
  51:23 55:5 61:6,8
  63:3 97:25 106:25
  116:15 119:22
  126:5 129:6
  135:14

specifically 64:23
  85:8 97:13,16
  125:22 127:16
  128:1,24 138:20
spectrum 13:12
  32:21
speculate 136:8
spend 98:20
spent 98:21,24
spit 65:13 67:2
spoilage 136:16,18
spoke 123:6
spoken 123:10,24
spread 32:19
springdale 85:17
  85:19 86:12,17,23
st 9:13
standard 14:6
  33:8 124:20,25
  125:13,24
standards 16:17
  126:9
standpoint 10:5,6
  14:20 107:3
  114:18
start 123:12,12
started 96:13
starts 78:13,16,18
state 1:18 5:25
  9:14,17 12:5,19
  21:14,23 36:25
  80:8 85:14,21
  137:21 145:7,22
  146:12
stated 1:22 62:7
statement 62:3,22
  83:13,17,25 84:8
  84:10 127:24
  128:1
statements 52:16
  64:1 68:19 69:16

117:18
states 1:1 16:21
  17:15 22:4 78:5
  146:1
stem 140:23
steps 139:1,20,24
  140:4
stomach 27:8
  30:13
storage 96:11
stored 78:22 79:1
  79:9,25 136:10,10
strategy 15:7
stream 138:8
street 1:20 86:19
  86:25 148:8 149:8
strike 28:20 29:24
strong 20:1
student 13:17
study 13:5,7 58:7
  80:4
studying 9:14
style 16:10
styled 1:15
subject 64:24
  120:8
submaximal 13:10
submitted 146:19
subpoena 3:5
  56:25
subscribed 145:15
subsequently
  111:14 134:1
suckle 106:12
suffered 71:18
  135:6
suggested 130:14
suite 1:20 4:4
  147:7 148:9 149:9
summaries 72:13
  72:20

summarize 18:21
summary 2:13
summed 97:1
supplement 14:19
supplemental
  100:14
supplements 6:10
supplier 60:7
  119:4 127:17
  138:9
suppliers 15:11
  59:9 119:2,5
  127:18 128:8
supply 15:9 59:8
support 119:11
  120:16
supposed 77:1
supposedly 92:10
sure 29:18 51:23
  57:17 60:15 76:3
  86:21 97:24 98:1
  121:2 139:5
surprised 83:23
  92:5
surrounds 50:10
suspect 91:24
swallowed 30:12
  67:15,17
swallowing 68:20
  69:1 71:3
swear 5:14
sworn 1:15 5:7,20
  65:10,22 66:23
  120:23 131:1,3,4
  146:15
symptoms 71:7
system 18:12
  102:23 127:19
systems 12:23,24
  16:15

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

[tab - tissue]    Page 26

**t**

tab  97:11
table  124:20
tactic  108:21
tactically  108:21
  109:3
tactile  80:14,15,16
  108:19
tactilely  32:23
  36:17
take  3:9 12:5
  13:20 66:16 70:6
  70:17 120:14,20
  123:9
taken  1:15 10:18
  28:22 32:12 49:8
  49:21 73:10 96:7
  109:21 140:15
  147:3,16
talk  9:8 53:10 54:2
  70:8 72:20 104:16
  126:16 129:7
talked  77:15 99:7
  118:4,12 124:13
  124:13 125:7
talking  33:15
  60:25 73:4
tangible  116:5
  117:20 118:15
  119:9 120:15
tape  115:10
tapes  117:19
tasks  81:16
taught  21:23
team  13:17 16:12
  16:13,13,18 59:15
teams  15:14
technical  120:11
technicians  80:21
  90:16 91:1

techniques  22:12
  22:13 25:21 82:2
  83:12
technologist  18:7
  85:1
technologists
  10:14,15 11:2,15
  18:4
technology  18:1
  135:19
tecum  3:5
tell  29:18 34:7
  71:17,20 79:4,23
  114:11 121:24
  127:1 130:7,7
  138:20
telling  63:19 66:23
tells  66:15 86:4
  128:13
temperature
  136:10
temperatures  64:4
tendon  38:20 39:4
tendons  3:2 40:11
  43:2 50:7
tenure  129:19
terms  55:6 70:2
  80:18 82:3 113:16
  113:23 121:12
  122:20
test  11:6 22:18
  24:21 25:23,23
  31:16 67:20,24
  68:1 81:19,23
  97:24 107:6
tested  20:23,24
  23:12 25:6,14
  26:9,21 46:19
  96:1 105:20 133:9
  134:20

testified  5:20
  60:21 68:3,16
  95:20 112:9
  139:14
testify  54:16
testimony  5:14
  51:18 52:7 53:13
  54:22 55:2,24
  64:10 65:10,22
  66:24 69:2 70:21
  70:25 72:21 73:25
  88:20 99:3 120:23
  131:1,3,5 132:6
  140:17,20 141:1
  146:16 147:2
testing  20:9 98:3
  133:4
tests  135:14,19,21
texas  1:1,19,21 4:8
  5:3 15:18 17:4
  146:1,12 147:11
  148:9 149:9
thank  6:20 8:12
  51:7 96:23 115:8
  143:4
thaw  80:7,19,22
theory  93:23
therefor  148:17
thesis  12:22
thing  7:7
things  10:24 11:19
  27:6 30:7 60:25
  95:15 114:12
  117:17,20 119:10
  120:15 121:25
  128:5,14,19,19
  129:2,4 132:1
  136:6 139:8,11
think  7:4 45:3
  60:17,18 89:16
  94:11 98:5,9,19

120:14 130:22,25
  134:11 135:16
  137:4,7 140:16
  142:15
thinks  65:23
third  41:12 42:2
  74:20 90:19 108:6
thought  94:19
thousand  129:14
thousands  58:19
three  17:22 44:21
  72:22 91:13 99:8
  133:15
throat  27:8 30:11
throckmorton
  23:20 148:8 149:8
time  5:3,5 9:10
  12:25 13:3 19:6
  21:1,2 49:13
  71:11,14 78:22
  79:17,20 81:23
  82:14,16,19 91:16
  91:17 95:21 97:14
  97:15,15 98:6,7,9
  98:20,24 99:5,11
  101:18 105:12,24
  107:23 112:16,24
  113:2 115:11,14
  115:21,25 123:12
  123:18 124:22
  125:4 127:20
  133:23 134:12
  135:22 136:2
  137:8,8 143:5
  146:22 147:2
times  29:8,10
  49:11 53:13 85:18
  85:23 99:6 123:10
timing  104:23
tissue  3:1,7,8 19:9
  20:8,13 22:14

Job No. 2486858    CATHERINE ADAMS HUTT - 12/07/2016

[tissue - types]    Page 27

| | | | |
|---|---|---|---|
| 23:5 27:11 28:12 | **tough** 37:1,23 | 109:12,14,15,19 | 70:20 71:3 73:1,1 |
| 28:24 31:13 32:7 | **trained** 10:9,17 | 110:12 111:3 | 73:2,2 75:3,4,6,20 |
| 32:25 35:9 37:1 | 11:8,17 12:1 | 113:10,11,25 | 83:16 84:2 92:18 |
| 37:23 38:1,18,21 | 80:20 90:15,15 | 114:13,25 115:7 | 92:20,21,24 93:23 |
| 38:23,24,25 39:20 | 91:1 102:17,18 | 121:2,6 125:5,8 | 94:6 97:25,25 |
| 40:9,13 41:13 | **training** 16:13 | 129:16 136:24 | 102:11 105:19 |
| 42:3,8 43:1,3 | 51:13 52:17 71:25 | 138:23 139:16 | 106:13,17 107:10 |
| 45:18,19 46:14 | **transcript** 146:15 | 140:11,14,22 | 107:14,16 109:2,8 |
| 47:15 48:17,22 | 146:18 148:22 | 141:4,12,25 | 112:2,4,6,11,20 |
| 50:6,11 61:22 | **transform** 22:18 | 142:19 143:4 | **turkeys** 139:22 |
| 69:8 79:6 91:22 | **transmitted** 9:1 | 146:25 147:5 | **turn** 72:14 116:3 |
| 92:6 96:3,9 | **tray** 32:19 | 148:19 | **two** 6:2 7:5,5 13:6 |
| 108:20,25 109:1,6 | **treated** 69:17 71:7 | **truly** 46:18 77:2 | 13:12 17:18 19:5 |
| 110:8,15,16,18,20 | 94:2,4 | **trust** 56:10 | 26:5,11 29:12,25 |
| 110:21 111:20,20 | **treatment** 70:16 | **trustworthy** 7:20 | 31:13 32:7,18 |
| 111:22,24 112:10 | **trends** 6:12,13 | 9:6 | 35:3 36:8,12 |
| 112:20 114:20 | **true** 46:17 62:5,22 | **truth** 5:15,16,16 | 42:23 43:22 45:20 |
| 131:12,13,14,16 | 68:12,14,16 77:14 | **trying** 87:2 | 73:13,17 75:10 |
| **tissues** 19:4 26:1 | 92:3 94:11 145:3 | **turk** 112:4 | 80:24 86:5,17,22 |
| 75:1 | 146:16 | **turkey** 2:18 3:7,8 | 90:7,10 91:14 |
| **title** 15:6 16:9,10 | **trujillo** 2:5,6 4:2 | 8:3,4 19:1,1,5,13 | 92:6,25 93:3,8,9 |
| 107:25 | 5:8,8,22,24 7:10 | 19:17,18,21,22 | 93:11 95:25 99:8 |
| **today** 6:15 51:18 | 7:13 8:17,19 16:4 | 20:6,10,11,12,13 | 105:11,24 109:2,7 |
| 52:7 54:3 55:2 | 20:17 22:1 23:10 | 20:24 21:1,6 22:6 | 110:8 111:12,14 |
| 60:10 72:22 81:3 | 25:18 27:2,24 | 22:21,24,25 23:6,7 | 112:4,5,15 133:3 |
| 88:21 96:25 98:20 | 28:7 30:5 31:21 | 23:15,18,24 24:10 | 133:25 |
| 98:22,25 99:13 | 31:25 32:2,3 39:7 | 24:11,13,18 25:14 | **twofold** 87:9 |
| 104:25 117:4,15 | 41:3 47:1 48:6,9 | 25:24 26:9,10,20 | **tx** 1:25 4:4 147:7 |
| 117:21 119:16,20 | 48:12 49:1 51:5 | 27:13,23 28:13,16 | 149:12 |
| **told** 65:4,11 66:7 | 51:22 52:15 53:7 | 29:2 31:5,14 32:7 | **type** 20:2 22:15 |
| 66:24 67:18 68:15 | 53:18 54:5 55:4 | 34:15 36:9,17,25 | 54:4 56:1,2 61:8 |
| 78:23 81:3 95:15 | 55:11,13,19 64:21 | 37:24 38:17,21 | 63:3,5,14,17 69:22 |
| **toll** 148:11 149:11 | 65:5,16 66:1,9,18 | 39:21,22 40:8,12 | 70:18 71:21 76:8 |
| **tool** 18:9 | 67:5 69:14,25 | 40:21 41:14 42:18 | 82:6 87:24 107:6 |
| **top** 127:18 | 75:25 76:19 79:12 | 42:24 43:3,22 | 110:7 131:18 |
| **topics** 14:3 | 84:6 87:7 88:14 | 45:20 48:16,18,19 | 135:6 141:9 142:3 |
| **total** 97:2 | 89:12,16,21 90:4 | 57:20 58:22,24 | **types** 10:22,24 |
| **toto** 26:11 | 90:13 91:11 92:4 | 59:2,5,12,24 60:9 | 52:19 54:17 58:17 |
| **touch** 42:8 47:16 | 92:11 95:7 105:5 | 61:5,23 64:14,17 | 58:19 64:2 116:13 |
| 110:6 111:8 | 105:8,13,16 106:1 | 64:22,23,24 65:1 | 118:14 139:11 |
| | 106:20 107:18 | 65:12 69:4,22 | |

| | | | |
|---|---|---|---|
| typical 96:15,21 | undertaken | uwlaw.com 4:9 | vitamin 13:15 |
| tyson 86:19,22 | 116:10 | 147:12 | vitamins 13:1,1 |
| tyson's 137:6 | underwent 25:13 | **v** | voluntary 134:15 |
| **u** | underwood 1:20 | | **w** |
| | 4:7 147:10 | v 1:4 146:4 | |
| u.s. 17:19 | unique 20:6 97:22 | value 84:18 | waco 1:2 17:9,10 |
| ultimately 49:25 | united 1:1 16:21 | variable 95:22 | 17:12 146:2 |
| 68:3 129:22 | 17:15 146:1 | variety 14:5,20 | walmart 94:7 |
| unapp 36:13 | university 9:14,17 | 22:11 83:11 | want 76:1,2 80:19 |
| unaware 69:20 | 9:19 12:5,19 13:4 | various 13:25 60:6 | 128:3,9 |
| uncooked 67:23 | 13:19 21:14,23 | 113:3 | wanted 97:24 |
| undergo 11:7 | unopened 2:18 | verification 76:3 | 130:2 |
| understand 17:13 | 19:5,10 26:6,9,10 | 76:25 77:8,8 | warn 62:15 |
| 19:6 20:1 21:12 | 27:16,17 31:22 | 126:10 140:4 | warned 67:4 |
| 21:17 22:17 24:7 | 32:7,12,16,18 35:3 | verified 20:7 | warning 62:17,19 |
| 49:7,21 53:8 | 36:13 39:21 41:2 | 34:11 | 63:13,14,17,25,25 |
| 54:20,24 62:8 | 41:15 42:4,23 | verify 77:1 | 64:5 69:6 101:21 |
| 63:8 64:10 65:9 | 43:22 45:20 48:15 | veritext 148:7 | 101:22 |
| 65:14 66:20 67:9 | 48:16 73:13,18,20 | 149:7 | warns 69:6 |
| 67:16 72:4 74:2 | 75:10 80:22,24 | version 81:19 | way 9:13 58:8 |
| 74:23 99:21 | 90:7,11 91:8,14 | versus 93:12 | 64:6,9 69:22 |
| 116:18,24 122:7 | 92:6,25 109:2,7 | vertically 138:11 | 73:18 74:13 77:3 |
| 122:22 124:3,5 | 110:9 111:12,14 | 139:14 | 79:3 80:23 81:6 |
| 139:7,17 142:11 | 112:4,6 133:3 | veterinarians 18:3 | 86:6,9 93:17,22,24 |
| understanding | unusual 26:7 | vice 16:11 | 96:3 105:11 |
| 20:25 22:9 23:3 | update 7:15 | video 1:8,13 | 112:13 125:10 |
| 24:24 25:4,7 | upper 9:12 | 117:18 141:14,17 | 134:22 |
| 51:14 52:6 56:3 | upstream 18:14 | 141:20 142:2,6,7,8 | ways 81:12 82:16 |
| 71:1,17 72:21 | 138:8,12 139:1,14 | videographer 4:11 | we've 104:10 |
| 73:5,7,8,15 80:24 | usda 17:16,25 | 5:1 71:11,14 | 124:19,20 |
| 81:13,20,22,25 | 74:18 84:19,21 | 115:11,14 143:5 | website 21:20 |
| 82:11,17,18 83:17 | 85:12,17,21 | videotape 5:1 | week 140:17 |
| 84:3 92:23 99:17 | 107:20,22 108:4 | 57:11,16,19 | weeks 89:6 115:24 |
| 102:17 104:14 | 123:14,15 | violate 61:13 | 132:17 |
| 106:16,19 107:14 | use 81:15,18 82:5 | violation 53:24 | went 9:14,17,19 |
| 111:9 112:1 | 94:13,14 95:6,8 | 54:8 | 19:20 32:19 36:16 |
| 131:21 133:7,22 | 101:7,23 135:24 | visible 141:20 | 64:17 67:1 139:8 |
| understood 65:17 | 136:7 | visual 20:4 25:20 | western 1:1 146:1 |
| 73:12 74:20 91:13 | uses 12:13 | 34:8 35:5 | wet 12:24 |
| 103:14 105:22 | usually 136:3 | visually 80:10 | white 18:25 19:5 |
| 114:6 121:19 | | vitae 2:11 | 19:16,21 22:6,21 |
| 122:4 | | | 22:24 23:6,15 |

Job No. 2486858        CATHERINE ADAMS HUTT - 12/07/2016

[white - ziploc]                                          Page 29

| | |
|---|---|
| 27:12 64:24 75:3 | **worldwide**  15:22 |
| 106:12 | 15:25 |
| **witness**  1:14 3:4 | **worse**  136:23 |
| 5:7,18 28:5 36:4 | **worth**  1:21 5:2 |
| 51:6,7 56:13 | 148:9 149:9 |
| 105:10 115:7 | **written**  68:11 |
| 120:25 122:10,13 | **wrong**  114:12 |
| 143:3 144:2 | 121:25 128:6,14 |
| 146:14,17,19 | 128:19 129:3,5 |
| **women**  13:11 | 139:8,12,21 |
| **word**  53:12 74:22 | **wrote**  103:22 |
| 80:15 | 108:13 |
| **words**  6:2 22:22 | |
| 31:20 | **y** |
| **work**  6:9,10 11:20 | **yeah**  80:15 105:8 |
| 11:21,22 12:22 | **year**  125:17 |
| 13:16 14:15,22 | **years**  17:22 95:25 |
| 15:17 16:5 17:14 | 118:7 123:11 |
| 20:2 59:11 71:23 | |
| 71:24 87:15 90:16 | **z** |
| 90:23 96:14,25 | **ziploc**  22:6 106:13 |
| 97:4,8 98:14 99:3 | |
| 113:19 116:20,22 | |
| 119:3 121:8 | |
| 122:16 123:17 | |
| 134:16 137:18 | |
| 139:2 | |
| **worked**  13:14 15:1 | |
| 15:4,8,8,11,12,13 | |
| 15:19,20 17:1 | |
| 58:14,22,24 59:2 | |
| 71:24 84:19 97:2 | |
| 107:20,22 108:1 | |
| 123:18 125:12 | |
| 139:4 | |
| **worker**  129:18 | |
| **working**  116:8 | |
| 118:6 137:17,22 | |
| 138:1,2,12,18 | |
| **world**  58:20 | |

# Exhibit "P-9"

EXHIBIT
G
Hyatt 12-7-16

# Exhibit "P-10"



# Exhibit "P-11"







# Exhibit "P-12"





PLAINTIFF'S
EXHIBIT
P-12

# Exhibit "P-13"

PLAINTIFF'S
EXHIBIT
P-13

# Exhibit "P-14"

PLAINTIFF'S EXHIBIT P-14

# Exhibit "P-15"

March 2, 2015 at 1:21:08 PM

March 2, 2015 at 1:21:18 PM

PLAINTIFF'S
EXHIBIT
P-15

# Exhibit "P-16"



# Exhibit "P-17"

# Exhibit "P-18"

PLAINTIFF'S
EXHIBIT

# Exhibit "P-19"



**Certified Laboratories, Inc.**        *Full Service Laboratory Established 1926*

October 31st, 2016

Certified Labs of the Midwest
175 E. Crossroads Pkwy, Suite F
Bolingbrook, IL 60440

**Foreign Matter ID:** BG26747

**Final Results**

Three samples of bone fragments and one sample of foreign matter for sample BG26747 were received in a zip lock plastic bag inside individual Whirl-Pak bags. Two packages of ground turkey were also received for comparison. Visual, physical, and microscopic examinations, in conjunction with real-time PCR for Turkey DNA was conducted. Based on the observations and examinations including Real-Time PCR identification, we conclude that the bone fragments and foreign matter labeled as injested contained Turkey DNA. The ground turkey samples also showed the presence of turkey DNA as expected.

The contents of the two ground turkey packages were also physically examined for the presence of fragments. The physical inspection did not reveal bone fragments; however, five hardened connective tissue elements that appeared to have been partially ossified were found (See Figures 4-9).

**Description of samples received**

| Supplied Sample Description | CMW Lab # | Container |
|---|---|---|
| Bone Frag #1 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag |
| Bone Frag #2 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag |
| Bone Frag #3 | BG26747 | Inside a Whirl-Pak within a Zip-Lock Plastic Bag (completely consumed during testing) |
| Injested | BG26747 | Inside a Zip-Lock Plastic Bag |
| Ground Turkey | BG26747 | Inside Consumer Packaging within a Zip-Lock Plastic Bag |
| Ground Turkey | BG26747 | |



PLAINTIFF'S
EXHIBIT
P-19

**Examination**

The visual, physical, and microscopic examinations play a basic role in identifying foreign matter. However, the final confirmation of foreign materials was obtained via real-time PCR identification and comparison with reference materials. Microscopic techniques are used to examine the features. Real-Time PCR was selected to confirm the characteristics of foreign materials.

The real-time PCR assay used for the analysis was originally developed for the detection of turkey (*Meleagris gallopavo*) DNA in meat mixture at a relative amount of 0.1% in both processed and unprocessed samples. The real-time PCR assay contained an internal amplification control and an internal detection assay for animal DNA. The positive result of the internal detection assay for animal DNA and the positive result for turkey DNA showed that the extraction and analysis method were sufficient to detect turkey DNA from bone and marrow. The assay is specific to turkey DNA and has been validated to show no cross-reactivity for beef, pork, chicken, partridge, ostrich, Guinea-fowl, goose, pheasant, Muscovy duck, Peking duck, goat, horse, red deer, roe deer, and sheep. Positive and negative controls were also performed with the analysis and gave expected results.

Please contact me if there are questions or if further information is needed.

Respectfully submitted,


**Neil Rogman**
**Molecular Supervisor**
*Certified Laboratories of the Midwest*

---



**Figure 1. A.** The sample, Bone Frag #1 BG26747 was received in a zip lock plastic bag inside a Whirl-Pak. It consisted of a bone fragment and associated connective tissue (10X Magnification).

**Figure 1. B.** The sample, Bone Frag #2 BG26747 was received in a zip lock plastic bag inside a Whirl-Pak. It consisted of a bone fragment and associated connective tissue (10X Magnification).



**Figure 2. A.** Injested (10X Magnification).



**Figure 3. A.** Bone Frag #1.  **B.** Bone Frag #2.  **C.** Injested **D.** Ground Turkey



**Figure 4.** Contents of two ground turkey packages received in consumer packaging. They were physically examined for bone fragments.



**Figure 5. A.** Hard fragment GT-1 isolated from ground turkey in consumer packaging. It consisted of a tough connective tissue fragment (1X Magnification).



**Figure 5.B.** Hard fragment GT-1 isolated from ground turkey in consumer packaging. It consisted of a tough connective tissue fragment (10X Magnification).



**Figure 6.A.** Hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (1X Magnification).



**Figure 6. B.** Left side of hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 6. C.** Right side of hard fragment GT-2 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 7. A.** Hard fragment GT-3 isolated from ground turkey in consumer packaging. It consisted of a hard connective tissue fragment (1X Magnification).



**Figure 7. B.** Hard fragment GT-3 isolated from ground turkey in consumer packaging. It consisted of a hard connective tissue fragment (10X Magnification



**Figure 8. A.** Fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (1X Magnification).



**Figure 8. B.** Left side of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 8. C.** Center of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue (10X Magnification).



**Figure 8. D.** Right side of fragment GT-4 isolated from ground turkey in consumer packaging. It consisted of a connective a tissue fragment consistent with the characteristics of partially hardened/ossified tendons or ligaments associated with turkey connective tissue. This picture shows the junction between the harder left side and softer tissue on the right side (10X Magnification).



**Figure 9. A.** Hard fragment GT-5 isolated from ground turkey in consumer packaging. It consisted of slightly hardened connective tissue (1X Magnification).



**Figure 9. B.** Hard fragment GT-5 isolated from ground turkey in consumer packaging. It consisted of slightly hardened connective tissue (10X Magnification).

# Exhibit "P-20"





